**In re ELECTRIC MACHINERY ENTERPRISES, INC.,**
**Debtor.**

**Electric Machinery Enterprises, Inc., Plaintiff,**

**v.**

**Hunt Construction Group, Inc., The Clark Construction Group, Inc., and Construct Two Construction Managers, Inc., individually and as joint venturers trading as Hunt/Clark/Construct Two, a Joint Venture, Defendants.**

**Bankruptcy No. 8:03–bk–11047–MGW.**
**Adversary No. 8:03–ap–00811–MGW.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Aug. 28, 2009.

Christopher T. McRae, David J. Metcalf, James S. Myers, McRae & Metcalf, Tallahassee and Tampa, FL, C. Timothy Corcoran, III, Tampa, FL, for Plaintiff.

Jeffrey R. Gans, Michael S. McNamara, Howrey LLP, Washington, DC, Hywel Leonard, John J. Lamoureux, Carlton Fields, P.A., Tampa, FL, for Defendants.

## *FINDINGS OF FACT AND CONCLUSIONS OF LAW*

MICHAEL G. WILLIAMSON, Bankruptcy Judge.

The Orange County Convention Center in Orlando, Florida, is a beautiful conven-

tion space located north of Disney World, in between Universal Studios and Sea World.[1] Throughout the eight-week trial in this adversary proceeding, none of the parties questioned the fact that the Orange County Convention Center was built well and has shown no major construction or design flaws. This adversary proceeding is not about the failure of construction managers and subcontractors to construct a well-built convention space—it is *not* about a failed project. The dispute between the Defendants in this case, acting as the construction manager in charge of the Orange County Convention Center, Phase V project ("Project"), and the Plaintiff, Electric Machinery Enterprises, Inc. ("EME"), one of the three major electrical subcontractors employed on the Project, is, generally, about coordination and efficiency, and who should pay for the costs incurred when neither is achieved.

On March 24, 2000, Orange County, Florida, entered into a contract with a joint venture composed of Hunt Construction Group, Inc. ("Hunt"), The Clark Construction Group, Inc. ("Clark"), and Construct Two Construction Managers, Inc. ("Construct Two"), doing business as Hunt/Clark/Construct Two, A Joint Venture (together, "HCC") to be the construction manager for the Project ("CM Agreement"). Construct Two is a Florida-based construction company. Hunt and Clark are two of the largest national construction management firms. The HCC joint venture was created specifically for the purpose of constructing the Project.

This Project was a substantial undertaking. The Project consisted of the design and construction of a 2.8 million square-foot building with four-story north and south concourses and a 58 foot high, single-story exhibit hall in the center of the building. At the peak of construction, there were 2,500 workers a day employed at the Project site. The CM Agreement executed by Orange County and HCC established a guaranteed maximum price for the Project of $490 million and a "Construction Reserve" of $30 million. HCC committed to a substantial completion date of May 1, 2003.

As set forth in the CM Agreement, HCC's relevant major responsibilities included, specifically, garnering subcontractor bids on all parts of construction, conducting a review of the project designs, creating a project schedule that adequately coordinated the construction of the entire project, and, most importantly, efficiently managing the construction of the project, including the coordination of the work of subcontractors, such as EME.

As a general matter, one of the tasks of a construction manager on a major project such as the Orange County Convention Center is the coordination of all of the subcontractor work. Subcontractor work must generally be done in sequence—each subcontractor's work must be completed in order. If a subcontractor works out of order, it is likely that, if they are able to complete their work at all, they will have either ruined another subcontractor's work, or their work will be ruined by a subcontractor whose work should have been completed first. This is especially true for an electrical subcontractor—which generally completes its work at the end of the line.

The scheduling method that is the industry standard in construction is the critical path method ("CPM"), which is a system for creating an efficient flow of subcontractor work from area to area. To start working in an area, subcontractors must

---

1. The Court conducted an on-site visit, accompanied by the parties, on December 11, 2004, during a break in the trial proceedings.

bring machinery, tools, materials, and workers into that area. If a project is coordinated efficiently, a subcontractor will complete work in one space and move on to the next adjoining space, and then the next adjoining space, and so on. Moving materials, machinery, and tools takes time, and the farther the distance those items must be moved, the more time and money is wasted.

Another typical responsibility of a construction manager on a large project is to conduct an extensive constructability review of all of the design documents to determine whether there are any problems that will require revision. Such review should take place before construction begins, so that no major revisions to the design will be required in the middle of construction. During construction, when questions arise as to the designs, requests for information ("RFI's") are sent to the project's architect or design team. RFI's are intended to be a process to clarify design specifics, not a process for making revisions to project designs.

Finally, for many subcontractors, including electrical, much of their work cannot take place before the building is "dried-in" without risking ruination in the face of bad weather. A space is "dried-in" when the roof and exterior walls are complete such that the interior space will be protected from the elements. It is a fact commonly known in central Florida that the summer months bring summer storms, which may not last long but generally involve large amounts of rainfall.

HCC sought bids for the electrical work on the Project, which it divided into three parts for purposes of bidding. EME was the winning bidder on parts 16.2 and 16.3 of the electrical work. Another electrical subcontractor, Encompass Electrical Technologies–Florida, LLC, also known as Tri-City Electrical Contractors ("Encompass"), was the winning bidder on part 16.1 of the electrical work. Florida Industrial Electric ("FIE") was the electrical subcontractor employed early in construction on the Project, generally responsible for bringing power into the building. EME, Encompass, and FIE were the primary electrical subcontractors on the Project. EME signed an electrical subcontractor agreement on August 6, 2001 ("Trade Contract") (J. Ex. 239) in the amount of $13,386,827, and began working on the Project.

EME's Trade Contract, like the contracts of all subcontractors employed on the Project, attached and included in the supplemental "Contract Documents" a document entitled "General Conditions." The Trade Contract and General Conditions include provisions that create a contractual obligation on the part of HCC to adequately coordinate and schedule EME's work on the Project.

When EME signed the Trade Contract in August 2001, the overall project schedule in operation was called the "HOLE" schedule, which was produced in November 2000. On August 9, 2001, three days after EME signed the Trade Contract, and one day before HCC affixed its signatures, HCC issued a new overall project schedule, or "GMUP" schedule, identified as the OC 25 schedule ("OC 25"). While the HOLE schedule may have created the appearance of an orderly, properly scheduled project in which work patterns followed an efficient flow from space to space, the OC 25 schedule did not. The OC 25 schedule's coordination of work resulted in something more akin to a game of hopscotch than a sensible work flow and clearly departed from the critical path method. Moreover, the OC 25 schedule was compressed. Although the estimated date of completion of the Project had not changed, work had not progressed as quickly as anticipated in the HOLE schedule. Therefore, the OC 25

schedule, in order to keep the final date steady, compressed all aspects of the work on the Project. Many of the individual tasks listed in the OC 25 schedule were allotted less time for completion.

The OC 25 schedule was not followed for long. Throughout the course of the work on the Project, scheduling became a bigger and bigger problem for subcontractors. While additional versions and updates to the GMUP schedule were issued, the overall plan for the Project was not reconfigured again as Project conditions changes. Instead, HCC began to coordinate work through short-term look-ahead schedules rather than through an overall project schedule. As the Project was nearing completion, even these look-ahead schedules had been abandoned. The result was an inefficient mess in which trade contractors stumbled over each other, work had to be re-done in many places, and EME's work teams were required to move haphazardly throughout the Project as directed by HCC on an almost daily basis.

Prior to construction, HCC never conducted a constructability review of the electrical drawings, and as a result, EME was required to use RFI's to fix design defects throughout the course of construction. Because spaces where EME was working had not been "dried-in" when scheduled, when a storm occurred on May 30, 2002, several areas of work were ruined. The trouble was complicated by the failure of HCC to use adequate equipment to remove the storm water from the building. Somehow, in what appears to this Court to be a state of chaos, a convention center was built.

Discussions arose as early as October 31, 2001, regarding a demand for additional payment to EME for additional costs arising from HCC's failure to competently schedule and coordinate the subcontractor work on the Project (see Pl.'s Ex. 47). Towards the end of the work on the Pro-ject, HCC had instituted an ad hoc claims process through "change orders" signed by HCC and various subcontractors, allowing for additional payment above the contract amount due to changes in work or due to the impact of scheduling. Change Order No. 17 (Pl.'s Ex. 221), which was forwarded to EME on May 1, 2003, specifically addressed the impact of scheduling on EME and provided that $1.5 million would be the first payment on that claim, the final amount of which would be determined at a later date. The parties are now at that later date.

On May 29, 2003, towards the end of construction, EME filed a petition for relief under Chapter 11 of the Bankruptcy Code. However, EME completed its work on the Project during the post-petition period. This adversary proceeding commenced on December 23, 2003, with a Complaint for Injunctive Relief (Doc. No. 1) and a Motion for a Temporary Restraining Order and Preliminary Injunction (Doc. No. 3) filed by the Debtor, EME, against Hunt, Clark, and Construct Two, separately and collectively as joint venturers, and Orange County, Florida. Counsel for EME had learned that various HCC documents relating to the Orange County Convention Center project were in the process of being destroyed, deleted, or literally tossed into a dumpster at the Project site. The Court issued a Temporary Restraining Order on December 24, 2003 (Doc. No. 10), and a Preliminary Injunction on January 6, 2004 (Doc. No. 26). Several of the particularly relevant documents produced at trial were recovered from the dumpsters at the Project site at significant expense to EME. Orange County was dismissed from the proceeding on November 1, 2004, pursuant to a settlement reached between it and EME (see Doc.No. 290, 292). EME's Motion for Sanctions Against HCC For Post–Petition Set-off of Amounts Due Under Contract

(Bankr.Doc. No. 374), filed in the main case, was consolidated with this proceeding for purposes of trial (Order Consolidating, Bankr.Doc. No. 374).

The trial in this proceeding lasted a total of 39 days, spread out over the greater part of a year.[2] The trial proceeded on the Amended Complaint (Doc. No. 22), which contains five counts. Count One is for injunctive relief against all Defendants, to prevent the destruction of the books and records of HCC relating to the Project until they could be reviewed by EME and for damages based on spoliation of evidence. Count Two is for turnover of $538,280, the amount still owed to EME under the Trade Contract. Count Three is a claim for approximately $11 million in damages for HCC's breach of implied duties and warranties, including the implied duties to coordinate the work on the Project, to provide EME with reasonable access to the work site, and to provide adequate plans and specifications to EME. Count Four is a breach of contract claim against HCC, seeking as damages the amount remaining due under the Trade Contract of $538,280. Count Five is a claim for $11 million in damages for breach of contract based on HCC's breach of its contractual obligation to properly coordinate and schedule the Project and the resulting delays, disruptions, and damages experienced by EME.

In its Answer (Doc. No. 113), HCC raised a number of affirmative defenses, including estoppel, waiver, accord and satisfaction, release of claims, setoff, statute of limitations, and laches. Two other affirmative defenses pled by HCC are, first, that the claims are barred, in whole or in part, by EME's "failure to follow the contractual dispute resolution procedures" agreed to in the Trade Contract, and second, that the damages, if established, "were caused by the actions or nonactions of persons or entities other than HCC and for whom HCC is not liable." HCC demanded a jury trial on the claim of spoliation in Count One of the Complaint, which the Plaintiff moved to strike. Prior to trial, the Court granted the motion to strike the jury demand because, first, in the Trade Contract the parties waived the right to a jury trial, and, second, there is no right to a jury on a claim of spoliation. (Doc. No. 242).

In the findings of fact, the Court will first analyze the contractual relationships between the parties and provide an overview of the specific requirements regarding scheduling and coordinating in the Trade Contract and General Conditions. Second, the Court will discuss at length the evidence presented concerning the failure of HCC to meet its contractual obligations to adequately schedule and coordinate the work of subcontractors on the Project, including EME, and will address the cause of this failure. Third, the Court will weigh the facts supporting HCC's various defenses to liability. Next, the Court will consider the appropriate measure of damages to be applied to this breach of contract action, based on the facts of this case and the testimony of the experts. The Court will then address HCC's claim that it is owed back-charges under the Trade Contract. Finally, the Court will consider the evidence supporting EME's claim for spoliation of evidence based on the actions of HCC in December 2003.

In the conclusions of law, the first question addressed is the Court's jurisdiction over this proceeding. Second, the Court will address Count One and EME's claim based on spoliation of evidence. Third, the

---

**2.** During the nearly eight-week trial, testimony was received from 25 witnesses. The trial record is 14,191 pages in length consisting of a consolidated trial transcript of 8,287 pages and 1.424 separate exhibits.

Court will analyze the breach of contract claims in Counts Four and Five; fourth, the various defenses asserted by HCC; and fifth, the standard of damages that should be applied to the breach of contract claim under Count Five of the Complaint. Sixth, the Court will address EME's motion for sanctions for violation of the automatic stay. Finally, the Court will turn to the award of attorneys' fees in this case. Because the Court will rule in EME's favor on the breach of contract claims, Count Three, for damages based on HCC's implied duties, will be dismissed as moot. Count Two, the claim for turnover, will be granted, consistent with this Court's ruling on the breach of contract claims.

Based on the evidence before the Court, and for the reasons set forth below, judgment will be entered against HCC for damages arising out of breach of contract in the amount of $6,376,000.00, plus interest, attorneys' fees, and costs.

## FINDINGS OF FACT

### I. The Contractual Relationships Between the Parties

■ While EME has asserted several claims for relief in this action, for the most part, this is a breach of contract action. EME contends that HCC, as project manager, breached its contractual obligations under the Trade Contract with EME to properly manage, schedule, and coordinate the work on the Project and that this breach caused damages to EME. In order to fully understand HCC's overall role with respect to the Project, the Court will first review the provisions of the CM Agreement that define that role. While the provisions of the CM Agreement do not serve as the basis for EME's action against HCC, they do demonstrate HCC's role and responsibilities with respect to the Project and give context to the similar provisions contained in HCC's Trade Contract with EME. Second, the Court will generally review the Trade Contract between EME and HCC and the provisions that impose a duty on HCC to properly manage and coordinate the work of the trade contractors, including EME, on the Project.

### A. HCC and Orange County

HCC and Orange County's relationship is reduced to writing in the CM Agreement, which imposes a variety of management obligations on HCC. While EME is not a party to the CM Agreement, the CM Agreement is an attachment to the Trade Contract. Although the CM Agreement was not included in the bid package originally provided to EME, representatives of HCC testified that EME would have been allowed to review the CM Agreement if they had asked, and that EME was entitled to rely on it. (Trial Tr. 7684:20–7685:3, July 21, 2005.) While HCC is correct in arguing that the CM Agreement cannot be the basis for EME's breach of contract claim, the provisions of the CM Agreement do, however, establish what were HCC's role and responsibilities with respect to the Project. Additionally, understanding the role that HCC had contracted to fill on the Project as the construction manager will help to put the provisions of EME's Trade Contract into their proper perspective.

The CM Agreement designated a "Construction Team" for the Project composed of Orange County, its project director and representative, HCC as construction manager, and the Project architect, Helman Hurley Charvat Peacock/Architects, Inc. ("Architect"). (J. Ex. 239, CM Agreement, Art. 1.1.) The Architect's role was to "provide leadership during the design phase with support from the Construction Manager." (Id.) The construction manager, HCC, was to "provide leadership to the Construction Team on all matters relating

to construction." (*Id.*) In the CM Agreement, HCC accepted full responsibility for the whole of the construction of the Project and agreed to exercise its best skill and judgment and to be judged by a high standard of care for the industry. The preamble states that HCC accepts "the relationship of trust and confidence established between it and the Owner." (J. Ex. 239, CM Agreement pmbl.) Further, HCC agreed to accept "the relationship of trust and confidence established by this Agreement, ... exercise [its] best skill and judgment in furthering the Project in order to adhere to and comply with ... the Master Project Schedule." (J. Ex. 239, CM Agreement, Art. 2.1.1.1.) HCC's services were to "be judged by a standard of care, that is consistent with the standards and quality prevailing among first-rate, nationally recognized construction management and general contracting firms of superior knowledge, skill and experience engaged in projects of similar size and complexity." (J. Ex. 239, CM Agreement, Art. 2.1.1.2.) The CM Agreement also required HCC to provide efficient business administration and superintendence in order to complete the work in a sound way, consistent with the requirements of the contract documents. (J. Ex. 239, CM Agreement, Art. 1.)

HCC assumed full responsibility for all tasks required to construct the Project for Orange County, including the coordination and scheduling of the work on the Project. The CM Agreement described HCC's responsibility as follows:

> The Construction Manager's construction responsibility is all inclusive. It shall be the Construction Manager's responsibility to administer, *coordinate, schedule,* obtain, contract, inspect, control, arrange, supervise, manage and/or otherwise provide and perform all the Work in a manner that is in full accordance with the requirements of the Contract Documents.

(J. Ex. 239, CM Agreement, Art. 2.4.1 (emphasis added).) As this provision indicates, the primary function of HCC as Construction Manager was to schedule and coordinate all the work on the Project, which largely consisted of coordination of the trade contractors. To accomplish this coordination, HCC was obligated under the CM Agreement to develop a critical path method ("CPM") network schedule and bar chart schedules to illustrate the activities of the trade contractors and the logical relationships between the activities. The development of the Project schedule was to be an ongoing process, and "[a]ll changes in the planned sequence, interrelationship, description, or duration of any activity [were to] be incorporated into the networks, as they are determined." (J. Ex. 239, CM Agreement, Art. 2.2.3(1).) HCC was obligated to "distribute updated CPM plots and bar charts to the Owner on a monthly basis." (*Id.*) The CM Agreement states that the "schedule will be used to plan, analyze, and control progress during the construction and occupancy phases of the Work." (*Id.*)

The CM Agreement specifically described HCC's scheduling responsibilities both before and during construction. Article 2.2.3(2) of the CM Agreement required HCC to prepare and incorporate, at the required intervals, the following schedules:

> (a) Master Project Schedule—Within 4 weeks of receiving each set of Schematic Drawings, Design Development Documents, and the Construction Documents from the Architect, the Construction Manager shall submit a Master Project Schedule for the Work covering the permitting, all submittals requiring Owner acceptance or approval, construction, and occupancy of the Work. This CPM schedule will serve as the framework for the subsequent development of all detailed schedules. The Master Project Schedule shall be produced and updated

monthly throughout the term of this Agreement by the Construction Manager. . . .

(b) Pre–Bid Schedules (Sub–Networks)—The Construction Manager shall prepare a construction schedule for that portion of the Work encompassed in each Trade Contract and material/equipment supplier bid package. The schedule shall be sufficiently detailed as to be suitable for inclusion in the bid package as a framework for contract completion by the successful bidder. It shall show the interrelationships between the Work of the successful bidder and that of other Trade Contractors and material/equipment suppliers and shall establish milestones keyed to the overall Master Project Schedule.

(c) Construction Schedules (Sub–Networks)—Upon the award of each Trade Contract, the Construction Manager shall develop, with the Trade Contractor's input, a schedule which is more detailed than the Pre–Bid Schedule included in the specifications, taking into account the Work schedule of the other Trade Contractors. The Construction Schedule shall include as many activities as necessary to make the schedule an effective tool for construction planning and for monitoring the performance of the Trade Contractor. . . .

(J. Ex. 239, CM Agreement, Art. 2.2.3(2),) Once construction began, the CM Agreement required that HCC do the following:

> [C]ontinue to provide current scheduling information and provide direction and coordination regarding milestones, beginning and finishing dates, responsibilities for performance and relationships of the Construction Manager's work to the work of its Trade Contractors and suppliers to enable them to perform their respective tasks so that the development of construction progresses in a smooth and efficient manner in conformance with the overall Master Project Schedule.

\* \* \*

> The Construction Manager shall hold job-site meetings at least once each week with the Construction Team and at least once each week with the Trade Contractors and the representative of the Architect, or more frequently as required by Work progress, to review progress, discuss problems and their solutions, and coordinate future Work with all Trade Contractors.

(J. Ex. 239, CM Agreement, Art. 2.4.5.)

The key purpose of the detailed scheduling obligations assumed by HCC was to provide for the efficient and orderly coordination of the various trade contractors, suppliers, and others performing work on the Project so as to ensure the timely completion of the Project. The CM Agreement specifically stated that schedule conflicts among the trade contractors were not merely undesirable, but they constitute "errors, omissions or deficiencies" in HCC's work, which it would be required to "promptly correct" at its own cost. (J. Ex. 239, CM Agreement, Art. 2.1.1.3.) The CM Agreement required HCC to:

> [E]stablish, implement, and maintain throughout the entire period of the contract administration, practices so that the status of planned and actual Work is progressing in a proper, orderly, harmonious, well documented, well coordinated manner without conflict, interruption, disruption or delay in the schedule prosecution, execution, and completion of the required Work.

(J. Ex. 239, CM Agreement, Art. 2.4.11.) The CM Agreement further provided as follows:

> [S]o as to ensure that all of the Work is well coordinated, executed without delay and completed within the contract time period, and done in full compliance and

conformance with the requirements of the Contract Documents, [HCC] shall establish, implement and maintain throughout the entire period of the contract procedures and practices to supervise, monitor, and control those portions of the Work provided and performed by all Trade Contractors, subcontractors and others.

(J. Ex. 239, CM Agreement, Art. 2.4.11(9).) To ensure that it would have the necessary capabilities to undertake this intricate scheduling and coordination effort, HCC pledged to "maintain off-site support staff and competent full-time staff at the Project site authorized to act on behalf of the Construction Manager to coordinate, inspect the Work in place, and provide general direction of the Work and progress of the Trade Contractors...." (J. Ex. 239, CM Agreement, Art. 2.4.2.)

In addition to the above, a litany of other provisions obligated HCC to address scheduling, coordination, and constructability issues on the Project. For example, the CM Agreement required HCC to do the following: (1) submit monthly reports regarding cost, schedule, and claim issues (J. Ex. 239, CM Agreement, Art. 2.2.2(2)); (2) use the CPM schedule "to plan, analyze and control progress during the construction" (*id.* at Art. 2.2.3(1)); (3) develop a construction schedule that "shall include as many activities as necessary to make the schedule an effective tool for construction planning and for monitoring the performance of the Trade Contractors" (*id.* at Art. 2.2.3(2)(c)); (4) submit written comments to Orange County and the Architect before construction begins regarding construction feasibility and constructability (*id.* at Art. 2.3.1); (5) disclose any known defects in the design, drawings, specifications, other construction documents, the constructability of the design, and numerous other issues (*id.*); (6) waive any claims based on design defects HCC reasonably should have identified in its pre-construction re-view (*id.* at Art. 2.3.2); (7) interface the work of the trade contractors so the work will be sequenced to maintain completion on schedule (*id.* at Art. 2.3.7); (8) report to Orange County on any "omissions, lack of correlation between drawings, and any other deficiencies noted" in the pre-construction phase (*id.*); (9) "coordinate" the work and "provide general direction of the Work and progress of the Trade Contractors" (*id.* at Art. 2.4.2); (10) ensure "that the portions of the Work provided and/or performed by Trade Contractors, subcontractors, and others is fully coordinated" (*id.* at Art. 2.4.10); (11) "[p]romptly address[ ] and resolv[e] any conflicts, gaps, or uncertainties that exist in the Contract Documents or which occur during the Work so as to ensure that the Work of all of the Trade Contractors, subcontractors, and all others is clearly understood [and] fully coordinated" (*Id.*) In sum, HCC was responsible for all matters relating to the construction of the Project.

## B. EME and HCC

EME's claim for breach of contract is based on HCC's breach of its duty, under the Trade Contract, to schedule and coordinate the work on the Project. HCC has argued that no such duty can be found in the Trade Contract or other contract attachments binding on the parties. The provisions of the Trade Contract giving rise to a duty to schedule and coordinate the work on the Project will be described thoroughly below, in the Conclusions of Law. This section will provide an overview of the Trade Contract and the general relationship between the parties. To the extent relevant, it will also present the testimony of various representatives of HCC and EME regarding HCC's contractual obligations.

Under the Trade Contract, EME agreed to perform specific categories of electrical

work on the Project in exchange for the contract price of $13,376,827. EME signed the Trade Contract on August 6, 2001, and HCC affixed its signature on August 10, 2001. (J. Ex. 239, Trade Contract Agreement, § 1.5; J. Ex. 12, 2.) The Trade Contract is a 43–page document, which specifically incorporates by reference several attachments. Also attached to the Trade Contract are the "Contract Documents," which "supplement and complement" the Trade Contract. (J. Ex. 239, Trade Contract Agreement, § 2.2.) Attachment III to the Trade Contract is merely a list of these Contract Documents. The list alone is 96 pages long. (J. Ex. 239, Trade Contract Agreement, § 2.1; J. Ex. 239, Attach. III.) Various provisions of the Trade Contract and Contract Documents required HCC to schedule and coordinate the activities of the trade contractors.

The most important contractual provisions are summarized as follows. Under the provision of the General Conditions describing "Information and Services Required of [HCC]," HCC is required to provide staff for the "coordination and direction" of EME's work and to "establish procedures for coordination among the Owner, Architect, Trade Contractor, other Trade Contractors and the Construction Manager with respect to all aspects of the Project." (J. Ex. 239, General Conditions Art. 2.1.3.) Article 5.1.1 of the General Conditions, which apply to all trade contractors working on the Project, provides that the "Construction Manager will provide for coordination of the activities of other Trade Contractors...." (*Id.* at Art. 5.1.) Article 5.1.2 provides that "the Construction Manager will schedule and coordinate the activities of the Trade Contractor in accordance with the latest Project Construction Schedule." (*Id.* at Art. 5.1.2.) Under Sections 9.3 and 9.4 of the Trade Contract, EME was required to "participate and cooperate in the development of HCC's project schedule" and to

"continuously monitor HCC's Project Schedule so as to be fully familiar with the timing, phasing and sequence of operations of its Work and of other work on the Project...." (J. Ex. 239, Trade Contract Agreement, §§ 9.3–9.4.) Clause A.5.1 of Attachment II of the Trade Contract required the parties "to mutually agree to a schedule that will allow for the efficient completion of Trade Contractor's Work, as well as coordination with the overall project schedule." (J. Ex. 239, Attach. II cl. A.5.1.) Under Article 4.10.8 of the General Conditions, EME was to furnish to HCC short-term interval schedules covering eight week periods, "two week history and six week future." (J. Ex. 239, General Conditions Art. 4.10.8.)

Although EME was required to both participate in the development of the overall project schedule and develop its own construction schedule in coordination with the overall project schedule, it was not able to do either. As described below, EME was not able to participate in the development and monitoring of the overall project schedule, in compliance with Section 9.3 of the Trade Contract, because HCC never provided EME with an updated and relevant overall project schedule. (Trial Tr. 4232: 9–13.) From the date of the execution of the Trade Contract through completion of the Project, an accurate overall project schedule never existed. Additionally, and as a consequence, EME and HCC never "mutually agree[d] to a schedule that will allow for the efficient completion of Trade Contractor's Work, as well as coordination with the overall project schedule." (J. Ex. 239, Attach. II cl. A.5.1.) HCC's construction manager Pete Milner testified on this point as follows:

Q. And what they [EME] have to rely on in becoming familiar with the timing, phasing and sequence of operations is HCC's schedule. Correct?

A. Yes, sir.

Q. Okay. So in order for [Section 9.3] to make any sense, then, HCC'S schedule better be correct and up-to-date. Right?

A. I think you can make that leap, yes.

(Trial Tr. 4232: 9–17.) As elaborated below, an accurate overall project schedule never existed.

It is clear from the evidence that HCC refused to acknowledge its responsibilities as problems with project coordination continued throughout the course of construction. For example, EME's Assistant Project Manager Barry Hughes testified that when EME approached HCC during construction about the problems of lack of coordination and scheduling, HCC replied with its consistent refrain, we will "move the job along as we see fit [and] . . . deal with [the] repercussions later." (Trial Tr. 284: 15–16, Oct. 18, 2004; Pl.'s Ex. 242, Record of Conversation no. 64.) These repercussions would presumably include damage claims based on the lack of coordination. Mr. Hughes testified that he viewed HCC's role as including the coordination of the Project, but that HCC's typical response to objections to the poor coordination of the work of the trade contractors was as follows: "You take care of it, it's your responsibility." (Trial Tr. 202:7.) "I don't care. Read your contract." (Trial Tr. 241:5–8; Trial Tr. 338:21–23, Oct. 19, 2004; Trial Tr. 557:25–558:7, Oct. 20, 2004.) "We will deal with repercussions later." (Trial Tr. 284:15–16; Pl.'s Ex. 242, Record of Conversation no. 64.)

In accordance with HCC's position at trial, HCC Construction Manager Pete Milner testified that he did not believe that HCC had *any* contractual obligation to coordinate the work of the trade contractors. He testified specifically as follows:

I believe I've testified, again, not being a lawyer, I don't believe that our trade contract requires or obligates us to do that coordination to the trade contractor. I believe the issues of fairness and reasonableness are those—are what give us that relationship with our trade contractors, to help coordinate their work.

(Trial Tr. 4246:10–17.) This position is not supported by the Trade Contract.

During the cross examination of Mr. Milner, he was asked whether his earlier testimony that HCC owed no coordination obligations to EME was contradicted by Section 5.1.2 of the General Conditions. He responded as follows:

Q. [T]he question I'm asking is, sir, would you not agree that section 5.1.2, where it says the construction manager will schedule and coordinate the activities of the trade contractor, that contradicts your testimony that you had no obligation to coordinate the work on the project?

A. If your question is related to looking at 5.1.2 in isolation without the rest of the contract, is it contrary to my testimony as far as our obligations for coordination.

Q. That's my question.

A. Is that your question? Then my answer would be, yes, it is contrary to my testimony.

(Trial Tr. 4408:24–4809:11, Feb. 24, 2005; *see also* J. Ex. 239, General Conditions Art. 2.1.3.) Although he persistently denied that HCC owed any duty to coordinate the work of trade contractors, Pete Milner did agree that HCC had to be *reasonable* in how it coordinated the trade contractors. (Trial Tr. 4235:5–7.)

HCC Senior Electrical Project Manager Mike Sincavage likewise testified that while there might be an overall duty to coordinate, there was no duty to the trade contractor to coordinate the work on the Project. (Trial Tr. 6727:7–17, July 13,

2005.) However, Mr. Sincavage later testified that he believed that a trade contractor would be entitled to payment if HCC did not meet its obligations of coordinating the overall Project. That testimony was as follows:

Q. Remember you talked about if the contractors could prove things to you, you would pay them additional monies? That was the predicate question. Do you remember us talking about that?

A. Yes.

Q. ... And if a trade contractor came to you and they were able to prove or establish that in fact, "Look HCC, you didn't do your job, you didn't coordinate the overall project," is that something you would then pay them for?

A. Yes.

(Trial Tr. 6844:3–13, July 14, 2005.)

HCC's position at trial was that it owed absolutely no duty to its trade contractors to coordinate the work on the Project. However, the testimony described above indicates that HCC's representatives did not unequivocally support the hardline position asserted by HCC in this litigation. At least certain members of the HCC team operated under the assumption that HCC was required to be reasonable in scheduling and that an overall failure to coordinate would justify the payment of damages.

## II. Breaches of Contract by HCC

■ As described above, HCC had a duty to adequately schedule and coordinate the work of the trade contractors, including EME, on the Project. Ample evidence was presented at trial establishing that HCC failed to adequately coordinate and schedule the work of the trade contractors on the Project, in violation of its obligations under the Trade Contract. Work on the Project took place in an uncoordinated nightmare, with trade contractors tripping over one another and hampering each others' work. The work on the Project was completed, but in the most unproductive way possible.

It is always helpful to hear testimony from expert witnesses when dealing with the performance of duties in a highly specialized field such as the management of large, complex construction projects. The Court heard testimony from one expert retained to testify as to the adequacy of HCC's efforts at scheduling and coordination of the Project. This expert was Gordon Curtis of Wagner, Hohns, & Inglis, who was retained by EME to testify at trial as an expert on a number of matters including the scheduling and management of the Project. (Trial Tr. 1443:16–23, 1449:4–6.) Mr. Curtis was a well-qualified expert in all matters on which he gave an opinion, and the Court gives great weight to his expert testimony.

Based on the evidence presented, including expert testimony, the Court will first describe the industry standards in construction management for scheduling and coordinating a major project such as the Orange County Convention Center. The Court will then walk through the various ways in which HCC breached its duties under the Trade Contract by failing to create and maintain an adequate overall project schedule and failing to adequately coordinate the work of the trade contractors on the Project, which resulted in damages to EME. Finally, the evidence indicates that these failures were exacerbated by the conflicts and problems within the HCC joint venture.

### A. Best Practices in Construction Management

All established industries have standards, and the same is true of construction management. The standard practice in the construction industry for the scheduling and coordination of the work of trade

contractors is called the critical path method of construction management, or CPM. (Trial Tr. 1461:19–1462:22.) The ordinary practice in construction management is for schedules to be prepared in advance of construction that detail the process and flow of construction of the entire project, specifically providing the start and end dates of the various subcontractors on the different parts of the project. (Trial Tr. 1607:11–1610:5.) Under a CPM schedule, a subcontractor will know, in advance of construction, precisely what crews and equipment will be needed each day on the Project, and the location of their work at any given time. (Trial Tr. 207:1–22; see also Trial Tr. 238:5–25.) Another general responsibility of a construction manager is to perform a constructability review of the design documents. (Trial Tr. 2292:11–2293:11, Dec. 15, 2004.) A constructability review determines whether the project can be constructed as designed and will reduce the number of RFI's on the project. (Id.)

As a general rule in subcontractor scheduling, "the big stuff rules." (Trial Tr. 194:2–195:1.) Heavy mechanical equipment and components must be in place before the work by other trade contractors, including electrical subcontractors, can begin. The term "predecessor activity," as used in the construction industry, describes the work that must be done in an area before a subcontractor can begin its work. (Trial Tr. 177:9–178:6.) For an electrical subcontractor, several significant relevant predecessor activities include "block," mechanical, duct work, pipe and sprinkler installation, framing, and the installation of outside electrical feeders. (See Trial Tr. 195:2–198:7; Trial Tr. 6132:4–16; Trial Tr. 6183:6–20.) These are predecessor activities that must be complete before electrical work in the area can commence. (Trial Tr. 1463:3–24.) Also, much electrical work cannot be installed until an area is "dried-in," until the structure is completed such that rain cannot enter the interior space, without facing the chance that the work will be ruined. (Trial.Tr.221:19–223:16.)

A schedule instituting the CPM will appropriately dictate the flow of work across the project in a way that ensures that all relevant predecessor activity takes place before any trade contractor begins working in an area. (Trial Tr. 1607:11–1610:5.) Subcontractors are scheduled to follow one another such that before a subcontractor would be scheduled to commence work on a particular portion of the project, any subcontractors engaged in relevant predecessor activity will have completed their work on that portion. (Trial Tr. 177:9–17.) This logical flow also applies to the components of the work performed by a particular subcontractor. For an electrical subcontractor, rough work must be completed before trim work can begin. Rough crews install conduits, boxes on the walls, and wiring. The trim crews follow, installing the electrical devices. (Trial Tr. 212:7–22.) Electrical subcontractors invariably come at the end of the line of trade contractors. (Trial Tr. 1462:3–24.)

Where a project schedule departs from the CPM, one common result is something referred to as "trade stacking." Trade stacking occurs when several trade contractors end up working simultaneously in the same area of a project. (Trial Tr. 804:6–18.) It happens when areas within the project are not available for subsequent trade contractor work to start in a timely manner. When the areas do become available for trade contractors to begin their work, "there is a stacking of the trades to try to accomplish the work … all at one time. It causes all the trades to be trying to be working in the exact same location at the same time…." (Trial Tr. 804:13–17.) As is easily understood, the result is "not very productive." (Trial Tr. 804:18.)

## B. The Failure of HCC to Adequately Schedule the Work on the Project

From the very start of construction, issues emerged with the Project schedule. By the time EME started working on the Project, there was no longer an overall project schedule in use as the means of coordinating the work of the trade contractors. EME's expert witness, Mr. Curtis, testified that based on his analysis HCC did not use a CPM schedule to "plan, analyze and control the progress" of the work. (Trial Tr. 1604:3–22, 1606:2–10; J. Ex. 239, CM Agreement, Art. 2.2.3(1).) While HCC may have published schedules, there was no scheduling. (Trial Tr. 2275:13–16, 2279:13–18.) The result was a complete failure at coordination of the trade contractors. While EME expended every reasonable effort to coordinate its work with the other trade contractors (for example, by coordinating the spacing requirements for equipment), the actual coordination of the work on the Project required a schedule from HCC. (Trial Tr. 202:4–19.) As EME Assistant Project Manager Barry Hughes stated:

The distinction is, one, you're sitting down in a trailer, in a room with the representatives of all the different trade contractors figuring out by the plan of what you know of your system a space to be able to use it so that the installations are coordinated at a level and no conflicts . . .

The other side of that is the coordination of the installation of that work, that's where the sequence and schedule and the layering of that installation is actually worked out on paper for a schedule.

(Trial Tr. 202:21–203:10.)

From the date EME stepped foot on the Project, there was no usable overall project schedule to coordinate the trade contractors working on the Project. (Trial Tr. 234:3–20.) The master project schedule became the focus of immense criticism on the Project. The trade contractors felt that the method and manner of scheduling that HCC had represented would be followed on the Project when the trade contractors were preparing their bids was not the way in which HCC had begun construction of the Project. HCC was not using the project schedule to manage or sequence work, and the contractors were not being allowed to work in an efficient manner. The scheduling and sequencing of work is particularly critical to trade contractors at the end of the line, such as EME, whose work is dependent on predecessor trade contractors, including concrete, glazing, roofing, framing, drywall, plumbing, and mechanical trade contractors. (Trial Tr. 1463:3–1464:25, Oct. 25, 2004; Trial Tr. 1710:7–10, Oct. 26, 2004.) The following sections will present in chronological fashion HCC's continuing failure to adequately schedule the Project using the industry-standard CPM.

### 1. 2001

The evidence at trial established that work on the Project became unsynchronized at the very beginning of construction, and that HCC never recovered—HCC was never able to achieve a synchronized job sequencing pattern. (See Trial Tr. 234:3–20.) The failed schedule affected earlier trade contractors, including the structural trade contractors. (See Trial Tr. 236:17–23.) It was the subject of daily conversation in the Project. (See Trial Tr. 236:24–237:3.) HCC's January 2001 monthly report to Orange County noted the scheduling issue as follows:

Based on the review of the preliminary Composite Building Set, HCC is concerned that the 2/1/01 issuance [of the Composite Building Set] will be substantially incomplete and lacking in coordination. If this turns out to be the case, *there will be impacts to the overall schedule.*

(Pl.'s Ex. 235, Jan. 2001 Report pt. 3A (emphasis added).) EME Assistant Project Manager Barry Hughes identified the scheduling problem as early as September 1,2001. (Trial Tr. 236:11–16.)

On August 9, 2001, three days after EME signed the Trade Contract, HCC published a new overall CPM schedule for the Project. (Trial Tr.2012:20–25, Oct. 27, 2004; J. Ex. 239, Trade Contract Agreement signature page.) Upon receiving the revised baseline schedule, and becoming aware of the new-sequencing of work, EME had serious concerns about incomplete or missing schedule items, flaws in schedule logic, and the lack of proper coordination among the trade contractors. (Trial Tr. 268:8–23.) EME began facing schedule impacts due to delays (Pl.'s Ex. 242, Record of Conversation no. 15), limited work area and site access problems (id. at no. 19), and lack of sequencing and coordination of the trade contractors (id. at nos. 22 and 34).

As problems arose in the field that delayed or impeded the work, HCC began manipulating the project schedule to make it appear to Orange County that it was upholding the completion date of May 1, 2003. For example, in the new OC 25 schedule of August 9, 2001, HCC reduced the time allotted for punch list and final inspections by eleven days. (Pl.'s Ex. 38.) In other words, HCC reduced the time allotted for a controlling piece of work at the end of the Project so as to conceal the lack of progress during earlier phases. In this way, HCC was able to hide from Orange County (and for a while the trade contractors) the true extent of the delays. (Trial Tr. 3976:17–3980:5, Feb. 9, 2005.) This made it appear as though HCC had not lost any time, when in fact the schedule was beginning to be compressed. HCC had schedules, but they were not for scheduling. (Trial Tr. 2283:21–23, Dec. 14, 2004.)

On August 21, 2001, HCC sent out a memorandum entitled "Baseline Schedule Status Reporting Procedures" setting forth the manner in which the senior project managers were to provide the necessary information for the baseline schedule updates. (Pl.'s Ex. 39.) The memorandum concluded as follows:

It is important that the procedures outlined above are adhered to on a monthly basis. The schedule can be used for its intended purpose only if accurate update information is provided.

(Id.) This memorandum was part of HCC's efforts to fulfill its coordination and scheduling obligations. (See, e.g., Trial Tr. 2746:14–2747:12, Feb. 1, 2005.) However, HCC never actually followed the scheduling procedures outlined in the memorandum. (Trial Tr. 6871:18–6872:20.) The CPM schedule was supposed to be updated monthly by HCC so that it could be used for its "intended purpose" of scheduling the work. (Trial Tr. 6871:3–25, July 14, 2005.) It was not. (Id.)

EME was not the only party becoming concerned with the Project schedule. Some members of HCC's senior management were likewise uneasy about the state of affairs on the Project. On September 29, 2001, HCC Senior Project Manager Gordon Gibson wrote to HCC Project Executive Bob May concerning management failures within the HCC joint venture. Mr. Gibson complained that "the level of input from those managing the work is so lacking." (Pl.'s Ex. 424.) He continued as follows:

I could go on and on about what's not being done to get on top of this job because all I need to do is look at the cost issues and the [request for information] issues and neither of these is being addressed as they should be. I'm glad that someone is coming in to take [HCC Construction Manager] Jim [McElroy]'s

old position [3] but I doubt very seriously if it will make a difference. The mold has been cast and *no one seems to care whether [HCC General Superintendent] Tom Spall has the material and manpower necessary to meet the dates that he discussed in Thursday's staff meeting. How many of the [project managers] are aware of what the Schedule says?* ... If nobody else cares then why should I.

\* \* \*

I must admit that I'm getting to the point where I don't care anymore. Let the chips fall where they may.

(*Id.* (emphasis added).)

An HCC internal memorandum, authored by a senior manager and dated October 16, 2001, contains several revealing statements. First, the senior manager admitted that the revised baseline schedule, or CPM schedule, had forced the trade contractors to work out of sequence and that HCC was attempting "to remedy this situation." (Pl.'s Ex. 45, Item 4.) Second, in discussing the revised baseline schedule, he admitted that HCC's baseline schedule and subsequent updates did not "reflect the actual progress in the field." (*Id.* at Item 2.) Third, the senior manager contended that because the baseline schedule and updates were inaccurate, HCC was "attempting" to use the look-ahead schedules to get the work "back to a logical flow. . . ." (*Id.*) Look-ahead schedules, also referred to as "short term schedules" and "near term schedules," were short-term, non-detailed, bar-chart schedules outlining generally where the trade contractors could expect to be working. Initially the look-ahead schedules were 90–day schedules, but they were reduced to three-week schedules, then two-week schedules, and finally were abandoned entirely. (Trial Tr. 6084:22–6085:6, Apr. 28, 2005.) Instead of being used as a tool to supplement the project schedule, they were not tied into or connected with the project schedule and did not allow for any degree of long-term planning, sequencing, or organization of the trade contractors' crews, equipment, or materials. (Trial Tr. 4470:9–21, Mar. 24, 2005.) The memorandum dated October 16, 2001, was the second HCC memorandum in a month in which HCC acknowledged that it was not using a baseline schedule to coordinate the work on the Project. (Pl.'s Ex. 45, Item 2; Pl.'s Ex. 424.)

As concerns with HCC's scheduling efforts grew, EME retained an outside scheduling consultant, Chitester Management, to review the updated baseline schedule of August 9, 2001 (the 2001 GMUP schedule, also labeled OC 25), against the original schedule of November 8, 2000 (the 2000 HOLE schedule). (Trial Tr. 785:4–9; Trial Tr. 1098:11–21.) The 2001 GMUP schedule was produced by HCC three days after EME signed the Trade Contract and one day before HCC affixed its signature. (Trial Tr. 5697:1–3; J. Ex.239, Trade Contract Agreement signature page.) On October 26, 2001, Chitester Management reported its findings, which confirmed EME's suspicions that the 2001 GMUP schedule that HCC adopted after EME signed the Trade Contract was unworkable without wholesale changes. (Trial Tr. 786:9–14.)

On October 31, 2001, EME forwarded to HCC Senior Project Manager Mike Sincavage a copy of the report of Chitester Management, showing the negative impact of HCC's failure to competently schedule the work on the Project. (Pl.'s Ex. 47, 1; Trial Tr. 785:4–786:4.) In this communica-

---

**3.** "To take Jim's old position" refers to the construction manager position that had been left vacant by Jim McElroy's departure. This position would be later tilled by Peter Milner after EME had begun work. (Trial Tr. 3919:1–23.)

tion, EME notified HCC that the new master project schedule would have catastrophic consequences for the scheduling and coordination of EME's work and would result in significant changes to EME's work and untold increased costs. (Pl.'s Ex. 47, 1; *see* Trial Tr. 787:3–788:19.) The Chitester Management report also described the actual flow of work on the Project and demonstrated that the actual flow had no correlation to the 2001 GMUP schedule. (Trial Tr. 781:15–23.)

EME's letter of October 31, 2001, also notified HCC that the 2001 GMUP schedule failed even to depict all of the work EME was to perform and did not tie EME's work to the critical path at all, which would result in "numerous and inefficient" mobilizations and demobilizations within the job site. (Pl.'s Ex. 47, 1.) The letter further described several areas where EME's work was not coordinated with other trade contractors, which would "result in EME incurring labor inefficiencies." (*Id.* at 1–2.) The October letter also contained a schedule analysis describing the likely effect of reducing EME's work duration from 116 weeks to 79 weeks. (*Id.*) However, because the schedules were incomplete, a comparison of the labor hours required under the two schedules could not be done, and it was impossible to predict the full impact of the new schedule. (Trial Tr. 1102:15–1109:1.)

HCC did not respond in writing to EME's letter of October 31, 2001. (Trial Tr. 4262:21–4263:7, Feb. 10, 2005.) In response, HCC met several times with EME to discuss the schedule. (Trial Tr. 788:20–789:5.) During at least two of these meetings, senior personnel from the Clark Construction arm of the HCC joint venture stated candidly that they were aware of the issues with the schedule, but that because Hunt Construction was the controlling member, there was nothing they could do to help EME. (Trial Tr. 789:7–22.) As

anticipated in the Chitester Management report, EME experienced enormous difficulties in efficiently performing its work. EME was required to work under conditions that were quite different than what had been represented in the Trade Contract and upon which EME had based its bid price.

Throughout the fall of 2001, EME repeatedly requested a copy of HCC's overall project schedule. (Trial Tr. 1114:2–10.) Although both the Trade Contract and the CM Agreement unambiguously required HCC to furnish this schedule to EME at the very outset for use as the basis for scheduling and coordinating EME's work and the work of the other trade contractors, HCC refused to provide a copy for months after EME began work. (Trial Tr. 319:8–23, Oct. 19, 2004.) Testifying about the difficulty EME had in acquiring the overall project schedule from HCC, EME's Assistant Project Manager Barry' Hughes stated as follows:

> In the beginning we kept being told that we were going to get one, it's coming, they're still working on [it], then several months later it was, well, we don't know if we're going to use one, we're using a three week now and that's what we're going to use to build the job. . . .

(*Id.* at ll. 15–20.)

As highlighted in HCC Scheduler George Perkowski's memorandum of October 16, 2001, other trade contractors were voicing similar complaints. (*See* Pl.'s Ex. 45.) Encompass, the electrical subcontractor awarded the part I electrical work, repeatedly wrote to HCC regarding HCC's failure to provide an overall project schedule incorporating Encompass's schedule. (Pl.'s Exs. 50, 56, 58, & 60.)

2. 2002

In mid-January 2002, HCC finally provided the trade contractors with the re-

vised baseline schedule (also called OC 30). (OC 30; Data Date of December 31, 2001; *see* Pl.'s Ex. 67.) After performing an analysis of the revised schedule similar to the analysis EME commissioned of the 2001 GMUP schedule, Encompass responded to the OC 30 schedule on February 15, 2002. (Pl.'s Ex. 62, 1.) Encompass advised HCC that the revised schedule was not accurate—it contained a "fatal logic error" and was incomplete. (*Id.*) Moreover, Encompass warned HCC that substantial completion would be delayed six to eight months because "precedent work by others has not progressed in a timely manner." (*Id.*) EME echoed similar complaints about the schedule being incomplete. EME Senior Project Manager Mike Estes testified that the overall project schedule that EME eventually received from HCC was only half complete. (Trial Tr. 1114:23–1115:4.) Among the most glaring errors, it inexplicably omitted the electrical work from the entire south structure. (Trial Tr. 1115:1–4.)

On March 18, 2002, EME wrote to HCC, stating that the "schedules produced by HCC are incorrect and do not realistically represent the actual sequence, durations, or delays to the activities" EME was performing. (Pl.'s Ex. 66, 1.) In the same letter, EME pointed out that the oversights had already caused delays and inefficiencies and would continue to do so. (*Id.*) EME balked at the position taken by HCC that the coordination of the trade contractors was not HCC's responsibility and that the sequencing, scheduling, and coordination of the trade contractors was as good as it was going to get. HCC had told EME that it would "just [have to] deal with it." (*Id.*) Also on March 18, 2002, Lou Wells, one of the two HCC schedulers, wrote in a draft letter to Encompass that "construction is progressing based on the HCC near term schedule," not based on the overall master schedule. (Pl.'s Ex. 67.)

On April 23, 2002, EME wrote HCC again to complain about the lack of an overall master schedule incorporating the trade contractors' schedules. (Pl.'s Ex. 78.) EME pointed out that HCC was relying solely on the look ahead schedules, despite the requirement in the Trade Contract for EME to participate and cooperate in the development of the master schedule and to monitor the master schedule as work progressed. (*Id.*) EME warned HCC that if the looming completion deadlines were "to be met, it is imperative that EME receive some feedback on the schedule which was submitted three months ago and that all contractors on this project get a grasp on an overall *published* Project Schedule" instead of relying on three-week look ahead schedules which vary from month to month and are "preventing all parties on this Project from seeing the overall picture." (*Id.* (emphasis in original).) EME warned that "a massive stacking and compression of trade [would] occur during the next year of work. This should never have happened." (*Id.*) HCC's Senior Project Electrical Manager Mike Sincavage acknowledged that EME was damaged as a result of the problems addressed in EME's letter of April 23, 2002. He testified as follows:

Q. Do you agree that the issues that EME complained about with regard to scheduling and coordination resulted—or caused EME to incur additional costs in the performance of their work?

A. Yes.

Q. Okay. And, in fact, those are the very same issues that we're looking at here, or at least some of the very same issues in Plaintiff's Exhibit 78, correct?

A. Some of the issues, yes.

(Trial Tr. 6984:12–20, July 18, 2005.)

On April 24, 2002, HCC Scheduler Lou Wells prepared a schedule review of HCC's most recent schedule update of

March 29, 2002, OC 33. (Pl.'s Ex. 322, Schedule Review as of March 29, 2002.) The schedule review confirmed that the Project was behind schedule and that, without question, the Project would be completed late. (*Id.* at Pt. I Summary of Findings and Pt. II Summary of Findings.) Mr. Wells predicted that HCC would complete the Project 70 days late and that the Project was, at that time, six percent behind schedule. (*Id.* at Pt. I Summary of Findings.) At that rate, HCC would be assessed $2,100,000 in liquidated damages. (*See* J. Ex. 239, General Conditions Art. 9.4.1.) After analyzing the possibilities for making up lost time, Mr. Wells bluntly told his superiors that "total recovery is not an option." (Pl.'s Ex. 322 at Pt. I Summary of Findings and Pt. II Summary of Findings.) Confirming what EME and the other trade contractors had said, HCC Scheduler Lou Wells stated as follows:

> [T]he [Master] [S]chedule no longer reflects the true project status, and therefore will not accurately forecast project completion.

> Continuing to update the schedule based on the established Critical Path, without regard to the concurrent activities NOT ON THE CRITICAL PATH has resulted in a condition known as stacking of trade contractors[.]

> This produces an un-manageable and un-achievable schedule due to resource demands.

(*Id.* at Pt. I Sched. Critique—OC 33 (emphasis in original).)

On May 1, 2002, EME wrote to inform HCC that it was unable to plan its work, organize with other trade contractors, or determine its labor needs because of HCC's reliance on three-week look-ahead schedules. (Pl.'s Ex. 80.) EME suggested that HCC had ignored the issue. (*See id.*) EME Assistant Project Manager Jim Hughes testified as follows regarding the impact on EME of HCC's failure to properly schedule the Project:

> [E]lectricians are one of the last MEP trades to come through. So all of the changes in scheduling, all this bouncing around by other contractors prior to us impacts us all over again. . . .

> Everything impacts each other because I'm told to go over in this area, well, there was somebody there that had to perform work but he's not there yet, he wasn't scheduled to be there until next week, now I'm in his way. Well, then he has to go out and work somewhere else because HCC said to do this and he delays somebody else or causes problems for somebody else. Eventually all these variables spread out in what I call the spider web impacting just about everybody eventually.

(Trial Tr. 296:17–297:10.)

On May 24, 2002, EME Assistant Project Manager Barry Hughes met with HCC's Moe Young and Tom Spall about HCC's failure to schedule the work. (Pl.'s Ex. 242, Record of Conversation no. 172.) HCC agreed that the value engineering changes to the mechanical design and the resulting delays with installation had impacted EME's schedule. (*Id.*) Mr. Hughes recorded the following in his notes:

> I told him that I thought that HCC was overwhelmed. That was probably the case, however the fact remains that they were unable to schedule any work for EME. The subject of Tom's scheduling inspections for area and expecting the trades to perform their work based only on inspection date came up again. Told him that we found that unacceptable. To schedule an inspection without being able to schedule and sequence the work prior to the inspection was "ludricrous" [sic] (I did not use this word, but this is how I felt). . . . It is my impression that Tom will never be able to schedule and

sequence EME's work. I will have to try to spend more time in the building and do it for ourselves. I have discussed the inefficiencies involved with this type of installation and apparently this is not important to them. Their only goal is to get the job done and to push, push, push.

(*Id.*)

HCC delayed incorporating all of the trade contractors' schedules into an overall project schedule. (*See* Trial Tr. 319:9–23.) Not until OC 35, the updated schedule dated May 31, 2002,[4] did HCC include Encompass and EME's schedules in the master schedule. (Pl.'s Exs. 88, 425.) A second part to the schedule review, relating to OC 35, was issued on June 26, 2002. (Pl.'s Ex. 322, Intro.) Part two "respond[ed] to [HCC Senior Construction Manager] Pete Milner's request that instead of using historical data, [HCC Scheduler Lou Wells] take a look at the most recent three month's progress to reflect a higher level of productivity." (*Id.*) The result was "[a]lmost identical to the previous findings of [completing] 2.5 months late...." (*Id.*) Moreover, when Mr. Wells forecasted a completion date based on the gross billings as of April 24, 2002, he concluded that the Project would be completed five months late. (*Id.*) In the recommendations section of the report, HCC's Mr. Wells echoed EME's sentiments regarding the reliance on look-ahead schedules:

Dependence on the short interval schedules to measure the overall project performance must be discontinued. Routine failure to complete activities shown on these schedules indicates a lack of focus on the overall objectives. And since the master schedule is not proper-

ly structured the impact of missing schedule dates is diluted, and non consequential.

(*Id.* at Pt. I Recommendation.) Despite Mr. Wells' recommendation that dependence on short-interval schedules should be discontinued, HCC continued to use them as the sole means of scheduling the Project. (Trial Tr. 3977:21–23.)

HCC also continued to insist that the completion date for the Project had not been affected. In the November 2002 monthly report to Orange County, HCC stated:

Although much work remains to be completed and virtually all of the float time in the Project schedule has evaporated, overall construction progress continues to be satisfactory and remains on track for the scheduled Substantial Completion by May 1, 2003.

(Pl.'s Ex. 235, Nov. 2002 Report pt. 1A.) On November 5, 2002, after a scheduling meeting involving HCC, the Architect, and Orange County, the Architect wrote that the scheduling meetings "do not appear to update us on what is going on in the field" and are a waste of time because the construction manager could not address scheduling concerns. (Pl.'s Ex. 45, Email from Susan Richardson to Mark Gustetter, HHCP/Architects, Inc. (Oct. 31, 2002, 4:47 PM).) The Architect further noted that HCC Senior Construction Manager Pete Milner assured a "frustrated Owner" that HCC "will get done by May 1, and that his gut feeling is that the job is 75% complete." (*Id.*) HCC could provide no details because it had no realistic overall schedule. (*See id.*)

4. As will be discussed below, one of HCC's contentions at trial was that the delays in the Project were substantially caused by a rain storm that occurred on May 30. 2002. It is significant that in the schedule review dated June 26. 2002. Mr. Wells made no reference to any impact on scheduling caused by the May storm. (*See* Pl.'s Ex. 322, Intro.)

Two weeks later, on November 13, 2002, EME wrote HCC a letter that included the following:

We know what [sic] the public and newspapers are saying that the Convention Center is ahead of schedule and under budget but if you stand back and look at the project and where it is that in 6½ months this job will not be done as everyone is being told.

In closing, we need to know how HCC is planning to complete this project in the time allotted. We feel that now the schedule can not be achieved by any electrical contractor as per the original bid requirements. Finally how is HCC planning to compensate various trade contractors for the clear and provable items that have caused the schedule to slip or not be achieved for the past 14(sic) months of this scope.

(Pl.'s Ex. 152, 1.) EME attached a copy of its letter of October 31, 2001, enclosing the Chitester Report. The October 2001 letter had placed HCC on notice that the problems EME and the other trade contractors had been and would be experiencing were the anticipated direct result of HCC's failure to develop a workable overall project schedule at the outset. (*See id.*)

These frustrations are echoed in a letter dated December 20, 2002, from subcontractor Exterior Walls, Inc., which described the problems resulting from having to install drywall in a building that is not yet dried-in. (Pl.'s Ex. 171.) The letter states that there is "no evidence of a working CPM schedule" and that since Exterior Walls' letter of May 16, 2002, the "entire project has endured a pathetic state of disarray." (*Id.*) The subcontractor remonstrated, "I think we have been exposed to a society of ineptism (sic)." (*Id.*) Exterior Walls likewise complained about the lack of coordination of the trade contractors:

*If we were granted (1) Christmas wish for 2002, it would be a completion schedule identifying all other trades['] outstanding activities with projected completion dates.* It seems that our work on the South Concourse has changed from installing metal framing and drywall finishes to tracking down inspections and hunting for each trade['s] sign-off for any given area. There are many reasons we have been forced to play this game but nevertheless, EWI still awaits sign-offs despite the lack of building dry-in.

Hopefully our Christmas wish will come true and based on the way this project is managed thus far, a punch list for this project will be a mile long and no direction where to start. Good luck, *we'll be looking for Santa or someone with a written plan.*

(*Id.* (emphasis added).)

### 3. 2003

HCC was unable to keep pace with the demands of maintaining, updating, and implementing a project schedule to coordinate the work. To further aggravate the situation, around the 2003 New Year, one of HCC's two schedulers, Lou Wells, passed away. (Trial Tr. 3973:24–3974:2.) HCC's junior scheduler, George Purkowski, took over scheduling responsibilities, but Mr. Wells was never replaced. (Trial Tr. 6249:24–6250:17.) Shortly thereafter, HCC completely gave up trying to schedule the Project. On January 13, 2003, HCC issued the last look-ahead schedule. (J. Ex. 91, 1.) On January 31, 2003, HCC issued the last master schedule, OC 43. (Trial Tr. 1638:22–1639:3.)

On February 20 and February 24, 2003, EME wrote HCC about the effect of the acceleration of the metal stud and drywall contractor's work and complained that it was being required to simultaneously work

over the entire 2.8 million square foot building site like a "cost plus contractor." (Pl.'s Ex. 177; J. Ex. 69.) EME pointed out that the acceleration of the work of the metal studs and drywall contractor had not been coordinated with EME or shown on any schedule, and that the result was significant out-of-sequence work. (Pl.'s Ex. 177; J. Ex. 69 & 70.) EME also stated that while design changes had delayed the Project, the impact of the changes was more pronounced because of the lack of scheduling and coordination. (Pl.'s Ex. 177; J. Exs. 69, 70.)

On May 29, 2003, EME filed its Chapter 11 proceeding in the Middle District of Florida. The building was substantially completed on August 8, 2003. Even without the benefit of a qualified expert witness, it is clear to the Court that HCC failed to adequately schedule the work of the trade contractors, and because of that failure, substantial additional effort and expense was incurred by EME.

### 4. Expert Analysis of HCC's Scheduling

EME's expert witness Mr. Curtis began his analysis by reviewing the various Project schedules. (Trial Tr. 1461:9–18.) He testified that project schedules are a "coordination communication tool" between the trade contractors and the construction manager and are particularly important to an electrical contractor because they are a "follow-on contractor" that is at the "mercy of everybody else on the project." (Trial Tr. 1462:16–1464:25.) An electrical contractor is one of the first trade contractors on the job doing temporary power and one of the last trade contractors to leave. (Trial Tr. 1463:10–17.) Further, "most of the time they have to follow the drywall contractor and follow the mason contractor, obviously follow the steel [and] concrete [trade contractors]." (Trial Tr. 1463:21–24.) An electrical contractor has no ability to force another trade contractor to relocate their crews or materials to another area. (Trial Tr. 309:10–15.)

Mr. Curtis testified that in his opinion the HCC schedules were "just horrible," had "no resemblance of being a schedule at all" and were the biggest problem EME faced on the Project. (Trial Tr. 1465:16–23, 1602:11–16, 2280:23–2281:24; see Pl.'s Ex. 280, 60–62.) He further testified that it was the worst attempt at scheduling he had ever seen in his forty years of experience in construction. (Trial Tr. 2283:5–11.) The following testimony summarizes Mr. Curtis's assessment of HCC's overall failure to adequately schedule and manage the Project:

Q. All right. What opinions did you form after reviewing the documentation, discussing with the individuals, various individuals you talked about yesterday, what opinion did you form with regard to lack of a real schedule?

A. I believe there was no real schedule on the project, there was no master schedule, and subsequent look-ahead schedules that really had any meaning. There were schedules but the schedules didn't have the scheduling elements that are necessary to coordinate the trades and complete the job, project, in an economical, smooth process for the contractors.

Q. And as a result of that was—did EME incur any damages? . . . .

A. I believe most of their damages was (sic) due to the lack of scheduling.

(Trial Tr. 1601:23–1602:16.)

It was Mr. Curtis's opinion, which this Court finds credible and well supported by the evidence, that the master schedule was not actually used by HCC in the field to build the Project but was more likely used for public relations purposes—to show Orange County that "everything was okay on the job . . . . [b]ecause they were holding the end date." (Trial Tr. 1466:5–6; see

Trial Tr. 555:12–556:25, Oct. 20, 2004; Trial Tr. 1637:14–1638:6; Trial Tr. 2276:3–21.) To keep the same Project completion date, HCC began manipulating the schedule. Mr. Curtis further testified as follows:

Q. Did you see any indication based on your review whether or not HCC was manipulating the schedule in this matter?

A. Yes, they were.

Q. Can you explain that?

A. Well, what happened here is that there was a critical activity and the critical activity did not get performed during that month so it showed up the next month. Well, if it showed up 20 days later, 20 working days later the project would be extended 20 days. What 1 did is I went through each of the schedules and determined how the activities were changed through digger reports, this is a special program that you use, and for each month the completion date stayed the same, but the previous critical path activities kept on moving out and moving out.

So they were getting delayed on the project which would normally have delayed the completion of the project, but the schedule was revised continuously to make sure that the schedule showed to be complete on time, that I consider manipulating the schedule.

(Trial Tr. 1610:20–1611:17.)

Many of the problems with scheduling stemmed from the fact that HCC's schedules did not coordinate or "tie-in" the dates between the finish of one work activity and the finish of subsequent work activity. (Trial Tr. 2225:1–2229:22, 2267:5–12.) Instead of coordinating the finish dates of related work activities, HCC used the project completion date as the tie-in. The schedule "continually held the finish date on the project while all these activities were taking longer and longer and longer to do, so there was no logic as you go

through [CPM] methods, so that's why everything happened at once." (Trial Tr. 2229:18–22; *see also* Trial Tr. 2276:3–21.)

Additionally, the schedules allotted an excessive amount of float time. (Trial Tr. 2266:24–25.) "Float" is the amount of time reflected in a schedule to accomplish a particular task in excess of the time actually needed to complete the activity. (Trial Tr.1962:9–15.) Items of activity on a schedule's critical path should have no float time. These activities should "be done when [the schedule] says they have to be done." (Trial Tr. 2268:10.) HCC's schedules had a "tremendous amount[s] of float," had improper scheduling logic, and were not proper CPM schedules. (Trial Tr. 2229:3–22, 2266:24–2267:12, 2274:16–2276:21.)

Thanks to the internal memoranda prepared by HCC Scheduler Mr. Wells, HCC was alerted to these scheduling problems but took no action to correct them. (*See* Pl.'s Ex. 322, Intro.) HCC had been informed that the Project was behind schedule, that "total recovery [was] not an option" (*id.* at Pt. I, Summary of Findings), that the HCC schedules were causing and would continue to cause stacking "due to improper logic relationships between activities" (*id.* at Pt. I, Sched. Critique—OC 33), that the published schedules were "unmanageable and un-achievable" (*id.*), and that dependence on the short-term interval schedules to measure overall performance should stop (*see* Trial Tr. 2272:6–2279:23). HCC was aware, as early as April 2002, that although the published schedule showed that the job would be completed on time, they "no longer reflect[ed] the true project status, and therefore will not accurately forecast project completion." (Pl.'s Ex. 322, Pt. I, Sched. Critique—OC 33.) Nevertheless, HCC changed nothing. (Trial Tr. 2279:19–23.) HCC continued to rely on short-term schedules that had no

relationship to the overall project schedule and eventually gave up altogether in scheduling the Project. (Trial Tr. 2279:19–2280:3.) The result was that the Project had no overall schedule. (Trial Tr. 2275:13–16, 2279:1–18, 2280:16–21.) At most, HCC scheduled a room or an area for a given time. (Trial Tr. 2279:15–18.)

The Court finds credible and persuasive the expert testimony of EME's expert witness, Mr. Curtis. Together with the Court's own conclusion based on a review of the lengthy evidence presented at trial, it is quite clear that HCC failed to create or maintain schedules that in any way established the critical path for this Project. HCC's failure to schedule the work of EME and the other trade contractors on the Project was utter and complete and clearly resulted in significant damage to EME.

### C. The Failure of HCC to Adequately Coordinate the Work on the Project

■ HCC also failed to adequately coordinate the work of the trade contractors on the Project. HCC's failure to provide and maintain an adequate CPM schedule heavily impacted Project coordination. Without workable schedules, HCC coordinated the trade contractors in an ad hoc manner during the Project. The failure to prepare and follow a schedule sequencing the activities of the various subcontractors working on the Project had a negative effect on the ability of subcontractors to perform their work as originally contemplated in their bids. As the work continued to be delayed, and the schedule compacted, these problems worsened. However, HCC was most concerned with the requirement that it complete the Project in time for the scheduled September "Surf Expo." (Trial Tr. 1475:8–17.) Several of the major contributing and resulting problems associated with the poor coordination of this Project were the misuse of requests for information, the haphazard flow of work, trade-stacking, and uncoordinated inspections. These problems will be addressed in order.

### 1. Requests for Information

One of the failures and inefficiencies on the Project that contributed to the lack of coordination was the improper utilization of requests for information, or RFI's, as a means of making revisions to the construction designs. During construction, 5,555 RFI's were issued. (See Trial Tr. 6761:13–18.) Using RFI's to make revisions during the process of construction is inefficient and had a negative impact on the coordination of the work of the trade contractors, including EME. This problem arose early in the construction, long before EME signed the Trade Contract and began working on the Project.

As explained by EME's expert, Mr. Curtis, a constructability review of the design documents, including a review of the whole project and of the work of the trades, is one of the general responsibilities of a construction manager. (Trial Tr.1963:6–1964:14.) Mr. Curtis testified on cross examination that "[a]nybody who has even a minimal background in the construction industry would know that a construction manager, like HCC, on a project like the phase V project[,] was going to perform a design review...." (Id.) While HCC did perform a design review for constructability, its review did not cover any of the electrical work on the Project. (Trial Tr.1983:13–17.) Instead, HCC decided not to perform a constructability review of the electrical drawings and instead forced EME to use the RFI's process to complete the designs. (See Trial Tr. 6504:2–7.) Although HCC Senior Project Manager Mike Sincavage asserted that this process "worked out great," the overwhelming evidence was to the contrary. (Id.) Under

the General Conditions, HCC shared the responsibility of promptly responding to RFI's with the Architect: "The Construction Manager and/or Architect shall respond to RFIs within ten (10) working days." (J. Ex. 239, General Conditions Art. 1.2.5.)

HCC was aware that the design documents were not complete. In its January 2001 monthly report, HCC noted that "it is apparent that, similar to previous Drawing Packages, significant revisions and numerous RFIs will be required to complete the documents." (Pl.'s Ex. 235, Feb. 2001 Report pt. 1A.) Likewise, HCC's February 2001 Monthly Report stated that "the Composite Building Set was far less than complete and coordinated. In particular, the electrical work and reflected ceiling plans were significantly incomplete...." (*Id.* at pt. 3A.)

From the beginning, the Architect blamed HCC for the RFI's and the lack of coordination, arguing that any problems arising from the designs occurred because HCC had not performed the necessary "final coordination of the design amongst the disciplines" during the design development phase. (Pl.'s Ex. 9, Email from Mark Gustetter, Project Architect, HHCP/Architects, Inc., to Bob Wilson, et al. (Mar. 29, 2001, 6:20 p.m.).) According to the Architect, the failure of HCC to complete a pre-construction review resulted in the many revisions and changes to construction drawings that were otherwise "complete." (*Id.*) The Architect accused HCC of constantly attempting to shift the blame away from itself and onto others, stating that the problems HCC complained of were caused by HCC. (Pl.'s Ex. 161, 2.)

HCC continued to complain to Orange County that it was dealing with excessive RFI's throughout the Project. HCC's April 2002 monthly report stated that "[i]n lieu of issuing Revisions for changes in the work, the Design Team has been increasing the use of the RFI process to make the changes, when the RFI process is supposed to be for the purpose of clarifying the Contract Documents, not changing the Contract Documents." (Pl.'s Ex. 235, Apr. 2002 Report pt. 3A) Likewise, in the June 2002 monthly report, HCC stated that the RFI process was being misapplied:

> The volume of Revisions to the Construction Documents issued by [the Architect] has subsided significantly. However, many design coordination issues still exist that are having to be handled in the RFI process in lieu of the reissuance of conformed and coordinated drawings, which would benefit HCC and the multiple trade contractors and subcontractors involved. In addition, the RFI process is now frequently used by [the Architect] as the method to issue changes to the Construction Documents. The numerous and substantial Revisions previously issued continue to impact both the physical work and administrative work.

(Pl.'s Ex. 235, June 2002 Report pt. 3A.) In HCC's March 2003 monthly report, it further complained that the lack of completeness and coordination of the design documents was resulting in excessive RFI's. (Pl.'s Ex. 235, Mar. 2003 Report pt. 3A; Trial Tr. 6761:17–6762:13.)

At trial, however, HCC Senior Project Manager Mike Sincavage, who was working on his first project for Hunt, testified that the RFI's did not create significant problems for HCC and the trade contractors. (Trial Tr. 7032:1–10.) He disagreed with the statements in HCC's monthly reports and contended that the number of RFI's were not unusual and did not create any problems. (Trial Tr. 6762:7–6763:24.) He testified as follows:

> Q. Even looking at the internal opinions between members of the HCC

team, you can have different perspectives, right?

A. Individuals would have different perspectives, correct.

Q. For instance, you think that the number of—the 5,555 RFI's is not excessive, and someone else thinks that they are excessive, right?

A. That's possible. Yes.

(Trial Tr. 6763:16–24.) In response to another report, Mr. Sincavage further testified that "we had numerous RFI's that were in fact signed and sealed, so those are a change to the contract documents. Apparently—or it's possible this individual is incorrect." (Trial Tr. 6767:17–22.) Mr. Sincavage noted that the HCC monthly reports presented a "different perspective." (Trial Tr. 6778:17–19.) He testified that he disagreed with many of these statements "in hindsight." (Trial Tr. 7031:24–25.)

EME's expert witness, Mr. Curtis, testified that the lack of coordination on this Project, combined with the large number of RFI's, impacted EME. He noted that work on any project is schedule-driven. (Trial Tr.1988:5–10.) While a contractor generally expects a certain number of RFI's on a given project, on a project like this, where improper scheduling exists and EME was being forced to work concurrently in many areas, the "RFIs are going to have a bigger impact. The job is driven by its schedule. That's why we have scheduling." (Trial Tr. 2282:1–17; see 2169:7–25.)

2. Haphazard Work Flow

Work on the Project did not flow in a logical progression. Instead, work flowed haphazardly across the many grids that made up the work site. (Trial Tr. 777:7–778:12.) Because predecessor work was often delayed, rather than follow a logical work flow and progression, EME was forced to "hop-scotch" around the Project to find places to work. (Trial Tr. 298:6–16, 337:14–338:2.) Work that was commenced on one level was not completed on that level. Rather, the work was interrupted and redirected to another level, where again, it would not be completed prior to its being interrupted and redirected to another area. EME communicated with HCC regarding this problem. EME stated that the "lack of continuity in schedules is causing" EME to have to continually "bounce around" the Project in a way that is "highly inefficient." (Pl.'s Ex. 242, Record of Conversation no. 103.) For example, according to the sequence set forth in the Trade Contract, EME was supposed to begin its work on the Project on the north structure at the concourse level (first floor) with the intention of working west to east through the structure. (Trial Tr. 176:10–25, 211:6–15, Oct. 18, 2004.) However, instead of following the expected progression and flow of work, HCC directed EME to start work at the mezzanine level (third floor) of the north structure. (Trial Tr. 214:2–9.)

Additionally, EME was forced to work in a piecemeal fashion. (Trial Tr. 317:19–318:4.) Instead of being able to install an entire rack of conduit, EME would only be able to install ten feet in one area before being required to move to another area. (Trial Tr. 318:5–11.) The piecemeal installation of conduit affected the labor and material costs, the job knowledge of EME's workers, and the overall continuity. (Id.) Work that should have been finished, for example, in one continuous nine-day flow was broken into three separate three to four days segments. Returning workers had to reposition their crews, equipment, and materials and try to remember the site work details to get back "up to speed" before a new work rhythm could be achieved. The resulting low morale negatively affected efficiency, as did the time and labor required to move equipment and

materials from one part of the Project to another as work was repeatedly interrupted and rescheduled. (Trial Tr. 209:21–210:11.) Work crews were demoralized because recently gained "learning curves" had to be quickly replaced by other unrelated work and new "learning curves." (See Trial Tr. 208:11–210:11, 264:20–266:8.) Such problems occurred, for instance, in the exhibit hall. (Trial Tr. 217:7–221:13.) Because of sequencing problems, a large amount of duct work and the installation of the sprinklers were not completed in time for EME to start its work. (Id.)

Further, because HCC directed EME to deviate from the normal progression of the work, EME was forced to split its rough-in crew and spread its workers throughout the Project. (Trial Tr. 214:10–16.) Significant additional hours were spent as a direct result of working in multiple locations at the same time rather than working under a typical coordinated flow of work across the Project. (See Trial Tr. 1106:14–1107:14.) Working in multiple locations also made supervision difficult. (Trial Tr. 1107:9–10.) EME experienced significant overtime charges as a result of the lack of project coordination.

3. The Problem of Trade Stacking

EME was severely impacted and damaged by the trade stacking that resulted from the lack of coordination of the trade contractors. The evidence before the Court clearly established that trade stacking occurred on the Project. Trade stacking on the Project resulted because the time sequences for work were compressed without regard to the inability of trade contractors to simultaneously perform necessarily sequential work. EME was often unable to proceed because it was blocked by predecessor trade contractors, such as the mechanical, dry wall, roofing, and painting subcontractors. (Pl.'s Ex. 242, Record of Conversation no. 63 & no. 69.)

EME Assistant Project Manager Barry Hughes testified as follows regarding the trade stacking he experienced:

Once it really got started going good it was what 1 would term a free-for-all stacking. Almost every where every day the whole job was pretty much mushroomed at that point where everything was working at it all the time, somebody was always trying to work somewhere somebody else was.

(Trial Tr. 235:19–25.) The trade stacking problem is also reflected in a letter from Encompass to HCC Senior Project Manager Mike Sincavage, dated July 18, 2002:

I will reiterate as in numerous letters sent before, that the stacking of activities of our scope of work throughout the project has been and still continues to grow, and the concern of having to work at a later date in more areas than anticipated, while at the same time starting and completing activities in other areas has been and remains a concern.

(Pl.'s Ex. 108, 1; see also Trial Tr. 6875:16–6876:15.) Encompass again complained about trade stacking in a letter dated October 4, 2002, to HCC:

We, and all the other trade contractors on this project, have a right to rely on your Master Schedule to plan and coordinate our activity and resources to perform the work. Your failure to utilize the Master Project Schedule to coordinate the work and the trades involved, has thus far led to massive impacts to our labor productivity. These impacts are due to incomplete predecessor work, out of sequence work, stacking of trades and the like, which were and are entirely beyond our control and can be directly attributed to your decision to utilize uncoordinated Near–Term Schedules that have not been generated from the Master Project Schedule.

(Pl.'s Ex. 134, 1; *see also* Trial Tr. 6884:6–18.)

After reviewing Encompass's letter of October 4, 2002, Mr. Sincavage testified that he agreed that trade stacking had occurred on the Project. (Trial Tr. 6884:16–18.) Mr. Sincavage further testified that HCC had paid for at least some of the resulting damages. His testimony was as follows:

Q. I want to ask the question over again. Okay? There were legitimate complaints that trade contractors made about trade [stacking] that resulted in additional costs to them for which HCC paid, true or false?

A. Yes. True. Sorry.

Q. So it happened on the job?

A. Yes.

(Trial Tr. 6879:24–6880:5.) Orange County Construction Manager John Morris also testified that he heard of scheduling and trade stacking issues on the Project, as follows:

Q. And Dick Larson with OBK, they talked about problems with the schedule that may lead to stacking of trades. Do you recall receiving information along those lines?

A. Yes.

Q. Okay. They warned you about that. Right?

A I don't think they were warning me. I think they were just bringing it to the attention that, you know, that's what they're hearing and that's what they're seeing on some of the scheduling.

(Trial Tr. 2755:14–25.)

One of the specific problems that EME encountered as a result of trade stacking was that often during the course of the Project EME was unable to access the electrical rooms where it needed to work. (Trial Tr. 191:17–192:5.) Before EME could begin its work in the electrical rooms, the walls needed to be dry-walled and painted, the switch gears needed to be on, and transformers and the racks supporting the conduit needed to be installed. (Trial Tr. 193:24–194:11.) Encompass, the other electrical contractor working on the Project, also encountered problems due to delayed predecessor activity and lack of access to the electrical rooms. On March 4, 2002, Encompass wrote to HCC, observing that the building was "still not dried-in and the electrical rooms continue to be unavailable...." (Pl.'s Ex. 63.) As a result of these problems, Encompass decided to decrease its workforce on the Project. (*Id.*)

Many problems arose due to the lack of coordination. For example, EME needed to be able to use the scaffolding that was used by the dry wall subcontractor. (Trial Tr. 293:18–294:21.) Normally, work would flow so that the scaffolding would be available to EME when it began its work following the dry wall preliminary work. (*Id.*) However, because a gap developed between these tasks, the scaffolding became unavailable. (Trial Tr. 294:14–21.) EME also experienced problems due to the lack of notice of concrete pours. (Pl.'s Ex. 242, Record of Conversation no. 61.) The roof work continuously caused problems. Only one subcontractor was working on the roof-a father and son company with only a handful of workers. (Trial Tr. 1740:4–12; Trial Tr. 6401:3–6402:7.) Roof work is critical to the flow of work since the job cannot be "dried in" until the roof is complete. (Trial Tr. 222:4–13.) The failure to complete the roof on time slowed down the work of other trade contractors who needed a dry working space. (*See id.*)

In the assessment of EME's expert witness Mr. Curtis, "everything was going wrong on the project, all the correspondences said things were going wrong and the end date was being kept firm, firm, firm, and all it kept doing was pushing all the activities towards the end overlapping

and collapsing the activities." (Trial Tr. 1466:7–12.) This resulted in trade stacking and lack of efficiency. (Trial Tr. 1466:19–1467:2, 1473:9–22; Trial Tr. 2229:12–2230:1.) Mr. Curtis gave the following description of what occurred on this Project:

> I guess an analogy would be ... if your escalator is going too fast and something goes on and you're all standing on the escalator and it goes too fast, everybody ends up in a pile at the end of the escalator because you have runaway escalator....
>
> That's a good analogy of what happened on this job. All the project, all the trades were going to the end of the project, they're all stacking up and they're all hurrying up to meet that end date and they met the end date but at a terrific cost.

(Trial Tr. 1782:21–1783:14.)

4. Failure to Coordinate Inspections

EME and other trade contractors also were delayed by HCC's problematic coordination of inspections. (See Pl.'s Exs. 110, 171; see also Trial Tr. 4088:1–24; Trial Tr. 4280:3–25.) Even when EME's work was completed, Orange County would not inspect and approve EME's work if non-conforming work by other trade contractors existed in the area. (Pl.'s Ex. 426; see Pl.'s Ex. 171; Pl.'s Ex. 118, 1; Trial Tr. 247:10–249:24.) EME was forced to wait until all other electrical subcontractors in an area being inspected had completed their work before its work could be inspected and approved. (Trial Tr. 248:14–249:1, 253:2–7.) The reason for this taxing inspection process was both because there were multiple electrical contractors and subcontractors on the Project and because HCC had agreed to the procedure during an inspection meeting. (Trial Tr. 250:3–252:25.) Problems with the schedule and sequencing of the work fur-

ther impacted EME's inspections. (Pl.'s Ex. 242, Record of Conversation no. 172.)

HCC Senior Project Manager Mike Sincavage testified that the inspection process on this job was "typical" of other projects. (Trial Tr. 6656:2–6657:7.) This testimony, however, is not credible given the extent of the evidence and the conflicting testimony of other HCC representatives and statements documented in HCC reports. HCC Field Manager Moe Young testified that there were problems with coordinating inspections that "definitely" impacted EME, by forcing it to "jump around." (Trial Tr. 6124:16–23.) HCC Project Executive Bob May testified that the inspection process on the Project was "onerous." (Trial Tr. 7299:19.) HCC's July 2002 report to Orange County also asserted that the inspection process "impacted the progress and schedule of the Work." (Pl.'s Ex. 235, Mar. 2003 Report pt. 1A; Trial Tr. 6745:19–22.) The report complained about the issues surrounding the construction documents, revisions, and inspections. (Pl.'s Ex. 235, July 2002 pt. 1A; Trial Tr. 6773:18–22.) HCC wrote in the report that "[m]echanical and electrical coordination and inspections continue to be a significant factor in the overall schedule." (Pl.'s Ex. 235, July 2002 Report pt. 2A; Trial Tr. 6776:11–17.)

D. Management Failures in the HCC Joint Venture

The scheduling and coordination failures on the part of the HCC joint venture have been clearly established by the evidence presented at trial. It is also clearly indicated that these failures were the result of breakdowns in management between the joint venture partners and within the HCC joint venture structure. This breakdown in management explains how such experienced construction management firms

were responsible for such a terrible failure in construction management.

Soon after commencement of the Project, an atmosphere of distrust and finger pointing arose between the HCC joint venture partners. Throughout the Project, the two principal joint venture partners, Hunt and Clark, and their respective employees, maintained a volatile and strained relationship that spilled over into HCC's management. HCC Senior Construction Manager Pete Milner, a Hunt employee, acknowledged that when he arrived on the Project in October 2001, there were communication problems within the joint venture. (Trial Tr. 3948:4–3949:22.) Contrary to Mr. Milner's assertion that communications within the joint venture improved over time, it is clear from the record that the communication problems continued, particularly between the Hunt and Clark employees. (Trial Tr. 3951:2–20; Pl.'s Ex. 430.)

Management problems within the HCC joint venture are evident in multiple internal communications. One of the first is an email dated September 29, 2001, from HCC Senior Project Manager Gordon Gibson, a Clark employee, to HCC Project Executive Bob May, a Hunt employee. Mr. Gibson complained that "no one seems to care whether [HCC General Superintendent] Tom Spall has the material and manpower necessary to meet the [schedule] dates . . . ." (Pl.'s Ex. 424.) Mr. Spall, of Clark, himself authored a memorandum dated June 25, 2002, to HCC Project Executive Bob May and HCC Senior Construction Manager Pete Milner, both of Hunt, further addressing these issues. Mr. Spall's memorandum included the following:

I have managed and pushed a lot of work. I have delivered many projects. I never got the work done by being ignored or turned into some kind of lame duck. The lack of support the field receives from this Joint Venture is clear. . . . There is only one Senior PM that attends the Superintendents meeting. Do any of the rest ever review the look ahead? 1 never get questioned about performance or the multitude of questions 1 should get from individuals so unfamiliar about what goes on in the field. Is there any interest in the schedule beside giving George [Perkowski] his monthly update? You know the one all the PM's give to the Superintendent to do! . . .

**This job is dying.** You can feel it in our office. "Team work" is non existent. . . . Look where we are and DO THE MATH! IT DOES NOT ADD UP!!!

(Pl.'s Ex. 427, 1–2 (emphasis in original).) Mr. Spall also discussed the failures and criticisms of the look-ahead schedules as follows:

The look ahead [schedule] that I produce is supposed to be a plan for the [trade contractors] to work to. That look ahead has become a joke. I go through the motions week after week. I schedule work with trade contractor input. They fail to perform. I push the dates out. The time to stop accepting this as fact is now!

(*Id.* at 1.) Mr. Spall further stated that the "biggest rock in the road is the financial log jam expressed by all the trade contractors" over unresolved and outstanding proposed change orders. (*Id.*)

When questioned at trial about Mr. Spall's memorandum, HCC Senior Project Manager Mike Sincavage, of Hunt, stated that he disagreed with these conclusions, had never asked Mr. Spall about it, and could only conclude that Mr. Spall was "upset" and in a "strange state of mind." (Trial Tr. 6864:23–6869:7.) When asked on cross-examination if he knew whether anyone else shared Mr. Spall's opinion, Mr. Sincavage responded: "I don't know. Pos-

sibly the sycophants to Tom [Spall] might, to appease him. Beyond that, I don't know." (Trial Tr. 6852:14–15.) Mr. Sincavage's tenor during this exchange further demonstrates the breakdown in the joint venture relationship and communications among the HCC leadership.

HCC Senior Project Manager Gordon Gibson, of Clark, sent an internal memorandum, dated September 9, 2002, to HCC Senior Construction Manager Pete Milner and HCC Project Executive Bob May, both of Hunt, in which he openly complained that HCC's staff was not performing their responsibilities or using "basic engineering processes and practices" to manage the Project. (Pl.'s Ex. 124, 1.) Mr. Gibson chastised Mr. Milner for his failure to support him in his efforts to timely post RFI's from trade contractors, to use up to date submittal registers to ensure materials were timely obtained, and to promptly review trade contractor cost proposals. Mr. Gibson noted that each of the disciplines, each team of HCC engineers and employees, was working separately instead of working together for the good of the overall Project. He wrote, "[e]ach team does it differently. Each team has a different set of rules." (Id. at 4.) Mr. Gibson quoted Mr. Milner as having said that they "all should probably be fired." (Id.) Gibson concluded as follows:

> [M]y frustration is based on the fact that people are not doing the job they were hired to do. Most of these individuals, and the specifics for management of this project, work for you. I have little, if any, control over correcting or changing the outcome of the above issues. However, I seem to be the only one who actually knows the specifics of the above issues. And I seldom, if ever, see you taking the time to review the information that I detailed above. 1 close by

saying that all of the above are statements of fact.

(Id. at 5.)

Finally, another memorandum from Mr. Gibson, of Clark, dated September 19, 2002, to Sid Jordan, Clark's senior member of the HCC joint venture, complained of Hunt's reactive management philosophy and the communication problems he was having with HCC Project Executive Bob May and HCC Senior Construction Manager Pete Milner, both of Hunt. (Pl.'s Ex. 430.) Mr. Gibson relayed his frustration to Mr. Jordan as follows:

> To follow up on our phone conversation of yesterday evening, I believe there is an inherent difference in management philosophies between Hunt and Clark. Hunt seems to be typically reactive whereas Clark attempts to be proactive. . . .
>
> I really was hoping that the memo would force Bob [May] to put the three of us (Bob, Pete, and myself) in a room to discuss. To date, Pete [Milner] has yet to say anything to me about sitting down and discussing the memo. Hopefully, if we meet tomorrow, we can come away with a game plan that will be beneficial to the project.
>
> . . . .
>
> PS—In addition to the above, 1 know that the engineers are frustrated and have been speaking to me on two different issues. One is advancement (and the future) and the other being the frustration of working for Hunt managers who provide no input or guidance. Maybe we can chat about this as well tomorrow.

(Id.)

All of these communications clearly demonstrate the internal conflicts within the HCC joint venture. This internal fight spilled over onto the Project, affecting

HCC's efforts to meet its management obligations, as has been fully described above.

## III. HCC's Affirmative Defenses

### A. Notice that EME Intended to Present a Claim

■ One of HCC's defenses is that EME has waived its claims for damages or otherwise should be estopped from asserting a claim so long after the damage-causing events took place. The facts clearly establish, however, that EME has not been negligent in bringing its claim to HCC's attention. HCC was clearly made aware, from a very early date, that EME intended to assert a claim against HCC for damages based on the scheduling and coordination failures. The argument based on estoppel and waiver is not well founded.

Shortly after EME began working on the Project, HCC received notice that EME believed it had been negatively impacted by HCC's failures in scheduling and coordinating the work of EME and expected or intended to make a claim against HCC for damages. This was reiterated in communications between EME and HCC throughout the time EME worked on the Project. The first clear communication from EME regarding damages due to the negative impact of the Project schedule was the letter of October 31, 2001, from EME to HCC Senior Project Manager Mike Sincavage. (Pl.'s Ex. 47, 1; Trial Tr. 785:4–786:4.) The letter enclosed the report of Chitester Management, an outside scheduling consultant retained by EME to compare the overall project schedule of August 9, 2001, identified as OC 25, against the prior schedule of November 8, 2000. (Trial Tr. 785:4–9; Trial Tr. 1098:11–21.) Chitester Management concluded that the OC 25 schedule was unworkable without wholesale changes in a report dated October 26, 2001. (Trial Tr.

786:9–14.) EME's letter to HCC included the following statement:

> This schedule revision will require EME to increase (ramp up) its work crews earlier than originally planned in an effort to support the current schedule. In addition, the current plan requires that EME forego a plan that moves from building grid to building grid in a progressive order that economically minimizes mobilizing and demobilizing work areas and efficiently utilizes work crew labor, to one where EME is required to move in a random pattern (exhibit 3).

(Pl.'s Ex. 47, 1; see Trial Tr. 787:3–788:19.) The letter contained a schedule analysis describing the likely effect of reducing EME's work duration from 116 weeks to 79 weeks. (Id.)

At trial, EME Senior Project Manager Mike Estes was asked to compare the number of labor hours required under the two schedules. (Trial Tr. 1102:12–15.) First, he stated that a comparison of the labor hours required could not be done because the schedules were incomplete. (Id. at ll. 15–22.) Second, he stated that any calculation could not take into account the impact of acceleration (Trial Tr. 1105:15–1107:24), but that the Chitester Management analysis included the best estimate that could be made at the time of the increased labor hours that EME would incur. (Trial Tr. 1107:15–1109:1.) The report clearly stated that it was impossible to know what the full impact of the new schedule would be. (Id.) Thus, the letter of October 31, 2001, clearly put HCC on notice of a claim-causing event-the issuance by HCC of an unworkable revised master schedule. The letter also made clear that EME would incur damages as a result, including acceleration damages, labor costs, delay and disruption damages, and provided EME's best estimate of the damages likely to be incurred, based on

the information available at the time. EME requested that HCC revise the schedule so as to prevent these damages. (Pl.'s Ex. 47.)

On April 8, 2002, EME advised HCC that it would be submitting a claim for the additional costs, additional direct labor, lost productivity, and labor inefficiency associated with the Lutron Dimming and Lighting System. (Pl.'s Ex. 73.) On May 8, 2002, EME Assistant Project Manager Barry Hughes met with Kevin Hale, HCC's electrical superintendent, informing him of the following:

> EME could no longer afford to continue to build this job piece work. It is killing us in [Field Correction Reports], inspection problems [and] that EME was not going to roll over … anymore just to satisfy them if they could not get us some areas to work in. Told him the Job was still out of sequence, out of schedule—no schedule.

(Pl.'s Ex. 242, Record of Conversation no. 164.) Further, Mr. Hughes insisted that "EME needs a schedule, we need to be able to plan more than 4 hours in advance on this project. It is very unproductive and does nothing for us." (Id.)

In February 2003, EME again notified HCC that it "need[s] to get compensated for the extra out of sequence work [it has] been forced to do." (J. Ex. 69.) On April 15, 2003, HCC wrote Orange County asking for "an extension of the Date of Substantial Completion to May 15, 2003." (Pl.'s Ex. 187.) Also on April 15, 2003, at HCC's request, EME furnished HCC with a breakdown of EME's monthly general conditions costs on the Project. (J. Ex. 112.) On April 16, 2003, EME requested a partial payment from HCC for the additional overhead and labor hours that EME had expended. (J. Ex. 117.) EME notified HCC "of its intent to present a claim" in an April 23.2003, letter. (Pl.'s Ex. 78.) On May 27, 2003, HCC wrote Orange County requesting an additional "extension of the Date of Substantial Completion to June 30, 2003." (Pl.'s Ex. 192; Trial Tr. 4268:3–4270:2.)

Many of the other trade contractors on the Project, in addition to EME, were insisting that HCC compensate them for the additional costs associated with improper scheduling and coordination. For example, in multiple additional correspondences. Encompass pointed out the additional costs it was incurring due to being forced to work out of sequence, the lack of available work areas, the lack of coordination, and improper scheduling. (See Pl.'s Ex. 49.)

B. The Impact of the May 2002 Storm

On May 30, 2002, the area in which the Project is located experienced a very strong storm. Although the parties may disagree as to the severity and overall impact of the May 2002 storm, both acknowledged that it caused some damage to portions of previously completed work. One of the reasons for the damage was that as of the date of the storm, the roof had not been completed, and the building had not achieved "dry in" status. The storm inundated the Project with water. Rain came through numerous openings in the roof, flooding interior sections. John Morris, Orange County's construction manager who was present during the storm, testified that it was a "pretty substantial storm," but "I've seen worse." (Trial Tr. 2727:8–14.) He continued, "[i]t was one of those summer, you know, Florida, hit hard and go away type of storms that we're all accustomed to" in central Florida. (Id. at ll. 15–17.)

Initially, HCC seemed to acknowledge that the storm's impact was minimal, but during construction, HCC came to view the storm as a way to justify the request for additional construction time, which it

desperately needed. By blaming construction delays on the storm, HCC was able to claim that Orange County and its builders risk carrier, Zurich American Insurance Company, were responsible for the additional costs of scheduling changes and impacts. As one of HCC's trial experts reasoned in an e-mail, "However, it strikes me that if we, perhaps jointly with EME, can develop a [unintelligible] realistic storm damage claim, this would be found money to help settle the global claim. Zurich's money is still green." (Pl.'s Ex. 438.)

There are many problems with putting the blame for EME's delays and additional costs on the May 2002 storm. First, HCC's own analysis concluded that the impact of the storm was minimal. On August 26, 2002, HCC Scheduler George Perkowski concluded in an internal memorandum that the total impact of the May 30, 2002, storm was only "9 calendar days to the project completion date." (Pl.'s Ex. 120.) The claim HCC submitted to Zurich contended that the storm delayed completion by 84 days and resulted in $22,912,666 in damages, in addition to the direct "brick and mortar" damages paid by Zurich separately. Of the approximately $23 million in damages, HCC claimed it was owed $12 million directly, with the remainder to be allocated between Orange County and various trade contractors.

Second, much of the damage from the May 2002 storm was exacerbated by the failure of HCC to properly prepare the work site for a storm. The roof was behind schedule. Scheduling and coordination problems were also exacerbated because the building had not been timely dried-in. (Trial Tr. 779:11–25.) HCC's roofing contractor, Sunshine Roofing, "was supposed to be complete in May on the North building," but the evidence shows that they were not. (Pl.'s Ex. 427, 1; Pl.'s Ex. 242, Record of Conversation no. 183 (noting that water was pooling up in con-

tractor work areas).) In fact, water continued to come into the building throughout the summer of 2002 because the roof was not finished. (Trial Tr. 226:5–227:1.) Moreover, HCC had not put adequate temporary closures on windows and openings. Nevertheless, HCC had directed the installation of interior finish work in areas with little or no protection from summer rains. Plywood and roofing materials had not been secured, and as a result, during the storm those materials were blown around, causing extensive puncturing of portions of the roof that had been completed. (Trial Tr. 224:1–24.) These roofing materials also damaged EME's work. (*Id.* at 11. 17–24.) HCC Project Executive Bob May accepted that HCC was obligated to take precautions to protect the Project from storms or extreme weather. (Trial Tr. 7811:1–7813:11; J. Ex. 239, CM Agreement, Art. 2.3.9.) Further, Mr. May acknowledged that EME was entitled to rely upon HCC's obligation to protect the Project from storms and extreme weather. (Trial Tr. 7813:12–20.)

Third, it is clear from the evidence that the delays HCC seeks to blame on the storm existed prior to May 30, 2002. HCC Scheduler Lou Well's schedule review dated March 29, 2002, used two different models to estimate a lengthy delay of completion, of either a two-and-a-half or a five-month delay. (Pl.'s Ex. 322, Intro.) Several items were incurred either prior to the storm or were principally the result of HCC's failure to schedule and manage the work, including the "accelerat[ion] and mitigat[ion] damages," the "extended general condition costs, costs for extended scaffold rental, costs for extended temporary power and lighting, costs for additional supervision, and other costs." (Pl.'s Ex. 292, Vol. 1, no. 4A.)

Fourth, many water problems that HCC experienced after the storm were caused

by the failure of HCC to properly manage the removal of the water from the Project. (Trial Tr. 779:2–10, Oct. 21, 2004; Pl.'s Ex. 100.) Trade contractors complained that their work was being damaged because of the manner in which HCC was attempting to remove water from the building. Specifically, HCC crews were using squeegees to move the water and pushing it to any available floor opening, causing areas that might otherwise have been dry to become wet. (*See* Pl.'s Ex. 100; Pl.'s Ex. 242, Record of Conversation no. 183.) Problems due to HCC's poor handling of excess water continued for at least several weeks. In an internal e-mail dated June 26, 2002, HCC admitted that the efforts of its clean-up crews were causing additional problems and that their ability to remove the water was being hampered by the failure to provide sufficient equipment. (Pl.'s Ex. 100.) HCC General Superintendent Tom Spall wrote to HCC Field Manager Moe Young, stating that "HCC does need more equipment to expedite water removal. One vacuum for each building doesn't make a dent." (*Id.*) Orange County, upon learning of the water removal problem, questioned HCC's lack of supervision in dealing with the excess water and pointed out that "[e]very rainstorm WILL NOT be the cause for an insurance claim." (Pl.'s Ex. 99, 1.) Orange County's Construction Manager John Morris testified as follows:

Q. Isn't what's going on is that you finally had to put your foot down and say, look, guys, every time it rains out here you're not going to have an insurance claim?

A. That's pretty much where I was coming from, yes.

(Trial Tr. 2738:24–2739:4.)

### C. Damages Caused by Orange County and the Architect

■ HCC has likewise argued that part of EME's purported damages can be attributed to the actions of Orange County and the Architect, for which, HCC argues, it cannot be held liable under the Trade Contract. HCC was, however, required to cooperate with EME in order to benefit from this limitation of liability provision, as will be discussed below. As established by the evidence at trial, HCC did not cooperate with EME in the submission of pass-through claims. Under Articles 16.4 and 16.1(b) of the CM Agreement, upon receipt of a pass-through claim from EME, HCC had ten days to give Orange County written notice of a claim or potential claim by EME, and 15 days thereafter to submit a written claim. (J. Ex. 239, CM Agreement, Art. 16.) HCC failed to provide the necessary notice to Orange County, much less submit a written statement, in response to any of EME's letters or notices regarding its impact claim based on the scheduling and coordination failures on the Project. (Trial Tr. 7680:12–7684:19.) HCC Project Executive Bob May testified that the reason HCC did not submit the claim to the Owner is that EME's damages were covered by an allowance in the guaranteed maximum price. (Trial Tr. 7681:18–7682:1.) However, nowhere does the Trade Contract suggest that pass-through claims need not be forwarded to Orange County if there is an allowance. HCC's argument also fails because the damages EME seeks in this breach of contract claim flowed from HCC's breach of its obligations to schedule and coordinate the work on the Project, not from actions of Orange County or the Architect.

### D. Participation in the Zurich Storm Claim

■ HCC pressured EME and other trade contractors to participate in the storm claim against Orange County and the builder's insurance company, Zurich American. HCC has argued that EME should be foreclosed from claiming damages in this case because its damages were

caused by the May 2002 storm and EME had the opportunity to participate in HCC's storm claim against Orange County and Zurich American Insurance Company but chose not to. To the extent that any damage to EME was caused by the May 2002 storm, EME's decision not to participate in the HCC storm claim was justifiable.

It is clear that HCC was attempting to use the problem of water entering the building as the basis for multiple claims against Orange County. As noted, Orange County warned HCC that every rainstorm would not be an insurance claim. (Pl.'s Ex. 99, 1.) However, this appears to be precisely the track HCC followed in June and July 2002. In its storm claim, HCC sought damages not only for the May 2002 storm but also for above-average rainfall in June and July. (Pl.'s Ex. 292, Vol. 1, no. 2; *see also* J. Ex. 150.) Although HCC promised the trade contractors that they "certainly have the right to make a claim for any additional costs incurred" due to the storm, the Builders' Risk Policy ("Policy") at issue is far less clear. (J. Ex. 150; Trial Tr. 2726:25–2727:7.) For example, the Policy explicitly provides that the only insured parties with respect to delay in completion coverage are Orange County and the Project lender. (J. Ex. 239, Builders' Risk Policy, Declarations, no. 1, and Delay in Completion Endorsement, Declarations Page.) HCC and the trade contractors are not clearly insured parties.

Additionally, "delay" is defined under the Policy endorsement to mean "[t]he period of time between the *ANTICIPATED DATE OF COMPLETION* and the actual date on which commercial operations or use and occupancy can commence...." (*Id.* at Delay in Completion Endorsement, Definitions no. 3 (emphasis in original).) The anticipated date of completion is identified in the Policy and the endorsement as December 16, 2003. (*Id.* at Declarations,

no. 3, and Delay in Completion Endorsement, Declarations Page.) Additionally, the Endorsement mandates a 30–day deductible period beginning with the anticipated date of completion. In short, coverage, to the extent it exists, would only cover a delay after January 15, 2004, 30 days after the anticipated date of completion of December 16, 2003. Because HCC substantially completed the Project on August 8, 2003, there was no "delay" as defined in the Policy. (Pl.'s Ex.201.)

One other provision in the Policy endorsement that bears comment is Number 2 in the Coverage section, which reads as follows:

> The [Insurer] shall not be liable for any increase in the *DELAY* caused by or resulting from:
>
> (C) Any consequential loss; . . .
>
> (J) Any change order or other cause which results in deviation from the original progress schedule, or revisions thereto, and which is independent of insured loss or damage which give rise to the *DELAY,* whether occurring prior to or after the insured *DELAY* . . . .

(J. Ex. 239, Builders' Risk Policy, Delay in Completion Endorsement, Coverage 2 (emphasis in original).) Clearly, the consequential damages arising from the scheduling and coordination problems that occurred before the May 30, 2002, storm were the result of "deviation[s] from the original progress schedule, or revisions thereto, and [are] independent" of the storm. As such, they would likewise be excluded from the Policy. This may help explain why HCC cautioned EME to "be careful with the use of acceleration, consequential damages, etc." in putting together a Storm Claim. (Trial Tr. 7633:1–25; Def.'s Ex. 450, 1.)

When questioned about the Policy at trial, HCC Project Executive Bob May testified that it appeared to him that HCC

and the trade contractors were not named insured parties under the Policy and that the delay in completion coverage only covered Orange County and not EME. (Trial Tr. 7617:9–7619:11.) He further testified that even if coverage existed, it did not cover delays in completion or consequential losses, such as acceleration damages, and that there was no delay in completion as that date is defined by the Policy. (Trial Tr. 7619:16–7630:25.) Mr. May, however, indicated he would have sought the advice of "somebody that knows insurance like Mr. Pienknagura," Hunt's in-house counsel, when attempting to interpret the Policy. (Trial Tr. 7618:24–7619:1.) The Policy warns against the concealment or misrepresentation of any material fact (J. Ex. 239, Builders' Risk Policy, Pt. D(6).)

HCC benefited in several ways by having the trade contractors blame their damages on the storm and not HCC. First, to the extent the trade contractors blamed the storm, HCC was shielded from liability, whether or not the claim was successful. Second, for each dollar the trade contractors attributed to the storm, HCC was able to mark it up for its benefit. (*See* Pl.'s Ex. 292, Storm Damage Claim Summary.) In fact, $12 million of the $22 million claim HCC ultimately submitted to Zurich was for the reimbursement of monies HCC had already paid to trade contractors, HCC's markup on the trade contractors' claims, and HCC's extended general conditions. (Pl.'s Ex. 292, Storm Damage Claim Summary). Third, by having the trade contractors point to an Act of God, HCC had additional support for requesting additional contract time from Orange County. (Trial Tr. 3839:24–3840:8.)

HCC has argued that EME's damages in great part relate to the May 2002 storm and that because EME chose not to participate in the insurance claim submitted to Zurich, it should not now be allowed to recover those damages against HCC. This argument fails for several reasons. First, the Court finds that credible evidence suggests that HCC strongly encouraged the trade contractors to work up their damages so that as much as possible might be claimed under the builders' risk policy. Given the ethical dilemma presented by HCC's actions, EME's decision not to participate in the storm claim is understandable and excusable and should not estop EME from now recovering damages. Further, based on the evidence presented during the whole course of the trial, it is clear that the storm of May 30, 2002, was not the cause of the damages EME is seeking in this action. Moreover, it is also clear that any damage attributed to the storm can also be attributed to HCC's failures on the Project. Had HCC properly secured the Project site ensuring that areas were properly dried-in before sensitive electrical work was done and engaged effective methods of water removal, EME's damages as a result of the storm would have been minimized. Thus, HCC's actions and inactions contributed to the damages incurred following the May 2002 storm. For all these reasons, any damage attributable to the May 2002 storm may be properly included in EME's damage claim against HCC.

### E. The Contractual Claims Provisions and the Change Order Process

HCC has argued that EME has waived or is estopped from pursuing its claim for damages due to its failure to follow the claims procedures outlined in the Trade Contract. During the course of construction, however, HCC departed from the contractual claims procedures and instituted a proposed change order process. (*See* Trial Tr. 4271:1–4272:16; Trial Tr. 6801:22–6803:2.) By so doing, HCC has itself waived the contractual claims procedures. HCC has also argued that by sign-

ing the change orders, EME waived its right to any additional compensation for the delay damages. (Pl.'s Ex. 385; *see also* Doc. No. 270.) It is clear, based on the language in the change orders, as supported by the understanding of the parties, that these change orders were not intended to be final settlements of the damage claim of EME.

■ The CM Agreement laid out a claims and disputes process to be used in the trade contracts between HCC and the various subcontractors working on the Project. (J. Ex. 239, CM Agreement, Art. 16.) However, HCC chose not to follow the process established in the CM Agreement. (*See* Trial Tr. 4271:1–4272:16; Trial Tr. 6801:22–6803:2.) The Trade Contract included various requirements for the submissions of claims to HCC. (J. Ex. 239, Trade Contract Agreement, § 21.) However, even before the Contract was signed, HCC Senior Project Manager Mike Sincavage provided two sets of plan revisions to EME Senior Project Manager Mike Estes. (*See* Trial Tr. 6591:13–6592:5.) Mr. Sincavage stated that any extra compensation associated with the changes would be handled through a proposed change order ("PCO"). (Trial Tr. 6592:1–15.) Neither the Trade Contract, the CM Agreement, nor any of the other contract documents make reference to "proposed change orders," "PCO's" or a "PCO process" to settle claims between HCC and the trade contractors. (*See, e.g.,* J. Ex. 239, Trade Contract Agreement § 18; CM Agreement, Art. 10.) Nevertheless, HCC had developed a system of "proposed change orders" to authorize and track changes to the work on the Project as the way for trade contractors to claim entitlement to payment from HCC, and for HCC to pass those claims through to Orange County or other trade contractors. (Trial Tr. 6626:16–6627:2.)

Once the Trade Contract was signed, the PCO process became ubiquitous, with HCC issuing hundreds of PCOs to EME and thousands more to other trade contractors. (*See generally* Pl.'s Ex. 221.) These PCOs were sometimes passed through and paid by Orange County, sometimes rejected by Orange County and treated as if they were rejected pass-through claims, sometimes paid directly by HCC, and sometimes became the subject of further negotiations. (Trial Tr. 7926:9–7927:7.) HCC representatives testified that they needed a quick and easy mechanism to direct additional work that would provide assurances for trade contractors that they would be paid. (*See* Trial Tr. 4045:19–4046:5.) HCC intended its PCO system to accomplish this, while also providing a mechanism for HCC to track the information needed to determine appropriate compensation and to provide support for any claims it might choose to make against Orange County. (*See* Trial Tr. 4044:24–4045:12.)

Every claims process provided for in the Trade Contract, including pass-through claims under Sections 21.2 and 10.1, direct claims under Sections 21.3 and, if applicable, Sections 10.2 and 9.7(a), overtime and additional workforce shifts under Section 9.7(a), and dispute resolution under Section 34.2 or Article 16 of the CM Agreement, were all subsumed into the PCO process. (*See* Trial Tr. 4041:5–14.) HCC Senior Construction Manager Pete Milner testified that for tracking changes on the Project, he could not "think of any other method that wouldn't be considered part of the PCO process." (Trial Tr. 4041:12–13.) The volume of PCOs made tracking them a difficult task; a task HCC did not master. HCC Senior Construction Manager Pete Milner was questioned about the inconsistencies and logic errors in a running spreadsheet maintained by HCC Assistant Project Manager Jorge Salgado, who was

responsible for tracking cost issues relating to the electrical work. (Trial Tr. 4051:3–4052:23; Trial Tr. 7833:6–7.) Mr. Milner testified that when he and HCC Senior Project Manager Mike Sincavage needed to review the actual status of EME's PCOs, they bypassed the tracking spreadsheet and relied instead on their own internal PCO files. (Trial Tr. 4052:7–18.)

The PCO process changed throughout the course of the Project. At the beginning of the Project, the preferred (but not exclusive) manner for handling PCOs was for a description of a change or additional work to be provided to a trade contractor, who would then price the change for HCC, who would then pass that pricing on to Orange County for approval. (Trial Tr. 4045:6–14.) Later on, because of the demands of the schedule and in order to keep the Project moving, HCC modified the process. (Trial Tr. 4045:16–22.) Under the new process, HCC would issue letters directing a trade contractor to immediately proceed with the work, asserting that the parties would resolve pricing issues later. (Trial Tr. 4046:1–5.)

Additionally, changes were often directed verbally at the Project site, with promises that a PCO would be issued later. HCC Field Operations Manager Moe Young, who was in charge of field supervision and responsible for supervising the HCC superintendents on the Project, testified that from the start, he would verbally direct EME and other trade contractors to proceed with changes, promising to later issue a PCO for the work. (Trial Tr. 6045:9–6046:8.) Mr. Young testified with obvious frustration, recalling how, at some point during the Project, EME had balked at working just on his verbal instruction, and began asking for a written PCO before proceeding with changes. (Trial Tr. 6049:10–22.) It was clear that he considered these requests both unnecessary and

a personal affront, and that he blamed EME for causing delays and inefficiencies for itself and other trade contractors. (See Trial Tr. 6049:23–6050:7.) Mr. Young's testimony, along with other evidence presented, clearly indicates that HCC considered the claims procedure mandated in the Trade Contract to be inefficient and a hindrance to the orderly flow of the work.

HCC representatives in the office tracked PCOs in both formal and informal ways. HCC Cost Engineering Manager David Sterling testified at length regarding the many ways in which HCC would create and often modify PCOs to track changes in the work, including not only the pre-printed PCO request forms, but also letters, emails, interoffice memoranda, verbal directives, prolog entries, and handwritten notes. (Trial Tr. 7865:1–7888:24.) He testified that PCOs frequently included only a short description of the work involved and a "rough order of magnitude" price quote. (Trial Tr. 7870:11–7871:7.) Mr. Sterling's description of these methods is similar to that in a draft memorandum dated November 20, 2002, written by Mr. Sincavage and printed from HCC's computer files. (See Trial Tr. 7865:1–7888:24; Pl.'s Ex. 444.) In the memorandum, Mr. Sincavage described using many of these same methods to request potential changes to EME's scope of work. (Pl.'s Ex. 444.) Mr. Sterling also testified in detail how many of these informal records were systematically purged from HCC's PCO files. (Trial Tr. 7889:3–7890:12; Trial Tr. 7912:5–24; Trial Tr. 7920:7–20.)

■ Sometime around May 2003, HCC began paying "allowances" to critical trade contractors. (See Trial Tr. 1126:1–17.) The allowances appear to have been made to temporarily appease trade contractors so that the work could be completed as quickly as possible, eliminating the risk

that unpaid trade contractors would refuse to continue. Such payments were made to EME, as well as to other trade contractors. (Trial Tr. 4130:24–4131:6; Pl.'s Exs. 446, 447 & 491.) Although the change orders were described by HCC as "allowances," the trade contractors who received them believed they were simply an initial payment toward the overall monies HCC owed to them. (Trial Tr. 1130:17–1131:18; Trial Tr. 4501:7–4502:10.) For example, HCC issued Change Order No. 2 to Encompass for costs "allegedly" incurred because of various delays and inefficiencies. (Pl.'s Ex. 446.) Encompass was paid $250,000 under Change Order No. 2 (Trial Tr. 4131–32) and additional amounts as part of a final settlement with HCC. (Trial Tr. 4132:14–4133:4.)

One of the most noteworthy exhibits introduced at trial was a document removed from HCC's trash dumpster after this Court entered a Temporary Restraining Order enjoining the destruction of critical evidence by HCC. (Trial Tr. 4130:11–20; Pl.'s Ex. 446.) The document was a draft of a change order dated November 20, 2002, that had been prepared for issuance to Encompass. (Trial Tr. 4130:11–20; Pl.'s Ex. 446.) The original description of work covered by the change order was as follows: "Interim funding for various project delays and inefficiencies." (Pl.'s Ex. 446.) After HCC Senior Construction Manager Pete Milner, HCC Senior Project Manger Mike Sincavage, HCC Cost Engineering Manager David Sterling and others had signed off on the change order, it went to HCC Project Executive Bob May for HCC's final approval. (Trial Tr. 7718:10–7719:17.) Mr. May crossed through the quoted language and hand wrote the following: "Allowance to be applied towards costs allegedly incurred by Encompass resulting from delays in the schedule for the work." (Trial Tr. 7718:10–7719:3; Pl.'s Ex. 446.) This same wording made its way onto the corre-sponding change orders issued to EME. (Pl.'s Ex. 310, Change Order no. 9667–017.)

On May 1, 2003, HCC forwarded EME proposed Change Order No. 17. (J. Ex. 144.) In a subsequent cover letter, HCC Project Executive Bob May wrote that Change Order No. 17 shall "constitute an advance and partial payment ... for *extra work, overtime, labor impacts, and builders risk claim.*" (Pl.'s Ex. 188 (emphasis added); *see also* Pl.'s Ex. 310.) HCC made no attempt to establish what portion of the advance related to each specific item of damage. (Trial Tr. 7716:7–7717:13.) Change Order No. 17 provided that $250,000 of the advance was for "[f]unding for interim payment for work in progress related to various changes" and that $1.5 million was an "[a]llowance to be applied toward costs allegedly incurred by EME resulting from delays in the schedule for the work." (Pl.'s Ex. 310, Change Order no. 9667–017.) Change Order No. 17 also included the following language:

The above costs for ... PCO 1727[and] 1728 are allowance amounts for work to be performed and *shall be adjusted following a final reconciliation* reflective of all supporting documentation associated with the *total cost for these issues.*

(*Id.*) At the time Change Order No. 17 was issued, EME was discussing the issue of delay and impact damages with HCC. (Trial Tr. 1125:21–1126:6.) Change Order No. 17 clearly was intended to be a partial payment for those impacts and delays. (Pl.'s Ex. 221; Trial Tr. 1129:16–1131:18.)

In Change Order No. 17, EME and HCC agreed that PCO payments would be made as "allowance amounts" and would be adjusted through a "final reconciliation reflective of all supporting documentation associated with the total cost for these issues." (Pl.'s Ex. 310, Change Order no. 9667–017.) In the end, the parties could

not agree on the proper reconciliation, or if there should even be one. (Trial Tr. 4061:8–4062:14.) HCC's Senior Construction Manager Pete Milner was asked on cross examination how a final determination should be made if EME and HCC could not settle on a price. (Trial Tr. 4061:8–4062:14,) He stated that the "[f]inal say hasn't been had yet. That's why we're here." (Trial Tr. 4062:12–14.) Ultimately, the job concluded with numerous "unresolved PCOs" on which the parties could not agree. (Trial Tr. 3246:1–3247:18; Trial Tr. 7687:6–14.) The most significant of these are PCO 1727 "Funding for interim payment for work in progress related to various changes," and PCO 1728 "Allowance to be applied towards costs allegedly incurred by EME resulting from delays in the schedule of the Work." (*See* Trial Tr. 1128:13–1129:10; Trial Tr. 1811:15–1812:14.) These are the essence of EME's so-called "impact claim," i.e., how much did the delay, disruption and interference caused by HCC cost EME? (*See* Trial Tr. 1882:11–15.)

HCC's position at trial was that EME was not damaged at all by HCC's actions. (*See* Trial Tr. 7653:19–22.) However, Change Order No. 17 belies that assertion. (*See* Trial Tr. 7654:11–7658:1.) HCC Project Executive Bob May testified that HCC did nothing that contributed to the delay of the Project. (Trial Tr. 7653:19–7654:14.) At trial, Mr. May was asked, "Can you think of anything that HCC did wrong that resulted in the delay of the schedule beyond May 1st, 2003?" (Trial Tr. 7653:19–21.) He responded, "Nothing comes to mind." (Trial Tr. 7653:22.) However, in contradiction, HCC Senior Construction Manager Pete Milner agreed that "there's probably some justification [for EME's claim]." (Trial Tr. 4128:14.) Mr. Milner continued as follows:

> There's probably some liability on our part here in things that we discussed, and that there has been a cost impact to EME that we would be directly responsible for, in addition to the other cost impacts that we knew that they had from the storm from other trade contractors.

(Trial Tr. 4128:14–19.) Mr. Milner was then asked the following: "Okay. And, in fact, isn't that what change order 17 is about? You recognize that EME has been impacted and they deserve to be compensated?" (Trial Tr. 4425:3–6.) Mr. Milner's candid response, which departs from HCC's position at trial, is illuminating:

> Never denied that. From the beginning of these negotiations, long before litigation was even contemplated, we've never denied that. There are impacts out there. There are impacts due to delays. There are impacts that were due to trade stacking, if you will, as we've talked about before, there were some negative impacts due to trade stacking. What we have continually asked for is some detailed documentation of how, how much, in some kind of analysis in terms of what the value of that is.

(Trial Tr. 4425:7–18.)

HCC has argued that by signing these various change orders, EME waived its right to any additional compensation. (Pl.'s Ex. 385; Doc. No. 270.) The Court disagrees. First, logically, EME could not have calculated the damages for its entire claim based on HCC's failure to schedule and coordinate the Project in the middle of construction. When EME calculated the amounts for the change orders, the calculation could not have included the increased costs associated with, for example, the "helter-skelter" nature of job conditions, the incomplete schedules, or the failure of the roof to be dried-in. (Trial Tr. 774:5–776:6; Trial Tr. 1117:17–1118:15.) The pricing of each change order reflected only the cost of the specific revision or change indicated in that change order.

(Trial Tr. 1118:16–20, 1133:1–20, 1236:19–1237:20.) This conclusion is supported by HCC's language in the change orders regarding "allowances" and "total costs," and by the fact that settlement discussions between HCC and EME continued even following the signing of the change orders. (*See, e.g.,* Pl.'s Ex. 310, Change Order no. 9667–017; Pl.'s Ex. 419.) Change Order No. 17, for example, clearly indicates full payment has not been made for the damages described. (*See* Pl.'s Ex. 310, Change Order no. 9667–017.)

HCC has also argued that EME should be barred from asserting a claim because EME failed to follow the specific claims procedures provided in the contract. (Pl.'s Ex. 385; Doc. No. 270.) However, the testimony at trial paints a picture of an informal process being instituted on this Project for ordering and documenting "brief descriptions" and "order of magnitude" pricing for changes to work on the Project, unreliable tracking spreadsheets to keep abreast of the status of the PCOs, and separate internal PCO files, which were not routinely cleaned out. (*See, e.g.,* Trial Tr. 7865:1–7888:24.) Based on these facts and the totality of the circumstances, the Court finds that HCC abandoned the Trade Contract claims procedures in favor of an unofficial and fluid PCO process which amounted to a simple bargain-if the trade contractor does the work now, we will sort out the payment details at the end of the Project.

Therefore, to the extent that EME failed to follow the claims procedures, HCC waived those procedures. During construction, HCC clearly failed to adhere to the notice provisions relating to pass-through claims of the trade contractors (Trial Tr. 4278:4–25), the assessment of backcharges against EME (Trial Tr. 4252:5–4255:8), and the submission of claim documentation from trade contractors prior to payment for claims (Trial Tr. 4278:4–

25; J. Ex. 17). Moreover, HCC executed Change Order No. 17 only two weeks before EME filed its Chapter 11 petition. (*See* Pl.'s Ex. 310, Change Order no. 9667–017; Trial Tr. 2846:16–17.) If nothing else, HCC's issuance of this change order within weeks of the filing amounts to a waiver of any assertion that EME failed to follow the claims procedures in the contract, or that EME's claims could now be untimely.

## IV. Damages

### A. *Expert Testimony on Damages*

Anytime a Court must evaluate damages in a highly specialized field, the testimony of expert witnesses is invaluable. At trial in this proceeding, the Court, as the finder of fact, heard the testimony of three expert witnesses on the issue of damages, and will herein weigh their testimony based on the Court's evaluation of the logic and sense of each of their expert opinions.

HCC presented two witnesses to testify as experts—William Zetterlund and Alan Nagorzanski. HCC retained Mr. Zetterlund to examine the reasonableness of EME's costs and Mr. Nagorzanski to establish that EME could have performed a measured mile analysis and thus is precluded from using the modified total cost approach in calculating its damages. The Court heard a total of approximately ten days of trial testimony from HCC's experts, reviewed hundreds of exhibits, charts and calculations, and has carefully considered the points they raised. After having done so, the Court concludes that the opinions espoused by HCC's experts generally lack support in the record, have little basis in logic, are overreaching, and often rely on the interpretation of HCC personnel who are unfamiliar or biased in their recollection of events. Accordingly, the Court gives little weight to the testi-

852

mony of Mr. Zetterlund and Mr. Nagorzanski.

HCC's first expert witness, Mr. Zetterlund, acknowledged that he is not a scheduling expert or an expert in estimating. (Trial Tr. 3180:21–3181:8.) He is the employee of Gibraltar Construction Services and owns a health studio and two mobile home franchises. (Trial Tr. 3240:9–15.) His only prior experience testifying as an expert witness involved testifying against EME in another action. (Trial Tr. 3178:14–18.) In direct examination, HCC elicited Mr. Zetterlund's opinion only as to the reasonableness of EME's costs. On cross-examination, Mr. Zetterlund testified that, in his opinion, EME had been adversely impacted and delayed in its work, was less productive because of interferences and delays, and that it was "very likely" EME incurred additional costs from these impacts. (Trial Tr. 3187:5–24.) Although he made a determination that EME's costs were not reasonable, HCC had not asked him to determine the amount of additional costs EME had incurred. (Trial Tr. 3187:25–3188:7.) Mr. Zetterlund also testified that as a contractor he had often used the modified total cost method, which EME has argued should be applied in this case, when filing claims and that its use was considered acceptable. (Trial Tr. 3214:20–3219:6.)

HCC's second expert, Mr. Nagorzanski, was retained to determine if a measured mile analysis could have been performed by EME. His analysis relied almost exclusively on information from HCC Senior Construction Manager Pete Milner and Project Manager Mike Sincavage and was generally not helpful to understanding the issues at hand. Although he testified that in his opinion EME and its expert could have performed a measure mile analysis, he did not perform one himself, despite having expended over $250,000 in expert consulting fees. (Trial Tr. 4842:23–

4843:18.) Instead, he attempted to persuade the Court that a measured mile analysis could have been performed using multiple examples. (Trial Tr. 4842:23–4856:3.) EME was able to show, however, that each example was littered with questionable analysis and skewed reasoning and relied on data and information that failed to account for the problems EME encountered. It was clear from Mr. Nagorzanski's analysis that, like Mr. Zetterlund, he accepted at face value information the HCC personnel had provided him with little or no independent analysis. Thus, the Court gives little weight to the testimony or analysis of either of HCC's experts.

EME retained Gordon Curtis of Wagner, Hohns, & Inglis to review and analyze the damages EME believed it had incurred. (Trial Tr. 1443:16–23, 1449:4–6.) The Court found Mr. Curtis to be a very credible witness and well-qualified by training and experience to render the opinions he did during trial. Importantly, he has a wide range of experience performing delay analysis and CPM scheduling on almost "any type of job out there" ranging from schools to the Superdome. (Trial Tr. 1451:5–16.) Mr. Curtis's experience as an electrical contractor, scheduler, and estimator was also particularly helpful to understanding the issues in this case. Accordingly, the Court gives great weight to the expert testimony of Mr. Curtis.

*B. Determining the Proper Method for Calculating Damages*

When a construction manager, such as HCC, fails to perform its contractual duty to adequately manage a construction project, the subcontractors, in this case, EME, may be adversely impacted due to the additional unanticipated labor and materials required to complete the project. The affected subcontractor is en-

titled to compensation for the damages incurred as a result of the construction manager's breach of its contract. Depending on the circumstances, there are various methods of calculating such damages. In a case such as this, where the damage was caused by a continuing failure to coordinate the work of trade contractors, an incident-by-incident approach to damages cannot accurately compensate the aggrieved party. The damages incurred by EME were pervasive throughout the project. Methods for calculating damages in such a case include the following: total cost analysis, modified total cost analysis, factor analysis and measured mile analysis. In this case, EME's damages expert Mr. Curtis concluded that the most appropriate method of calculating damages in this case is the modified total cost approach. (Trial Tr. 1819:3–9, 2032:10–2033:5, Oct. 27, 2004; Trial Tr.2094:3–8, 2103:1–22, Oct. 28, 2004; Trial Tr. 2157:1–15.) Mr. Curtis testified that he attempted to calculate EME's damages using several different methods, including the measured mile approach, factor analysis, segregation of the discrete impacts, and total cost method, but was ultimately unable to do so. Mr. Curtis concluded that the "modified total cost" method was the only practical method for proving EME's damages. For the reasons stated below, the Court agrees with this conclusion and adopts the modified total cost approach as the method of calculating EME's damages in this case.

The most practical argument in favor of using the modified total cost approach is simply because the other methods of calculating damages cannot be used in this case, either because the calculation cannot be done or because it would be inherently unreliable based on this set of facts. (Trial Tr. 1818:6–1825:22.) A measured mile analysis, for example, compares an area of work where the trade contractor is able to achieve anticipated or normal productivity, called the "baseline," against the areas in which the trade contractor is impacted. (Trial Tr. 1459:3–1513:6, 1516:10–1520:3; Trial Tr. 1822:2–12.) Mr. Curtis testified that he "wanted to use the measured mile" approach in this case (Trial Tr. 1753:1), but that after trying for weeks, he was unable to find a baseline, or "measured mile," because in each area or with each specific type of electrical work EME performed, EME was impacted. (Trial Tr. 1520:5–1523:17; Trial Tr. 1825:6–22.) Further, it was also impossible to use the measured mile approach in this case due to the limitations on recording or analyzing the time sheets from the field. (Trial Tr. 1851:8–1861:21.) To perform a measured mile analysis, Mr. Curtis indicated that he would need to know the details of each impact and could not simply track workers' timesheets. (Trial Tr. 1859:13–1860:5; Trial Tr.2093:2–2094:12.) Mr. Curtis testified that in order to accurately document the details of each impact, EME would have needed the following additional professionals devoted to the task:

[A] cost engineer or an accountant type of person, a time motion type of person and be with every crew on this project, so you'd have one person[ ] for every crew, that would cost—that would be 40,000 man hours if you figured ten crews, 2,000 hours a year for two years.

You know, there's over $1 million worth of extra expense to chase man hours on a project. . . .

(Trial Tr. 1860:13–20; see also Trial Tr. 2307:4–2308:13.) Moreover, while a measured mile analysis is inherently difficult to perform on electrical work, the difficulty is compounded on a project such as this one where the contractor experienced multiple different impacts. Segregating the damages for each discrete impact on the Project was impractical, if not impossible. Accordingly, the Court concludes that the

measured mile analysis cannot be used in this case to calculate EME's damages.

Calculating damages based on an impact-by-impact analysis is also not possible in this case. Although EME designed and implemented a system to track the actual costs from impacts during the Project, Mr. Curtis and the EME personnel agreed that such calculations simply could not be relied upon for any degree of accuracy. For example, EME's attempts to use code of interference forms to track the cost of each claim-related issue were unsuccessful from the beginning. As noted by EME Senior Project Manager Mike Estes, the code of interference forms that EME prepared recorded but the "tip of the iceberg." (Trial Tr. 1136:8–12.) EME Assistant Project Manager Barry Hughes testified that to accurately calculate the impacts that occurred during the Project would have taken an "army of accountants." (Trial Tr. 2102:3–11, 2110:14–2011:18.)

Mr. Curtis agreed with this assessment. He testified credibly that it would have taken a "time-motion [person], an engineer, an accountant type person, a cost engineer, to follow" each of EME's crews around on the Project to determine how they were impacted. (Trial Tr. 2307:13–15.) Mr. Curtis testified that the cost of hiring such an army of professionals would have been in the hundreds of thousands of dollars. EME's crews often were forced to "hopscotch" between areas and rooms because other trade contractors and materials were in the way, or because predecessor work had not been completed. (Trial Tr. 1699:1–16, 1765:1–4.) On a 2.8 million square-foot building, where EME had as many as 230 employees working at any given time, attempting to capture and document each discreet issue was simply not possible. (See Trial Tr. 447:4–7.) Furthermore, even with the requisite army of professionals, the most any one person could document would be the impact and effects, but not necessarily the cause of the impact. (Trial Tr. 2308:2–10.) Given these limitations, it simply was not practical for EME to attempt to capture all the impacts it suffered. (Trial Tr. 2307:2–2308:13.) Therefore, the Court concludes, based on the circumstances of this case and the level of impact to the work of EME and other trade contractors, it is not reasonable to expect the accurate calculation and documentation of damages for each separate impact. It is also unreasonable, if not impossible, to now unwind events and determine damages based on an impact-by-impact analysis.

Another method of calculating damages is the factor analysis method, which entails applying an inefficiency factor, for example, of 10% to 30%, to the work as a result of the impacts that occur. (Trial Tr. 1822:13–1823:11.) The problem with the factor analysis method, as Mr. Curtis noted, is that in situations like this where there are multiple concurrent impacts, in this case, trade stacking, a building that is not dried-in, haphazard scheduling, lack of coordination, etc., it is extremely difficult to determine what percentage to apply and can be far too subjective. (Trial Tr. 1823:15–1824:12.) The factor analysis method suffers from the same limitations and difficulties as an approach that attempts to isolate the cost of each specific impact. (Trial Tr. 1824:13–1825:5.) Assigning responsibility when concurrent impacts affect each crew can be highly subjective and impracticable to apply. (Id.) Accordingly, the Court concludes that it is inappropriate to use the factor analysis method to measure damages in this case.

Finally, the Court agrees with Mr. Curtis's assessment that using the total cost approach, without modification, is also not appropriate because it does not take into account problems on the project that were "self-inflicted" or for which EME had al-

ready been paid. (Trial Tr. 1819:21–1821:8, 1825:23–1826:1.) Therefore, the Court now reaches the modified total cost approach for calculating damages, and, for the reasons stated below, concludes that it is the most accurate and proper method of calculating damages in this case.[5]

## C. The Modified Total Cost Approach

The modified total cost approach is a variation of the total cost approach. Under the total cost approach, the original bid cost is subtracted from the actual cost of the entire project. Essentially, the difference between the two amounts, after various modifications and adjustments, is the amount of damages incurred as a result of the owner or construction manager's breach. The *modified* total cost approach allows for the adjustment of the amount calculated under the total cost approach to compensate for bid errors, specific costs arising from the subcontractor's actions, and specific costs arising from actions of parties other than the party against whom damages are sought.

The Court found Mr. Curtis's testimony and reasons for applying the modified total cost approach to be persuasive and credible. His conclusions were based on substantial facts and data that Mr. Curtis reviewed over many weeks. The principles and methods he applied in calculating damages are reliable and were applied reliably to the facts of this case. Therefore, the Court will, in large part, base its analysis of the application of the modified total cost approach on the expert analysis of Mr. Curtis.

### 1. The Modified Total Cost Approach Can Be Applied In this Case

■■■ As a predicate to using the modified total cost approach for calculating damages, the subcontractor must demonstrate the following: that the original bid was reasonable, that the actual costs incurred were reasonable, and that the subcontractor was not itself responsible for the cost overruns. (Pl.'s Ex. 280, 63–64.) All three elements have been proven in this case.

### a. The Bid Was Reasonable

Mr. Curtis considered whether EME's original bid was reasonable. To make his determination, he reviewed each line item and the drawings, spoke to EME personnel and compared EME's estimate to the accepted industry standards for estimating electrical work. (Trial Tr. 1826:10–1827:6.) He took into account EME estimator Frank Leto's 44 years of construction experience, his own years of experience, and the fact that EME's bid was based on its own experience with labor. (Trial Tr. 1827:7–1828:11.) He compared the information he gathered concerning EME's estimated labor and material costs against his experience as an estimator and determined that EME's bid was the same or similar to how he would have bid the Project. (Trial Tr. 1828:15–1829:17.) Mr. Curtis also reviewed HCC's internal estimate of the work, which verified that EME's bid was higher than HCC's internal estimates. (Trial Tr. 1830:22–1831:13, 1839:13–1840:7; J. Ex. 37, 2–3.) Based on these considerations, Mr. Curtis concluded that EME's original bid was realistic and

---

**5.** HCC's experts did not provide the Court with any preferable alternatives for calculating damages in this case. While Mr. Nagorzanski argued that the proper method to apply would be the measured mile analysis, he did not actually perform such analysis, and therefore his testimony on this point was nei-

ther credible nor helpful. As the Court has determined that EME did incur damages as a result of HCC's actions, some method must be applied to calculate these damages. The Court does not believe, based on the testimony presented, that there is any better method for calculating the damages in this case.

reasonable. (Trial Tr. 1826:2–1831:13; Trial Tr. 642:24–643:23.) Mr. Curtis's assessment being credible and logical, the Court likewise concludes that EME's bid was reasonable.

### b. The Costs Were Reasonable

To determine whether EME's costs were reasonable, Mr. Curtis reviewed the method EME used for buying and tracking the cost of materials, reviewed EME's records, and spoke to the EME personnel responsible for incurring and tracking costs, EME Accounting Manager Scott Bruce and EME Senior Project Manager Bruce Chabotte. The EME personnel he spoke with believed that the costs were reasonable. (Trial Tr. 1826:4–14, 1847:23–1848:3.) Mr. Curtis also reviewed every category and line item of the job cost report. (Trial Tr. 1847:5–9.) Scott Bruce, Manager of Accounting and Data Systems at EME, was the person primarily responsible for the job cost report. (Trial Tr. 1297:6–11.) Mr. Bruce explained that the job cost report was not a summary, but rather a detailed record "representing each invoice and each week of payroll that was applied to the job" and is based on "detailed transactions from [EME's] accounts payable, accounts receivable, payroll" and other items. (Trial Tr. 1302:10–1303:17.) Mr. Curtis concluded, based on his review, that the costs EME incurred were reasonable. (Trial Tr. 1847:23–1848:3.) EME Senior Project Manager Mike Estes likewise credibly testified that EME's costs were reasonable. (Trial Tr. 826:4–7.) Based on the expert testimony and other evidence presented, and the Court's own review of these documents, the Court likewise concludes that EME's costs were reasonable.

### c. EME Was Not Responsible For Cost Overruns

Mr. Curtis testified that, based on his review of the Project, he did not observe that EME did anything out of the ordinary that would contribute to the additional costs incurred on the Project, other than some "minor items" that were accounted for in his damage calculations. (Trial Tr. 1849:7–1850:24.) Mr. Curtis visited the Project, reviewed the quality of EME's work and concluded it was excellent. He also noted that in his review of the Project correspondence, HCC did not criticize the quality of EME's work. (Trial Tr. 1850:7–10.) Therefore, the Court concludes that EME was not responsible for the increased costs of the Project, except to the extent accounted for in the modifications applied below.

### 2. Application of the Modified Total Cost Approach

■ To calculate damages under the modified total cost approach, the Court must first determine the total costs EME incurred and then deduct items for which HCC should not be held responsible. Then, the amount HCC has already paid to EME to date must be deducted. The balance remaining is the amount of damages due to EME. (Pl.'s Ex. 366; Trial Tr. 1862:2–21.)

### a. Total Costs Incurred

The first step in this calculation is to determine the total costs incurred by EME. Mr. Curtis has calculated this number by reviewing EME's 293–page job cost report. (Trial Tr. 1847:5–22, 1865:22–1866:24; Trial Tr. 2181:4–15.) He also reviewed a sampling of actual invoices to ensure that they accurately reflected the costs incurred on the Project and were properly included in the job cost report. (Trial Tr. 2181:16–2182:4.) In addition, he spoke with the EME personnel responsible for tracking and inputting the costs into the job cost report and concluded that, except for certain costs that he believed

should be removed, it accurately reflected EME's Project costs. (Trial Tr. 1847:23–1848:3, 1867:1–1868:3.) Because the Court finds Mr. Curtis's testimony on this point to be competent, credible, and based on substantial evidence, the Court will adopt Mr. Curtis's number and concludes that the total costs incurred by EME on the Project amounted to $18,909,594.

### b. Modifications

Under the modified total cost approach, various items can be deducted from the total cost amount. There are several deductions that are appropriate in this case. The first deduction to be taken is $142,025 for returned materials. Mr. Curtis determined that a credit should have been applied to the total cost amount for materials remaining from the Project. (Trial Tr. 1866:6–24.) The next item to be deducted from the total cost is $180,931 for materials charged to Division 16, which were used for EME's work on Division 17. (Trial Tr. 1867:1–9.) The total project cost must also be reduced by the cost of miscellaneous materials charged to the job cost report that are properly characterized as overhead items, for which EME is separately compensated. These materials included items such as small tools, parts, safety goggles, and hard hats, which totaled $152,407. (Trial Tr. 1868:4–15.) Overhead costs, according to the testimony of EME Accounting Manager Scott Bruce, included rent or mortgage payments, utilities, the cost of general administrative staff, maintenance on vehicles, storage, and other costs, and were allocated to individual projects based on the total dollar cost of the project. (Trial Tr. 1269:1–1270:14, Oct. 22, 2004.)

Mr. Curtis also made an adjustment to account for certain items that he believed should have been given a higher cost in the original bid. (Trial Tr. 1846:1–25, 1868:22–1869:15.) These items related specifically to the cost of materials and work associat-

ed with unit struts and the hanging of conduit in the exhibit hall. (Trial Tr. 1868:22–1869:15.) The Court agrees with Mr. Curtis's assessment and finds that a credit of $651,742 must be given to HCC as a cost adjustment to the bid price for these items.

Additionally, legal fees of $24,442 must also be subtracted from the total cost amount, because although they are a cost, they are not typically allocated to job costs. (Trial Tr. 1868:16–20.) Mr. Curtis also testified that HCC should be given a credit of $232,068 to adjust for certain field conditions costs, relating to specific items such as punch lists and field correction items, for which EME should bear responsibility. (Trial Tr. 1869:16–23.)

Finally, HCC must receive credit for payments to the Owner Controlled Insurance Program ("OOP"). During the course of the Project, HCC withheld amounts from its payments to EME to be credited to the OOP, an insurance program set up by HCC for all trade contractors to participate in, resulting in a better insurance rate. The amount of $815,004, the amount attributed to these payments in the job cost report, will be deducted from the total costs. (Trial Tr. 1870:12–19.) After the above adjustments, which total $2,198,619, the modified total cost amount is $16,710,975. (Pl.'s Ex. 366.)

### c. Overhead and Profit

The next step in calculating damages under the modified total cost approach is to add in amounts to cover EME's overhead and profit. In calculating the overhead amount due, Mr. Curtis used EME's actual overhead percentage of 23.88% during the three years of the Project. While the Court finds that 23.88% reflects EME's actual overhead, the Court notes that EME's original estimate of overhead, upon which its bid was based, was 15%.

There was no evidence that the overrun of EME's overhead resulted from HCC's mismanagement. While certainly the gross amount of overhead increased as a result of the delays caused by HCC, there is no evidence that these delays resulted in an increase to the percentage of overhead to the total project cost. Moreover, if HCC had properly managed the Project and EME had expended the costs consistent with its bid, EME would have no right to seek damages for increased overhead above the 15% calculated by EME's estimator Frank Leto in preparing EME's original bid. Accordingly, although EME's actual overhead amount was $3,990,581, the Court will depart from the expert report and finds that 15% is the appropriate percentage to use to calculate overhead for purposes of calculating damages. Applying this percentage to the modified cost amount results in an overhead figure of $2,506,647, to be included in EME's damage award.

Profit must then be calculated and added to the damages award. The Court finds reasonable Mr. Curtis's conclusion that a profit of 10% is appropriate in this case. This percentage is based upon the amount of profit EME reasonably anticipated when it undertook the job. (Trial Tr. 1872:9–22.) Communications with EME personnel regarding the profit percentage that they anticipate based on their numbers historically also supports the 10% figure. (Trial Tr. 1872:14–1873:2.) The Court therefore concludes that EME's damages should include a profit of 10% of the total costs and overhead, which is $1,921,763.

### d. EME's Total Damages

Based on the above calculations, the total adjusted contract balance is $21,139,384. The $15,622,462 previously

paid by HCC to EME is subtracted from this amount (*see* Pl.'s Ex. 280, Appendix M, Tab J), leaving a subtotal of $5,516,922. (Trial Tr. 1875:1–1876:6.) EME is required to pay a bond premium, which, based on the price of $5.75 per $1000 of the adjusted contract balance, is $31,723. This amount must be added to the damages. Finally, the OOP pass-through payment of $827,355, the amount established through EME's settlement with Orange County, must be added as an expense. (Trial Tr. 1877:11–22.) Thus, the Court concludes that the total amount of damages due to EME from the Defendants, based on the work EME performed on the Project, is $6,376,000, exclusive of interest and attorneys' fees.[6] (*See* Trial Tr. 1877:23–25.) The damages calculation explained above is also presented in the following chart:

| Total Costs Incurred by EME: | | $ 18,909,594 |
|---|---|---|
| Deductions: | | |
| Returned Materials | $ | (142,025) |
| Div. 17 Charged to Div. 16 | $ | (180,931) |
| Material Normally Charged to Overhd. | $ | (152,407) |
| Legal Fees | $ | (24,442) |
| Adjustment Bid Package | $ | (651,742) |
| Field Job Conditions | $ | (232,068) |
| OCIP Credit | $ | (815,004) |
| **Total Deductions:** | | $ (2,198,619) |
| **Modified Cost:** | | $ 16,710,975 |
| Overhead 15.00% | $ | 2,506,647 |
| Profit 10.00% | $ | 1,921,763 |
| **Total Overhead and Profit:** | | $ 4,428,410 |
| **Total Adjusted Contract Balance:** | | $ 21,139,384 |
| **Amount Paid:** | | $(15,622,462) |
| **Subtotal:** | | $ 5,516,922 |
| .0575 Bond | $ | 31,723 |
| OCIP Pass–Through | $ | 827,355 |
| **EME's Damages:** | | $ 6,376,000 |

---

6. The parties have agreed that the issue of "prejudgment interest and attorneys" fees is reserved for the Court's determination subsequent to this ruling.

## V. HCC's Claim for Backcharges

■ Post-petition, but prior to the filing of this adversary proceeding, EME made a demand to HCC for the remaining amount due to EME under the Trade Contract and various approved change orders. HCC refused to turn over that amount, citing a claim for setoff or recoupment based on amounts HCC claims EME owes for backcharges, relating largely to clean-up costs on the project. HCC's claim for backcharges and attorneys' fees appears in this proceeding as the Tenth Defense in HCC's answer to the Complaint, which is in essence a counterclaim. The Tenth Defense reads in full as follows:

> HCC is entitled, by way of set-off, recoupment or otherwise, to recover all monies and/or costs incurred by HCC due to Plaintiff's breaches of contract, work deficiencies and other acts and/or omissions, including the costs associated with defending this action.

(Answer at 11.) During the course of the trial, senior HCC executives testified in support of HCC's claim for back charges against EME, testifying that HCC was entitled to and sought an affirmative recovery against EME in this litigation. Peter Milner asserted this recovery at trial. (Trial Tr. 4225:18–4226:16, 4295:9–4301:1.) Robert May also asserted this recovery at trial. (Trial Tr. 7546:2–20.) Mr. May and Mr. Milner, of course, were HCC's first and second most senior executives, respectively, on the Project. Therefore, the Court will treat the Tenth Defense as a counter-claim, and will address the merits of HCC's assertions.

HCC's claim for set-off is based on its assertion that EME owes $618,062 in backcharges. (Trial Tr. 3106:9–3107:21; Trial Tr. 4208:8–23.) The first time EME became aware of the existence of these charges was immediately before the start of this trial. (Trial Tr. 397:2–8, 399:11–402:23; Trial Tr. 4213:22–4214:22.) HCC admitted that it has not billed EME for these charges (Trial Tr. 4211:23–25), and at trial, HCC did not present any substantial, competent evidence to support their award. Indeed, the facts indicate that EME provided workers for the composite clean-up crew. (Trial Tr. 4212:23–4213:9.) Rather, HCC provided the Court with a summary of charges apparently based on a pro rata calculation of clean-up costs. Very little explanation was given to explain how the pro rata calculation was made, which apparently attempted to divide the cost of clean-up among the trade contractors. (Trial Tr. 4212:23–4219:5.) Even were there a clear right to clean-up costs, the dearth of evidence presented does not allow the Court to conclude, by a preponderance of the evidence, that such costs exist or can reasonably be tied to EME.

■ The Trade Contract does address the issue of clean-up costs. Section 16.2 of the Trade Contract requires HCC to provide timely notice of its intent to assess backcharges. The section reads in part as follows:

> If Trade Contractor fails to perform necessary or required clean up during the course of and at completion of its Work, upon twenty-four (24) hours written notice to Trade Contractor, HCC may provide such clean up work on behalf of Trade Contractor and charge Trade Contractor for the costs incurred, plus ten percent (10%) for overhead and ten percent (10%) for profit.... HCC shall give Trade Contractor prompt written notice of any backcharge and may deduct such clean up charges from any payment due Trade Contractor.

(J. Ex. 239, Trade Contract Agreement, § 16.2.) The evidence clearly established that HCC failed to provide EME with the required 24–hour writing or the "prompt notice of any backcharge." (Trial Tr. 4252:19–4253:22.) The 24–hour notice pro-

vides a trade contractor with the opportunity to locate the offending items and perform the clean-up itself. Because HCC failed to provide this notice, it is not now entitled to assert a claim of backcharges against EME.

Furthermore, it is also apparent based on the evidence presented to the Court that the threat of backcharges was used by HCC as a negotiating tool and to provide a means of setting off potential damage claims by the trade contractors employed on the Project. In a series of e-mails dated August 19 through August 21, 2002, HCC discussed the use of this strategy. An email authored by HCC Senior Construction Manager Pete Milner included the following statement:

> Collect the information. We will be using this to balance the BS claim for delay in the start of work. While we have no desire to try to actually collect on this Backcharge, [HCC Project Executive] Bob [May] feels it will be a good tool to trade one BS item for another.

(Pl.'s Ex. 410, Email from Pete Milner, Senior Construction Manager, HCC, to Ken Rowsey, Project Engineer, Orange County Convention Center (Aug. 21, 2002, 10:06 AM); Trial Tr. 4220:15–4221:9; Trial Tr. 7544:7–7445:20.) Not surprisingly, EME was not the only trade contractor to balk at HCC's claim of backcharges. Michael Cornelius, an electrician for Encompass, testified as follows:

> Q. Well, let me ask you, did HCC assess against [Encompass] back charges relating to the project?
> A. I think they—yeah, they proposed some back charges, yes.
> Q. What was your response?
> A. It ain't happening. We don't feel they were, you know, we don't feel they were justified.

(Trial Tr. 4510:5–12; see also Pl.'s Ex. 428, Email from C.L. Janeski, Project Manager, Encompass, to Mike Sincavage, Electrical Project Manager, HCC (Aug. 14, 2003, 5:56 AM) (stating that HCC was assessing backcharges "just because [Encompass] performed work [on the Project]").)

HCC conceded at trial that a portion of the backcharges asserted against EME "fall into the less than strong category." (Trial Tr. 4222:6–13.) The Court agrees with this assessment and finds that HCC has failed to meet its burden. HCC is not entitled to set-off any amount for backcharges or clean-up costs against the amounts owed to EME.

## VI. Spoliation of Evidence

This proceeding was initiated on December 23, 2003, with the filing of a Complaint for Injunctive Relief (Doc. No. 1) and Motion for a Temporary Restraining Order (Doc. No. 3), supported by the Affidavit of Richard J. Coble (Doc. No. 4). The Court entered a temporary restraining order the next day, December 24, 2003 (Doc. No. 10; see also Trial Tr. 2552:6–12, Dec. 16, 2004), preventing HCC from removing and destroying Project records, and held a hearing on the motion for an injunction on January 5, 2004.

Richard J. Coble is a construction dispute consultant who was retained by EME in the fall of 2002 to assist in compiling information, initially to determine what was happening on the Project and subsequently to determine possible claims that EME might have in connection with the Project. (See Trial Tr. 813:4–819:3; Trial Tr. 943:2–945:5.) When the Project was completed in the fall of 2003, Mr. Coble was actively engaged in the process of obtaining documents from both Orange County and HCC with respect to these potential claims. (See Trial Tr. 943:2–25.) As stated in his affidavits (Doc. No. 4; Doc. No. 21), in December 2003, Mr. Coble had become aware that HCC's project manager's office was going to be closed

down in mid-December. He was informed that he would not have any access to Project documents for a two-week period commencing December 15, 2003. He learned at that time that Project documents belonging to HCC were being thrown into a dumpster located at the construction site. Upon learning of this, EME employees visited the Project site and discovered that numerous Project documents had indeed been placed in a dumpster. Thus, EME instituted this suit to prevent the further destruction of documents related to its claims against HCC.

In the injunction this Court entered following the hearing on January 5, 2004, the Court required HCC to retrieve and preserve whatever thrown-away Project documents still existed from the job site dumpster, at its own cost. (Doc. No. 26.) EME subsequently amended its Complaint, preserving as Count I its claim against HCC for spoliation of evidence. At trial, the evidence clearly established that documents belonging to HCC that related to EME's work on the Project were being thrown into dumpsters located at the construction site throughout the fall of 2003. (*See* Trial Tr. 2536:9–2541:25; Trial Tr. 2563:2–2567:23; Trial Tr. 3885:20–3887:24.) HCC has not convincingly contested this fact.

HCC argued in defense, however, that it was unaware of possible litigation from the Project until EME filed this adversary proceeding. It is not credible that HCC did not anticipate litigation relating to the Project, given the numerous complaints, claims, disputes, threatened and actual lawsuits, and public records requests advanced by EME and others. In May 2003, for example, EME Senior Project Manager Mike Estes wrote to HCC Project Executive Bob May stating, "[i]t appears that we are headed down a path where electronic data will be an important part of the process we will need to go through in explaining how EME has been impacted on the OCCC project." (J. Ex. 173.) This letter further requests that all electronic data "be preserved on the [Project]." (*Id.*) Additionally, the HCC privilege log produced in this case also listed a number of privileged facsimiles and correspondence dated July 2003, when negotiations between EME and HCC were ongoing. (Pl.'s Ex. 374.) This indicates that HCC was clearly aware of impending litigation by the summer of 2003.

However, prior to the entry of the temporary restraining order and preliminary injunction, HCC had no document retention policy for the Project, and employees were allowed to decide, on their own, which documents to delete or destroy. (Trial Tr. 7852:5–7, 7855:9–7856:9.) Although Clark and Hunt both had their own document retention policies (Pl.'s Ex. 493; Trial Tr. 7852:8–16), David Sterling, an HCC cost engineering manager, testified that he had never seen any document retention policies and did not rely on them (Trial Tr. 7825:24–7826:5, 7939:19–7940:7). He was called by HCC to testify concerning the process HCC went through to decide which documents would be kept and which would be thrown away. (*See* Trial Tr. 7852:5–21.)

HCC Senior Construction Manager Pete Milner testified that no attorneys from either Hunt or their outside counsel advised him not to throw away Project documents during the month of July 2003. (Trial Tr. 4026:24–4027:6.) Additionally, Mr. Milner testified that no one ever advised him that HCC needed to maintain all records relating to EME. (Trial Tr. 4027:7–11.) In fact, his testimony confirmed Mr. Sterling's testimony that HCC employees were to use their own judgment as to what to destroy. (Trial Tr. 4026:24–4028:24.) It was not until he received a copy of this Court's temporary restraining

order on December 24, 2003, that HCC put into effect a document retention policy. (Trial Tr. 4029:22–4030:16.) Until that time, HCC took no action to preserve documents relating to the Project. (Trial Tr. 7726:2–19.)

Following the entry of the injunction, EME engaged in the process of recovering HCC's documents, both the documents that were recovered from the Project site dumpsters and electronic documents deleted from HCC's computer systems. These efforts recovered a variety of relevant documents and revealed that relevant documents had been destroyed by HCC. Some documents were recoverable, some were not.

After being removed from the dumpster, retrieved documents were stored in a sealed room at the Project site. (Trial Tr. 2554:12–2556:25) At trial, the Court reviewed various photographs that showed documents from "numerous different entities bunched together, as opposed to discrete files." (Trial Tr. 2557:15–21, 2584:14–2585:5; *see also* Pl.'s Ex. 380; Pl.'s Ex. 381.) A large number of these documents "were mildewed," "had been wet," and "were ripped." (Trial Tr. 2585:3–5.) The documents included numerous original Project documents with handwritten notes on them, including draft change orders and computer diskettes. (Trial Tr. 2557:15–2561:12, 2572:12–2573:3; Pl.'s Ex. 381.)

The efforts required to review these documents was extraordinary. For instance, representatives of EME were often required to wear hazardous materials suits along with protective face masks to view the documents. (Trial Tr. 2586:16–2587:6, 2589:4–16.) Describing EME's attempted review of these documents, EME General Counsel Leon Williamson testified as follows:

It's, again, like looking for a needle in a haystack. This situation, as depicted in the pictures, with all the documents piled together, all mixed in with various different entities, not organized, and, again, because of this particular situation not really knowing what's there and not knowing who you're looking for, is absolutely unprecedented and it's not like anything I've ever seen or heard of.

(Trial Tr. 2586:7–15.) The Court, upon the parties' request, made a site visit to the Project on December 11, 2004. During that visit, the Court viewed not only the Project itself but also the storage room where the dumpster documents were being maintained. The Court concurs with Mr. Williamson's assessment that the circumstances under which the disposed documents were produced were "unprecedented." In addition to the documents that were recovered, HCC had previously discarded additional Project documents into the dumpster that were removed and destroyed. (Trial Tr. 2537:13–2540:22.)

At trial, EME introduced copies of a sampling of documents that were retrieved from the dumpster. (Trial Tr. 2565:14–21; *see* Pl.'s Exs. 311, 312, 313, 369, 524 & 525.) These documents included a sizable number of handwritten notes, telephone messages, telephone logs, meeting notes, draft change orders, draft change orders with handwritten notes, tracking logs, tracking logs with handwritten notes, draft and original letters, calendars, claim calculations, and notes from design document reviews. Even a cursory review of the documents retrieved reveals literally hundreds of original documents and copies with handwritten notes.

During discovery, EME also attempted to recover documents from HCC's computers. EME retained Chester Kwitowski, a computer forensic expert, to perform a lost file folder recovery from computers used by HCC on the Project. (Trial Tr. 2420:19–25.) This process produced com-

puter printouts of files that had been deleted. (Trial Tr. 2421:6–14.) Mr. Kwitowski then attempted to recover the deleted files and store them onto hard drives. (Trial Tr. 2422:10–2423:2.) In total, approximately eight hard drives of information were recovered by Mr. Kwitowski from computers operated on the Project. (Trial Tr. 2423:3–7.) Mr. Kwitowski's examination of HCC's computers found instances where documents had been deleted from the hard drive by the user and were not found on the server. In some cases, those files, while not present on the server, were nevertheless recoverable. In other cases, they were not. (Trial Tr. 2426:6–23.)

HCC has argued that even if it had a duty to preserve relevant documents in anticipation of litigation, that it has not harmed EME because copies of all documents it threw away were maintained in its Project archives, and to the extent it destroyed documents, they were not relevant to this action. HCC asserted that "EME cannot produce a single document it recovered from the dumpsters that does not have a duplicate in HCC's files." (Pl.'s Ex. 504, 9; *see* Pl.'s Ex. 503.)

The evidence at trial clearly established that in many cases, "the original of any project record copy that was discarded" *cannot* be found in HCC's project files. (Pl.'s Ex. 371, 2, item c.) Moreover, there is no way to know what documents were destroyed by HCC prior to the entry of the Court's injunction. It was also clearly established at trial that many of the documents retrieved from the dumpsters at the Project site were very relevant to this litigation. As it is impossible to know what was destroyed, based on the evidence regarding the items that were recovered, the Court concludes that relevant documents were destroyed by HCC prior to this Court's injunction.

Therefore, the Court finds that HCC did not place a litigation hold on all Project documents. It has been established by evidence received at the initial hearings on the injunction and at trial that HCC destroyed a large number of Project documents and did so in the face of anticipated litigation with EME and other trade contractors. (Trial Tr. 7725:2–14.) Furthermore, this was done after HCC received written requests to preserve all electronic and other documentation relating to the Project. (Trial Tr. 7726:2–19; J. Ex. 173.)

## CONCLUSIONS OF LAW

### I. Jurisdiction

The constitutional basis for the establishment of bankruptcy laws and, by extension, bankruptcy courts, is found in Article I of the United States Constitution, which gives Congress the power "[t]o establish … uniform Laws on the subject of Bankruptcies throughout the United States." U.S. Const. art. I, § 8, cl. 4. When Congress created specialized federal bankruptcy courts in 1978, the judges appointed to those courts were not given the protections found in Article III of the Constitution. *See* U.S. Const. art. III, § 1 (granting federal judges life tenure and protection from salary reductions). In 1982, the Supreme Court held that the Bankruptcy Act of 1978 was unconstitutional to the extent that it granted bankruptcy judges, so-called Article I judges, the power to adjudicate rights that "are not of Congress' creation." *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 84, 102 S.Ct. 2858, 2878, 73 L.Ed.2d 598 (1982) (Brennan, J.) (plurality opinion). The narrow ruling in *Marathon* was that the "adjudication of state-created 'private rights' [is] too far removed from the 'core' of the federal bankruptcy power, i.e., the restructuring of debtor-creditor relations" to be finally adjudicated by Arti-

cle I bankruptcy judges. *In re Toledo,* 170 F.3d 1340, 1347 n. 9 (11th Cir.1999).

The jurisdictional reach of federal bankruptcy courts, "like that of other federal courts, is grounded in, and limited by, [federal] statute." *Celotex Corp. v. Edwards,* 514 U.S. 300, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995). Following *Marathon,* Congress enacted a new statutory arrangement to provide the basis for the jurisdiction of federal bankruptcy courts, intending that their "core jurisdiction would be construed as broadly as possible subject to the constitutional limits established in *Marathon.*" *CBI Holding Co., Inc. v. Ernst & Young,* 529 F.3d 432, 460 (2d Cir.2008). Post-*Marathon,* federal district courts have been given "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). Pursuant to the authority of 28 U.S.C. § 157, the Middle District of Florida, like other federal districts, has provided that all bankruptcy cases and proceedings listed under § 1334(b) "shall immediately be transferred and referred" to the federal bankruptcy court for the district. (Order of Reference, No. 84–misc–152, M.D. Fla., July 11, 1984.)

The distinction identified in *Marathon* between proceedings that are at the "core" of the bankruptcy-power and those that are not was incorporated into the jurisdictional statute. Accordingly, bankruptcy judges may "hear and determine" all "core proceedings" arising under and arising in a case under title 11, and enter all appropriate orders and judgments. 28 U.S.C. § 157(b)(1). However, while a bankruptcy judge may hear a proceeding that is "otherwise related to a case under title 11," the judge shall not enter a final judgment, absent consent of the parties, but shall submit proposed findings of fact and conclusions of law to the district court. *Id.* § 157(c)(1)-(2). A non-exclusive list of core proceedings is provided in 28 U.S.C. § 157(2)(B).

## A. The Law of the Case

Early in this proceeding, the Defendants filed motions to withdraw the reference. These motions were heard by the District Court and denied. (Order, Doc. No. 9, Case No. 04–399 (M.D.Fla. Apr. 27, 2004).) In the District Court's order, the core and non-core nature of each of EME's claims was established. The District Court's order is part of the law of this case. Citing *Charter Crude,* the Court made a determination that the Plaintiff's claim for turnover is not a core claim, but "actually a non-core proceeding seeking to recover on a breach of contract claim." (*Id.* at 7) (citing *Charter Crude Oil Co. v. Exxon Co., U.S.A. (In re Charter Co.),* 913 F.2d 1575, 1579 (11th Cir.1990).) Further, the Court determined that the claim for spoliation is likewise not a core proceeding, as it is a proceeding merely to preserve evidence "supporting … a non-core state law contract claim arising from a contract entered into pre-petition." (*Id.* at 7.) The Court noted that "to construe count I [spoliation] as a core proceeding would result in almost any litigation by a debtor being labeled as a core proceeding." (*Id.* at 6.) Also, the Court concluded that count II, including claims for retainage and unpaid change orders, "is just another breach of contract count that is a 'related to' non-core matter." (*Id.* at 8.) The Plaintiff did not contest that the claims based on breach of contract are non-core. (*Id.* at 7.) Finally, the District Court determined that the Motion for Sanctions, which was consolidated with this proceeding for purposes of trial, *is* a core proceeding and, moreover, is "inextricably intertwined" with the other claims pending in this adversary proceeding. (*Id.* at 6, 8.) The District Court held that it could not "separate the motion for sanctions from the other matters with-

out causing both the parties, this court, and the bankruptcy court to duplicate efforts." (*Id.* at 8.)

However, the District Court did *not* address the affect of the mixed core/non-core nature of this proceeding on this Court's exercise of jurisdiction-the District Court merely decided not to withdraw the reference. While it has been established that this Court has at least "related to" jurisdiction over all of the matters before it, the question remaining is whether this Court should enter a final judgment, as it does in all core proceedings and all non-core proceedings in which the parties have consented to the entry of a final judgment, or whether the Court should submit proposed findings of fact and conclusions of law to the District Court, as it would where a proceeding is entirely non-core. Further, at the time the motions to withdraw the reference were filed, the Defendants had not yet filed their answers, and therefore, they were not considered by the District Court when it made its core/non-core determination. (*Id.* at 4 n. 3.) In HCC's answer, it asserts "set-off or recoupment," based on EME's alleged breaches of contract, as an affirmative defense. (Answer at 11.)

There are two issues remaining on the subject of jurisdiction. The first is whether this Court may enter final judgment on both core and non-core claims in this proceeding, where the core and non-core claims are inextricably intertwined and, for the sake of judicial economy, have been heard together in a single trial. The second question is whether the assertion of the affirmative "defense" of "set-off" or "recoupment" in this case amounts to a counterclaim, which can be construed as a claim against the estate, bringing this whole proceeding into the core jurisdiction of the bankruptcy court. *See* 28 U.S.C. § 157(b)(2)(B)-(C).

### B. Inextricably Intertwined

 A number of courts have addressed the question of how a bankruptcy court is to treat a proceeding that has both core and non-core elements. The result has been the promulgation of two distinct approaches and a split in authority. As the Eleventh Circuit has yet to weigh in on the subject, this Court must examine the various approaches before deciding which approach most faithfully follows the rule of *Marathon* and the statutory scheme established in 28 U.S.C. § 157.

Several courts have adopted a "predominately core" · approach, holding that a bankruptcy court "may determine that the entire proceeding is core if the core aspect heavily predominates and the non-core aspect is insignificant." *Sibarium v. NCNB Texas National Bank*, 107 B.R. 108, 115 (N.D.Tex.1989) (citing *Blackman v. Seton (In re Blackman)*, 55 B.R. 437, 443 (Bankr.D.D.C.1985)). In *Blackman*, the bankruptcy court held that the core claims "far outweigh[ed] and predominate[d] over [the non-core] claim for money damages," and that as such, the core aspects "heavily predominate over any non-core aspect, and any non-core aspect is insignificant. Hence, this proceeding should be regarded as a core proceeding." 55 B.R. at 443; *see also Edgewater Medical Center v. Edgewater Property Co. (In re Edgewater Medical Center)*, No 04-3579, 2004 WL 2921957, *4 (N.D.Ill.Dec.15, 2004) (declining to withdraw the reference, the court held that it need not determine whether the core and non-core elements were inextricably intertwined, because the proceeding "is not predominantly non-core").

While the predominantly core approach may make practical sense, it has recently been criticized by the Third Circuit as being contrary to the Supreme Court's rule in *Marathon*. *Halper v. Halper*, 164 F.3d 830, 839 (3d Cir.1999). In rejecting

the "predominantly core" approach to mixed core/non-core proceedings, the Third Circuit adopted "the claim-by-claim approach as the only one consistent with the teachings of *Marathon.*" *Id.* This Court is inclined to agree with the Third Circuit's concerns over the "predominantly core" approach and agrees that the claim-by-claim approach is certainly consistent with *Marathon.* However, it is not always practical or even possible for a bankruptcy court to make findings on a claim-by-claim basis, submitting some for *de novo* review and presenting others in a final judgment.

Another approach taken by courts is to determine, when faced with mixed core/non-core proceedings, whether the core and non-core claims are "inextricably intertwined." If they are so enmeshed, then, rather than attempt to unravel the distinct claims, the court will treat the entire proceeding as a core proceeding and enter a final judgment on all matter so intertwined. For example, in *DeLorean,* the Bankruptcy Appellate Panel for the Ninth Circuit held that an otherwise non-core state law claim was "inextricably tied to the determination of an administrative claim against the estate and [ ] similarly tied to questions concerning the proper administration of the estate." *Honigman, Miller, Schwartz & Cohn v. Weitzman (In re DeLorean Motor Co.),* 155 B.R. 521, 525 (9th Cir. BAP 1993). Accordingly, the panel held that the whole proceeding was "a core proceeding within the scope of 28 U.S.C. § 157(b)." *Id.* The *DeLorean* opinion has been cited with approval by the Ninth Circuit. *See Maitland v. Mitchell (In re Harris Pine Mills),* 44 F.3d 1431, 1438 (9th Cir.), *cert. denied,* 515 U.S. 1131, 115 S.Ct. 2555, 132 L.Ed.2d 809 (1995). In the *Harris Pine Mills* case, the Ninth Circuit concluded that the state law claims against a trustee, which were "inextricably intertwined with the trustee's sale of property belonging to the bankruptcy estate," accordingly "involved a core proceeding."

*Id.* As such, the bankruptcy court properly entered a final judgment on the merits. *Id.; see also CDX Liquidating Trust v. Venrock Assoc.,* No. 04–7236, 2005 WL 3953895, *2 (N.D.Ill. Aug.10, 2005) (holding that where non-core claims were "inextricably intertwined" or "enmeshed with" the core claims, the non-core claims "should be treated as core claims"); *Edgewater Medical Center v. Edgewater Property Co. (In re Edgewater Medical Center),* No 04–3579, 2004 WL 2921957, *4 (N.D.Ill.Dec.15, 2004) (noting that "state law counts that are factually intertwined with [core fraudulent conveyance] counts may be considered core"). Likewise, a bankruptcy court in this district has held that where an adversary proceeding included one core claim and one non-core claim, which were "hopelessly and inextricably intertwined," that the court "may and would treat the entire proceeding as a 'core' proceeding." *Fleming v. Baynes (In re Fleming),* 228 B.R. 780, 783 (Bankr.M.D.Fla.1998); *see also Morrison v. Western Builders of Amarillo, Inc.,* 555 F.3d 473, 478–80 (5th Cir.2009) (joining all other circuits in holding that a bankruptcy court can enter a final judgment in a non-core matter where the non-core matter is the subject of a dischargeability action); *Vienneau v. Saxon Capital, Inc.,* No. 08–4021, 2009 WL 2514152, *5–6 (Bankr.D.Mass. Aug.12, 2009).

Although these cases provide little analysis in its support, the "inextricably intertwined" approach makes sense when considered in light of the doctrine of collateral estoppel. Accordingly, this Court will adopt it. Pursuant to the doctrine of collateral estoppel, where core claims are, as a factual matter, inextricably intertwined with non-core claims, the bankruptcy court's findings of fact as to the core matters would preclude subsequent contradictory findings as to the non-core matters. *See HSSM # 7 Limited Partnership v.*

*Bilzerian (In re Bilzerian)*, 100 F.3d 886, 892 (11th Cir.1996). The four elements of collateral estoppel are as follows: (1) the issue in the prior action and the issue in the present action are identical; (2) the issue was "actually litigated" in the prior action; (3) the determination of the issue in the prior action was a "critical and necessary part of the judgment" in that litigation; and (4) the "burden of persuasion" in the present action must not be significantly heavier than the burden of persuasion in the prior action. *Id.* Where a core matter and a non-core matter are inextricably intertwined, the bankruptcy court's determination of the core matter will almost always meet the requirements of collateral estoppel as to the non-core matter. Were a bankruptcy court to submit proposed findings of fact to a district court in such a case, by operation of collateral estoppel, the proposed findings would not truly be subject to *de novo* review, where the facts have been already decided by the bankruptcy court in a final determination of the core matter. *See I.A. Durbin, Inc. v. Jefferson Nat'l Bank*, 793 F.2d 1541, 1548 n. 8 (11th Cir.1986) (affirming in dicta the res judicata affect of a bankruptcy court's final judgment in a core proceeding). Therefore, this Court concludes that it is appropriate for a bankruptcy court to simply enter a final judgment on all non-core matters so intertwined with core matters that the determination of the core matter necessarily involves the determination of the non-core matter. *See generally Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 374–76, 127 S.Ct. 1105, 1111–12, 166 L.Ed.2d 956 (2007).

■■■ As stated by the District Court in this case, the Motion for Sanctions filed by EME against HCC is inextricably intertwined with the whole of this adversary proceeding. Even the claim for spoliation is intertwined with a determination on the Motion for Sanctions, because this Court must consider whether HCC reasonably believed that a real dispute existed as to the funds it was withholding, justifying its refusal to turn over the amounts. This Court must also consider the rights and obligations of these parties under the Trade Contract and their claims against each other to determine whether HCC was justified in withholding remittance of the amounts owed to EME. The determination of a motion for sanctions for violation of the automatic stay is a core proceeding arising in the bankruptcy case, and moreover is a matter over which this Court should be exercising jurisdiction. *See In re Lickman*, 301 B.R. 739, 746 (Bankr. M.D.Fla.2003); *Halas v. Platek*, 239 B.R. 784 (N.D.Ill.1999). As this determination is inextricably intertwined with all other claims in this proceeding, it is appropriate and expeditious to treat the whole proceeding as a core proceeding.

*C. Counterclaim Against the Estate*

Even if this Court were not required to treat this whole matter as a core proceeding to the extent the non-core matters are inextricably intertwined with a core matter, there is a second basis for the exercise of core jurisdiction in this proceeding. The second jurisdictional question this Court must address is whether HCC's "defense" of "set-off or recoupment" is, in substance, a claim against the estate, which would subject HCC to the equitable jurisdiction of the bankruptcy court and allow for the entry of final judgment by this Court on all matters in this adversary proceeding. *See Commercial Financial Services, Inc. v. Jones (In re Commercial Financial Services, Inc.)*, 251 B.R. 397, 404–08 (Bankr.N.D.Okla.2000). HCC's Tenth Defense of set-off or recoupment reads in full as follows:

> HCC is entitled, by way of set-off, recoupment or otherwise, to recover all monies and/or costs incurred by HCC due to Plaintiff's breaches of contract,

work deficiencies and other acts and/or omissions, including the costs associated with defending this action.

(Answer at 11.) The first issue to be addressed is whether a counterclaim asserted by a defendant in a non-core, related to proceeding qualifies as a claim against the estate sufficient to subject the defendant to the equitable jurisdiction of the bankruptcy court. The second issue is whether either set-off or recoupment, although pled as a defense, can qualify as such a counterclaim. The final issue to be considered is whether HCC's Tenth Defense is, in substance, a counterclaim seeking affirmative relief amounting to a claim against the estate.

### 1. Counterclaim as a Claim Against the Estate

■ Included in the statutory list of "core proceedings" are "counterclaims by the estate against persons filing claims against the estate," 28 U.S.C. § 157(b)(2)(C), and "allowance or disallowance of claims against the estate," *id.* § 157(b)(2)(B). The Supreme Court has been very clear that creditors filing claims in a bankruptcy case subject themselves to the equitable power of the bankruptcy court. *Granfinanciera S.A. v. Nordberg,* 492 U.S. 33, 58, 109 S.Ct. 2782, 2799, 106 L.Ed.2d 26 (1989). Even if a proceeding would not otherwise fall within the core jurisdiction of the bankruptcy court, by submitting a claim, a creditor triggers the allowance and disallowance of claims process, and an otherwise non-core action against that creditor by the estate is transformed into an action within the bankruptcy court's equitable jurisdiction. *See id.; Langenkamp v. Culp,* 498 U.S. 42, 111 S.Ct. 330, 112 L.Ed.2d 343 (1991) (per curiam).

■ HCC has not filed a claim in this case. However, while a formal proof of claim clearly qualifies as a "claim against the estate," several courts have considered whether other filings by a creditor may also so qualify. For example, it is well established that the filing of a complaint against a debtor may qualify as an informal proof of claim. *Barlow v. M.J. Waterman & Assoc., Inc. (In re M.J. Waterman & Assoc., Inc.),* 227 F.3d 604, 608–11 (6th Cir.2000); *Nikoloutsos v. Nikoloutsos (In re Nikoloutsos),* 199 F.3d 233, 236–37 (5th Cir.2000). The filing of a complaint against a debtor equates to making a claim against the estate, which subjects a creditor to the equitable jurisdiction of the bankruptcy court. *Southeastern Sprinkler Co. v. Meyertech Corp. (In re Meyertech Corp.),* 831 F.2d 410, 417–18 (3d Cir. 1987). In *Southeastern Sprinkler,* the Third Circuit reasoned that, given the broad definition of a "claim," *see* § 101(5)(A), the plaintiff's action for breach of warranty against the debtor "is correctly characterized as a claim against the estate" which is "a core proceeding under the bankruptcy judge's jurisdiction." 831 F.2d at 418. The Second Circuit has likewise opined that "[p]arties may, by their conduct, submit themselves to the bankruptcy court's jurisdiction." *Universal Oil, Ltd. v. Allfirst Bank (In re Millenium Seacarriers, Inc.),* 419 F.3d 83, 98 (2d Cir.2005) (Sotomayor, J.) The Second Circuit held that by objecting to a sale order and actively litigating their lien claims through an adversary proceeding, the lienors had submitted themselves "to the bankruptcy court's equitable jurisdiction." *Id.*

Several courts have likewise held that the filing of a counterclaim in an adversary proceeding may act as a claim against the estate for purposes of bringing the whole proceeding into the core jurisdiction of the bankruptcy court. *See Hedstrom Corp. v. Wal–Mart Stores, Inc. (In re Hedstrom Corp.),* No. 04–38543, 2006 WL 1120572 (N.D.Ill. Apr.24, 2006); *Commercial Financial Services,* 251 B.R. at 406–

08; *Barto Technical Services, Inc. v. Taylor–Winfield Corp. (In re Barto Technical Services, Inc.)*, No. 94–2193, 1996 WL 16664 (Bankr.W.D.Pa. Jan.16, 1996). These courts have concluded that by filing a counterclaim against the estate, a defendant submits to the jurisdiction of the bankruptcy court, triggering the process of allowance and disallowance of claims and creating core jurisdiction over the whole of the dispute, including otherwise non-core matters. *See, e.g., Barto Technical,* 1996 WL 16664, at *4. As stated by the Second Circuit, "one of the most elemental of all core bankruptcy functions [is] determining if a creditor may collect from a debtor's estate." *CBI Holding,* 529 F.3d at 461.

In *Barto Technical,* the debtor had filed a complaint that included entirely non-core, related to claims. 1996 WL 16664, at *4. The defendant to that action then chose to file a counterclaim. *Id.* The bankruptcy court held that by filing the counterclaim, the defendant had "submitted to the jurisdiction of [the bankruptcy] court because the filing of the permissive counterclaim, in essence, invoked the claims allowance process. The effect is the same as it would have been had [the defendant] filed a formal proof of claim." *Id.* The court noted that the defendant "could have defended that action without pleading a counterclaim" and instead pursued "state court remedies." *Id.* As stated by the court in *Commercial Financial,* "[w]hen a defendant sued by a debtor in possession asserts a claim against the estate, however, the bankruptcy court's equitable jurisdiction to adjust the debtor-creditor relationship is invoked. The 'restructuring of debtor-creditor relations ... is at the core of federal bankruptcy power.' " 251 B.R. at 404 (citing *Marathon,* 458 U.S. at 71, 102 S.Ct. at 2871). Adopting the reasoning of *Commercial Financial,* the *Hedstrom* court noted that should the creditor win on the claim, "the bankruptcy estate will be

significantly diminished." *Hedstrom Corp.,* 2006 WL 1120572, at *3; *see also Gecker v. Marathon Financial Insurance Co., Inc. (In re Automotive Professionals, Inc.)*, 389 B.R. 621, 629 (Bankr.N.D.Ill. 2008) (holding that "a claim for contribution would amount to a claim against the estate, triggering the process of allowance and disallowance of claims and subjecting Marathon to the court's equitable jurisdiction"); *Container Recycling Alliance v. Lassman,* 359 B.R. 358, 362 (D.Mass.2007) (noting that "courts' chief concern has been whether the counterclaimant was seeking to achieve an affirmative recovery from the estate by circumventing the bankruptcy court's formal claims allowance procedure"); *Styler v. Jean Bob, Inc. (In re Concept Clubs, Inc.)*, 154 B.R. 581, 588 (D.Utah 1993) (holding that a counterclaim for set-off "*may* constitute a claim against the bankruptcy estate for jurisdictional purposes" (emphasis in original)).

■ This Court finds persuasive and adopts the reasoning of *Commercial Financial* and *Barto Technical.* The adjudication of a creditor's traditionally non-core claims may be brought within the core jurisdiction of the bankruptcy court by the filing of a formal proof of claim *or* by the filing of a complaint or counterclaim against a debtor in possession in the bankruptcy court. Such a complaint or counterclaim operates as an informal proof of claim against the estate and triggers the claims allowance and disallowance process, which is within the core jurisdiction of the bankruptcy court.

2. Set-off is a Counterclaim Constituting a Claim Against the Estate

A second question is whether set-off or recoupment, pled as a "defense," may properly be considered a counterclaim. Few courts have addressed this question, and they are divided in their assessment.

The *Commercial Financial* court and cases following that opinion have held that "the assertion of setoff, whether as a defense or as a counterclaim, clearly invokes the claims allowance process." 251 B.R. at 406. The *Commercial Financial* court considered the creditor's argument that by asserting setoff as a defense it was not actually seeking to recover from the estate but merely seeking to reduce the amount it would have to pay to the estate. The court rejected this argument as follows:

> This Court fails to see a distinction between obtaining something of value from the estate by filing a claim and obtaining something of value from the estate, *i.e.*, discharge of all or a portion of a debt to [the debtor] by asserting setoff as a defense. In both cases, the estate may be diminished and [the creditor] may be enriched.

*Id.* at 407; *see also Hedstrom*, 2006 WL 1120572, at *3 (reasoning that "[w]hether [the debtor] writes [the creditor] a check or cancels [its] receivable, the end result is the same: the bankruptcy estate will be significantly diminished"); *Stoebner v. Leonard, O'Brien, Wilford, Spencer & Gale, Ltd. (In re O'Neill)*, No. 97–001, 1997 WL 615661, *3 (Bankr.D.Minn. Oct. 2, 1997) (noting that a creditor who is entitled to set off the amount of its claims against the amount it owes to a debtor "has effectively received full payment on its claims instead of being limited to the amount of the Trustee's pro rata distribution").

On the other hand, in *Concept Clubs*, the court adopted the creditor's argument and held that "when setoff is raised only as an affirmative defense seeking to reduce, or extinguish, the original claim, the party asserting the claim does not invoke the bankruptcy court's equitable jurisdiction." *Styler v. Jean Bob, Inc. (In re Concept Clubs, Inc.)*, 154 B.R. 581, 589 (D.Utah 1993) (noting, however, that a *claim* of setoff "may constitute a claim against the bankruptcy estate for jurisdictional purposes").

■ Like the court in *Hedstrom*, this Court finds the reasoning of *Commercial Financial* more persuasive. The right of setoff "allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'" *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18, 116 S.Ct. 286, 289, 133 L.Ed.2d 258 (1995) (citations omitted). Underlying an assertion to a right of setoff of amounts potentially owed to a bankruptcy estate is the assertion of a claim against the estate. In asserting set-off, a creditor argues that it has a valid claim against the debtor, which it should be allowed to deduct from what it owes. Accordingly, a creditor seeking to enforce a right of set-off seeks an affirmative recovery against the estate and thereby subjects itself to the equitable jurisdiction of the bankruptcy court.

■ However, this Court also agrees with *Commercial Financial* in its determination that it is necessary to look to the "substance of the assertion to determine whether the claims allowance process has been invoked." 251 B.R. at 408 (concluding that by asserting a defense of set-off, the creditor had asserted "a breach of contract claim against the estate and invoked the bankruptcy court's core jurisdiction"). As reflected in Federal Rule of Civil Procedure 8(c)(2), *see* Fed. R. Bankr.P. 7008(a) (incorporating Fed. R.Civ.P. 8), if a party to a proceeding "mistakenly designates a defense as a counterclaim, or a counterclaim as a defense, the court must, if justice so requires, treat the pleading as though it were correctly designated, and may impose terms for doing so." Fed.R.Civ.P. 8(c)(2). Courts should look beyond a title

or label to determine what is the substance of a pleading. *See Container Recycling Alliance v. Lassman,* 359 B.R. 358, 364 (D.Mass.2007).

Where the creditor asserts a claim, the claims allowance process is invoked. In general terms, a claim or counterclaim is "essentially an action which asserts a right to payment," whereas an affirmative defense is "neither an 'action' nor a 'claim,' but rather is a response to an action or a claim." *Nat'l Union Fire Ins. Co. of Pittsburgh, Penn. v. City Savings, F.S.B.,* 28 F.3d 376, 393–94 (3d Cir.1994). In other words, counterclaims are "affirmative claims for relief," which are distinguishable from affirmative defenses, "which challenge the plaintiff's legal right to bring an action but ... do not allow for recovery." 3 *Moore's Federal Practice* § 13.90[1] (Matthew Bender 3d ed.2009); *see also Nat'l Union,* 28 F.3d at 393 (giving a definition of a defense as "a reason in law or fact why the plaintiff should not recover or establish what he seeks") (citations omitted). Where the defense merely gives a reason for why the plaintiff should not prevail, it is simply a defense. However, where a "defense" asserts a right to payment, it is not a defense, but a claim.

### 3. HCC's Tenth Defense is in Substance a Counterclaim of Set-off

██ The Court will now turn to the final question—whether HCC's Tenth Defense of "set-off" or "recoupment" is in substance a claim against the estate. Based on the bare pleadings, it appears to be in substance a counterclaim against EME for breach of the Trade Contract. At trial, it became clear that HCC as-

serted a right to payment from EME for backcharges and clean-up of the Project site. As explained above, HCC did not present sufficient evidence to support either claim, and HCC did not argue entitlement to payment in the post-trial pleadings. Nevertheless, the claims were pleaded in the Complaint. HCC has also asserted, throughout this proceeding, that it does not owe anything to EME whatsoever under the Trade Contract. Accordingly, had HCC won on all issues in dispute, the result would have been a determination that amounts were owed by EME *to* HCC. Clearly, underlying its claim of set-off, HCC is asserting a claim against the Debtor. As such, HCC has invoked the equitable jurisdiction of the bankruptcy court, transforming this proceeding into a core proceeding under 28 U.S.C. § 157(b)(2)(B). Accordingly, this Court concludes that it may enter a final judgment on the merits on all claims in this proceeding.[7]

## II. Spoliation

When EME filed this proceeding, the first relief requested was to enjoin HCC from spoliating evidence. In conjunction with this initial request, as described above, it was established at that time that HCC destroyed or otherwise discarded a large number of Project documents and electronic data even though HCC was well aware that EME and other subcontractors had claims arising from the Project. Thereafter, the parties participated in a massive effort to retrieve and restore the discarded documents. This required restoration of physical documents as well as

---

**7.** While this Court is of the opinion that core jurisdiction extends over the whole proceeding, if, on appeal, another court should judge differently, these findings of fact and conclusions of law may be treated as proposed findings of fact and conclusions of law submitted pursuant to 28 U.S.C. § 157(c)(1). *See Mar-*

*shall v. Marshall,* 547 U.S. 293, 126 S.Ct. 1735, 164 L.Ed.2d 480. 302–05. 547 U.S. 293, 126 S.Ct. 1735, 164 L.Ed.2d 480. 1743–44, 547 U.S. 293, 126 S.Ct. 1735, 164 L.Ed.2d 480 (2006); *Williford v. Funderburk (In re Williford),* 222 Fed.Appx. 843, 844 (11th Cir. 2007) (per curiam) (unpublished opinion).

the retrieval of electronically stored documents. Count One of EME's Amended Complaint is a claim of spoliation. The first question the Court must address is whether EME has a separate cause of action for spoliation against HCC under Florida law, second, if no such separate cause of action exists, the Court must then address whether EME may nevertheless seek evidentiary sanctions for spoliation against HCC for its conduct in destroying or failing to maintain these documents.

### A. Spoliation as a Cause of Action

Spoliation encompasses two related but distinct concepts—an independent cause of action and evidentiary sanctions. The first form of remedy for spoliation is an independent cause of action at common law, arising under state tort or negligence law. There is no federal cause of action for spoliation. *See, e.g., Sterbenz v. Attina,* 205 F.Supp.2d 65, 74 (E.D.N.Y. 2002) (holding that the inherent power of a federal court to sanction litigants "does not effectively afford a federal cause of action for spoliation where a state law claim does not exist"). At one time, Florida law recognized both a first-party cause of action brought by a party to the underlying lawsuit and a third-party cause of action brought against a non-party for either negligent or intentional spoliation of evidence. *See Gayer v. Fine Line Constr. & Electric, Inc.,* 970 So.2d 424, 426 (Fla. 4th DCA 2007). However, after the Florida Supreme Court's ruling in *Martino,* there is no longer a first-party cause of action for spoliation against the same defendant as in the underlying litigation. *Martino v. Wal–Mart Stores, Inc.,* 908 So.2d 342, 346 n. 2 (Fla.2005); *Gayer,* 970 So.2d at 426. In *Martino,* the Florida Supreme Court held that the availability of sanctions, including the imposition of evidentiary presumptions and inferences, provides sufficient protection to the plaintiff where the defendant in the litigation commits negligent or intentional spoliation of evidence. 908 So.2d at 346–47. As noted, *Martino* specifically did not displace the independent cause of action for spoliation against a *third* party. *Id.; Jimenez v. Cmty. Asphalt Corp.,* 968 So.2d 668, 671 (Fla. 4th DCA 2007).

In Count One, EME has pled a claim of "spoliation" against the Defendants in this breach of contract action largely based upon Florida law. Under *Martino,* EME cannot bring an independent cause of action for spoliation against HCC. Accordingly, EME is limited to recovery under the second type of spoliation remedy—evidentiary sanctions based on one party's spoliation of evidence.

### B. Spoliation Sanctions

Federal courts are split on the question of whether federal or state law governs the imposition of spoliation sanctions in federal courts sitting in diversity, where the underlying suit arises under state law. *Flury v. Daimler Chrysler Corp.,* 427 F.3d 939, 944 (11th Cir.2005). EME has argued that federal law governs the imposition of spoliation sanctions in this case; HCC has argued such sanctions are evaluated under Florida law. In a way, both parties are correct. When affirming the imposition of spoliation sanctions in a suit in diversity arising under Georgia law, the Eleventh Circuit held that "federal law governs," but that the analysis "is also informed by Georgia law." *Id.; see also Serra Chevrolet, Inc. v. General Motors Corp.,* 446 F.3d 1137 (11th Cir.2006) (addressing spoliation sanctions in a diversity suit under Alabama law); *Fla. Evergreen Foliage v. E.I. DuPont De Nemours & Co.,* 470 F.3d 1036 (11th Cir.2006) (same under Florida law). Accordingly, the Court will first address the applicable federal case law on spoliation sanctions in the Eleventh Circuit before turning to the principles of Florida

law governing the imposition of spoliation sanctions.

■■■ The Eleventh Circuit has not enunciated a standard for the imposition of spoliation sanctions where the underlying cause of action arises under Florida law. In *Flury*, the panel adopted the analysis under Georgia law, which calls for a consideration of the following factors to determine whether to impose spoliation sanctions: "(1) whether the defendant was prejudiced as a result of the destruction of evidence; (2) whether the prejudice could be cured; (3) the practical importance of the evidence; (4) whether the plaintiff acted in good or bad faith; and (5) the potential for abuse if expert testimony about the evidence was not excluded." *Flury*, 427 F.3d at 945 (citing *Chapman v. Auto Owners Ins. Co.*, 220 Ga.App. 539, 469 S.E.2d 783, 785–86 (1996)). The panel also held that Georgia law is "wholly consistent with federal spoliation principles." *Id.* The Defendants have argued that the *Flury* analysis should be applied to this case. However, as explained below, Georgia law materially differs from Florida law in the area of spoliation sanctions, and accordingly, this Court will not apply the *Flury* factors to this case, but will generally follow the standard and requirements under Florida law.

■■■ Under Florida law, spoliation is defined as the "intentional destruction, mutilation, alteration, or concealment of evidence." *Golden Yachts, Inc. v. Hall*, 920 So.2d 777, 780 (Fla. 4th DCA 2006) (quoting *Black's Law Dictionary* 1437 (8th ed.2004). Spoliation sanctions are imposed in Florida "to assure that the non-spoliator does not bear an unfair burden." *Reed v. Alpha Prof'l Tools*, 975 So.2d 1202, 1204 (Fla. 4th DCA 2008). Another reason for spoliation sanctions is their "deterrent effect on miscreant defendants." *Perez v. La Dove, Inc.*, 964 So.2d 777, 780 (Fla. 3d DCA 2007). The Fourth District Court of

Appeal has articulated the following three threshold questions that a court must answer before imposing spoliation sanctions in Florida: "1) whether the evidence existed at one time, 2) whether the spoliator had a duty to preserve the evidence, and 3) whether the evidence was critical to an opposing party being able to prove its prima facie case or a defense." *Golden Yachts*, 920 So.2d at 781. Unless these questions are answered in the affirmative, spoliation sanctions are not appropriate. *Id.* The first prerequisite of spoliation sanctions, that the evidence once existed, is a question of fact to be established by competent evidence. In this case, EME has established through substantial competent evidence, including expert testimony, that various HCC documents and files existed at one time but were either erased or destroyed through HCC's actions.

The second prerequisite to spoliation sanctions is that there was an underlying duty to preserve evidence. In Florida, "[a] duty to preserve evidence can arise by contact, by statute, or by a properly served discovery request (after a lawsuit has already been filed)." *Royal & Sunalliance v. Lauderdale Marine Center*, 877 So.2d 843, 845 (4th DCA 2004). The majority of Florida courts have held that there is no common law duty to preserve evidence *before* litigation has commenced. *Id.*(holding that "we find Royal's argument that there was a common law duty to preserve the evidence in anticipation of litigation to be without merit"); *Gayer*, 970 So.2d at 426 (holding that "[b]ecause a duty to preserve evidence does not exist at common law, the duty must originate either in a contract, a statute, or a discovery request"); *but see Penn. Lumberman's Mutual Ins. Co. v. Fla. Power & Light Co.*, 724 So.2d 629, 630 (Fla. 3d DCA 1999) (neither rejecting nor accepting the argument that there might be "some type of common law duty to preserve [evidence]

after being notified of possible legal action"); *Golden Yachts*, 920 So.2d at 781 (holding that although no adverse presumption could lie where a spoliator was not duty-bound to preserve evidence, that nevertheless "an adverse inference may arise in any situation where potentially self-damaging evidence is in the possession of a party and that party either loses or destroys the evidence" (citation omitted)). The duty to preserve evidence has been established by statute in Florida in certain limited circumstances. *See. e.g., Gayer*, 970 So.2d at 426 (holding that a duty to preserve evidence is part of the duty to cooperate found in the Florida Workers' Compensation Act, *see* Fla. Stat. 440.39(7)).

■ It is not contested that the actions of HCC that led to the destruction of various arguably relevant documents took place prior to EME's filing of the present lawsuit. EME has not argued that such a duty to preserve evidence arose under a Florida statute or by the filing of a discovery request. Instead, EME has argued that the duty to preserve evidence arose when HCC had notice of impending litigation. EME cites various federal cases for the proposition that a duty to preserve evidence arises either "when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to *future* litigation." *Zubulake v. UBS Warburg, LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) (emphasis added). None of the cases cited by the Plaintiff are cases under Florida law within the Eleventh Circuit.[8] As noted above, the Eleventh Circuit has

held that a determination of whether to impose spoliation sanctions must be "informed by" state law. *Flury*, 427 F.3d at 944. In light of this directive, this Court cannot justify imposing sanctions for actions taken at a time when the parties were under no duty to preserve evidence under Florida law. *See Royal & Sunalliance*, 877 So.2d at 845.

■ However, there is some support in Florida for the imposition of an adverse inference where critical evidence was destroyed intentionally, pre-litigation, even where no duty to preserve existed. In *Martino*, the Florida Supreme Court divided spoliation remedies into lighter and stronger categories. The court indicated that where evidence is "*intentionally* lost, misplaced, or destroyed" the appropriate sanctions would be found in Florida Rule of Civil Procedure 1.380(b)(2) and include applying an adverse jury inference; whereas, where "the loss of the evidence was determined to be *negligent* the ... rebuttable presumption of negligence for the underlying tort" applies. *Martino*, 908 So.2d at 346 (emphasis in original); *see also Fini v. Glascoe*, 936 So.2d 52, 55 (Fla. 4th DCA 2006).

In *Golden Yachts*, the Fourth District Court of Appeal, noting this language in *Martino*, opined that the lighter sanction of an adverse inference might also be imposed by a court where there was no duty to preserve evidence if the pre-litigation spoliation was intentional. 920 So.2d at 781. The adverse inference imposed would be that the destroyed evidence, if reviewed, would support the non-spoliating

---

8. In an unreported decision in a case arising under Georgia law. the Eleventh Circuit recently stated that spoliation includes "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or *reasonably foreseeable* litigation." *Graff v. Baja Marine Corp.*, 310 Fed.Appx. 298, 301 (11th Cir.2009)

(unpublished decision) (emphasis added). However, unlike in Florida, under Georgia law, spoliation includes the destruction of evidence "that is necessary to pending *or contemplated litigation.*" *Silman v. Assoc. Bellemeade*, 294 Ga.App. 764, 669 S.E.2d 663, 666 (2008) (emphasis added).

party's claim. *See id.* Although the discussion in *Golden Yachts* is found in dicta and is arguably not in line with *Martino* and other Florida precedent, it nevertheless suggests that at least one Florida court might impose the lighter sanction of an adverse inference, where critical evidence is destroyed intentionally prior to litigation, even absent a duty to preserve.

Additionally, the imposition of an adverse inference where conduct is intentional is similar to the federal standard in this circuit, which allows for imposing an adverse inference upon a finding of bad faith. As stated by the Eleventh Circuit, "an adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith." *Bashir v. Amtrak,* 119 F.3d 929, 931 (11th Cir.1997). An adverse inference is not appropriate unless the circumstances "indicate bad faith," e.g., tampering with the evidence. *Id.*

The third prerequisite for spoliation sanctions, or for any adverse inference based on spoliation, is establishing that the destroyed evidence was critical for proving a prima facie case or a defense. If spoliation sanctions are imposed "to assure that the non-spoliator does not bear an unfair burden," then there is no reason to apply sanctions where no harm comes from the spoliation. *Reed,* 975 So.2d at 1204; *see also Fleury v. Biomet, Inc.,* 865 So.2d 537, 540 (Fla. 2d DCA 2003) (holding that where the spoliation was inadvertent and resulted in no prejudice, there was no basis for sanctions); *Rosario v. Miami–Dade County,* 490 F.Supp.2d 1213, 1226 (S.D.Fla.2007); *Public Health Trust of Dade County v. Valcin,* 507 So.2d 596, 599 (Fla.1987) (holding that a rebuttable presumption should not be imposed unless the absence of the spoliated evidence "hinders [the plaintiff's] ability to establish a prima facie case"). Even if, under *Golden Yachts,* this Court were to impose an ad-

verse inference, it would be necessary to show that the evidence destroyed was crucial to establishing EME's claims. EME produced substantial evidence in this case to establish its claims for breach of contract. Unlike in the products liability context, where many of these spoliation claims arise, there is no piece of material evidence that was destroyed that was necessary for establishing EME's claim for breach of contract. While the disposed documents may have further undermined HCC's defenses or supported EME's claims, none of the destroyed documents were truly critical to EME's case. Accordingly, under Florida law, it is clear that even though the Court finds that HCC intentionally destroyed relevant documents at a time when litigation was foreseeable, it is not appropriate to either award spoliation sanctions or to impose an adverse inference.

Finally, in its post-trial pleadings, HCC has argued that EME should be sanctioned for spoliating evidence. This professed counterclaim was not raised in the pleadings and there is not sufficient evidence in the record to support it. Accordingly, the Court will not impose spoliation sanctions against EME.

### III. Breach of Contract

 The parties agree that, pursuant to its terms, Florida law governs the interpretation and construction of the Trade Contract. (J. Ex. 239, Trade Contract Agreement, § 34.1.) To establish a breach of contract under Florida law, the plaintiff must prove: "(1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach." *Vega v. T–Mobile USA, Inc.,* 564 F.3d 1256, 1272 (11th Cir.2009) (citing *Friedman v. N.Y. Life Ins. Co.,* 985 So.2d 56, 58 (Fla. 4th DCA 2008)). The plaintiff's burden in a breach of contract action

under Florida law is to prove these three elements by a preponderance of the evidence. *Action Nissan, Inc. v. Hyundai Motor Am.*, 617 F.Supp.2d 1177, 1195 (M.D.Fla.2008).

As has been long established in Florida, "What will constitute a breach of contract is a matter of law to be determined by the court. Whether or not that has occurred which would constitute a breach of contract is a matter of fact to be determined by a jury." *Id.* (quoting *Winter Garden Citrus Growers' Ass'n v. Willits*, 113 Fla. 131, 151 So. 509, 511 (1934). To constitute a material breach, "a party's nonperformance must go to the essence of the contract." *Covelli Family, L.P. v. ABG5, LLC*, 977 So.2d 749, 752 (Fla. 4th DCA 2008). Additionally, in order to maintain a cause of action for breach of contract in Florida, the plaintiff "must also prove performance of its obligations under the contract or a legal excuse for its nonperformance." *Bookworld Trade, Inc. v. Daughters of St. Paul, Inc.*, 532 F.Supp.2d 1350, 1357 (M.D.Fla.2007) (quoting *Rollins, Inc. v. Butland*, 951 So.2d 860, 876 (Fla. 2d DCA 2006). Accordingly, the Court will address the three elements of a breach of contract in turn: whether HCC owed a duty to EME to schedule and coordinate the work on the Project, whether a breach of that duty occurred, and whether EME incurred damages as a result of the breach.

### A. Relevant Material Terms of the Trade Contract

EME's claim for breach of contract is based on HCC's breach of its obligation under the Trade Contract to schedule and coordinate the work on the Project. HCC has argued that it was not obligated under the Trade Contract, or any other contract attachments binding on the parties, to schedule or coordinate the work on the Project. The Court rejects this argument. As described in this section, various relevant provisions in the Trade Contract and additional binding contract documents create the duty for HCC to coordinate and schedule the work of EME on the Project. Moreover, as HCC's role was to be the construction manager for the Project, HCC's responsibility for scheduling and coordinating the work on the Project was an essential part of this agreement between it and EME, a trade contractor.

The Trade Contract between EME and HCC is a 43–page document, which specifically incorporates by-reference several attachments, and additionally references a list of "Contract Documents," which "supplement and complement" the Trade Contract. (J. Ex. 239, Trade Contract Agreement, § 2.2.) The most important document attached to the Trade Contract is the "General Conditions." The General Conditions is included among the Contract Documents, which are intended "to supplement and complement" the Trade Contract, but is also specifically identified in Section 2.1 of the Trade Contract. (J. Ex. 239, Trade Contract Agreement, § 2.1 ("Enumeration of the Contract Documents: The plans, specifications, *general conditions*, special conditions and addenda ...") (emphasis added).) The General Conditions includes a provision stating that the other trade contractors would be bound "under Conditions ... identical or substantially similar to the conditions of this Trade Contract." (J. Ex. 239, General Conditions Art. 7.1.2.)

HCC has argued that the General Conditions cannot create binding obligations because the document was not specifically incorporated into the Trade Contract. However, under Florida law, when an agreement "expressly refers to and sufficiently describes another document," courts are required to interpret

that collateral document as part of the agreement. *OBS Co., Inc. v. Pace Constr. Corp.*, 558 So.2d 404, 406 (Fla. 1990) (citations omitted) (interpreting subcontract between general contractor and subcontractor in light of explicitly included general agreements between general contractor and owner). A document is sufficiently described if it can be reasonably identified. *See Mgmt. Computer Controls, Inc. v. Charles Perry Constr., Inc.*, 743 So.2d 627, 631–32 (Fla. 1st DCA 1999). For a document to be incorporated, "[t]he contract must contain more than a mere reference to the collateral document, but it need not state that it is 'subject to' the provisions of the collateral document to incorporate its terms." *Id.* at 631. A document will be incorporated if there is at least "some expression ... of an intention to be bound by the collateral document...." *Kantner v. Boutin,* 624 So.2d 779, 781 (Fla. 4th DCA 1993) (per curiam). However, there is no "magic 'subject to' language" that determines whether an agreement has incorporated a document. *Quix Snaxx, Inc. v. Sorensen,* 710 So.2d 152, 154 (Fla. 3d DCA 1998).

Construction agreements in particular tend to incorporate many documents, specifying such matters as the details of the project and the relationship and expectations of the parties. *See* Philip L. Bruner & Patrick J. O'Connor, Jr., 1 *Bruner & O'Connor on Construction Law* § 3:31 (2004) (describing a phenomenon known as the "specifications tree").

The General Conditions are specifically identified in the Trade Contract as part of the "Contract Documents." (J. Ex. 239, Trade Contract Agreement, § 2.1.) Although the list of Contract Documents (found in Attachment III) is 96 pages long, only the following are specifically identified in the Trade Contract: "[t]he plans, specifications, general conditions, special conditions and addenda prepared by the Owner and/or Designer for the Project and the general contract between the Owner and HCC." (*Id.*) Section 2.2 of the Trade Contract, which establishes a standard for interpreting these Contract Documents, reads as follows:

> This Trade Contract and the Contract Documents are intended to supplement and complement each other and shall, where possible, be so interpreted. However, if any provision of this Trade Contract irreconcilably conflicts with a provision of the Contract Documents, the provision granting greater rights and remedies to HCC, or imposing the greater duty, standard, responsibility or obligation on the Trade Contractor, as solely determined by HCC, shall govern.

(*Id.* at § 2.2.) This provision, while not specifically incorporating the Contract Documents or General Conditions, evidences the intent of the parties to make the Contract Documents a binding part of their agreement. It is clearly contemplated that provisions in the Contract Documents would impose binding duties on EME. Additionally, the General Conditions, which are specifically identified in Section 2.1, like the Project plans and specifications, provide the necessary blueprint for the completion of the work on the Project. Therefore, the Court concludes that the General Conditions are part of the contract between EME and HCC and create binding rights and obligations on the parties.

Article 2.1 of the General Conditions describes the "Information and Services Required of [HCC]." (J. Ex. 239, General Conditions, at Art. 2.1.) First, HCC must "provide full information regarding its requirements for the Work." (*Id.* at Art. 2.1.1.) HCC must further provide staff for the "coordination and direction" of EME's work and to "establish procedures for coordination among the Owner, Architect,

Trade Contractor, other Trade Contractors and the Construction Manager with respect to all aspects of the Project." (*Id.* at Art. 2.1.3.) Article 2.1.5 of the General Conditions requires that "[i]nformation and services under the Construction Manager's control shall be furnished with reasonable promptness to avoid delay in orderly progress of the Work." (*Id.* at Art. 2.1.5.) Article 5.1.1 clearly states that HCC is responsible for coordinating the work of trade contractors, as follows:

> **Coordination of Trade Contractors—** The Construction Manager will provide for coordination of the activities of other Trade Contractors and of the Owner's own forces with the Work of the Trade Contractor, who shall cooperate with them.

(*Id.* at Art. 5.1.1.) Similarly, Article 5.1.2 provides the following:

> **Coordination with Project Construction Schedule—**The Construction Manager will schedule and coordinate the activities of the Trade Contractor in accordance with the latest Project Construction Schedule.

(*Id.* at Art. 5.1.2.) Likewise, Article 4.10.13 of the General Conditions provides that "[t]he overall sequence of construction will be outlined by the Construction Manager on the Project Construction Schedule and adjusted by subsequent schedule updates as necessary to achieve the overall Project Completion Date." (*Id.* at Art. 4.10.13.)

HCC's obligation to coordinate and schedule the work of the trade contractors, along with the asserted uniformity of the General Conditions applicable to all trade contractors, indicates that HCC intended to bind all trade contractors to the same system of scheduling and coordination. Indeed, without such a system in place, it would be impossible for HCC to provide EME and the other trade contractors with the scheduling information, direction, and coordination necessary to enable them to work in an efficient and coordinated manner. Also, without such supervision and coordination, various provisions in the Trade Contract would be rendered unachievable, unfeasible, and meaningless. For example, Sections 9.3 and 9.4 of the Trade Contract require EME to "participate and cooperate in the development of HCC's project schedule" and to "continuously monitor HCC's Project Schedule so as to be fully familiar with the timing, phasing and sequence of operations of its Work and of other work on the Project. . . ." (J. Ex. 239, Trade Contract Agreement, §§ 9.3–9.4.) The term "Project Schedule" in Section 9.3 refers to the overall project schedule in its various iterations. (Trial Tr. 4229:6–4230:1.) If HCC had no obligation to coordinate and schedule the Project, then EME's obligation to "participate and cooperate" with HCC's scheduling efforts would be meaningless.

Likewise, Clause A.5.1 of Attachment II of the Trade Contract also required EME to develop its own construction schedule in coordination with HCC's Project schedule. The parties were "to mutually agree to a schedule that will allow for the efficient completion of Trade Contractor's Work, as well as coordination with the overall project schedule." (J. Ex. 239, Attach. II cl. A.5.1.) Under Article 4.10.8 of the General Conditions, EME was to furnish to HCC short-term interval schedules covering eight week periods, "two week history and six week future." (J. Ex. 239, General Conditions Art. 4.10.8.)

HCC's position at trial was that although HCC may have owed a duty to Orange County to coordinate the work of the trade contractors, it owed no such duty to EME or to any specific trade contractor and thus cannot be responsible for failing to do so. In responses to discovery, HCC did not even concede that it was required

to be reasonable in coordinating the trade contractors. Specifically, in response to a request for admission, HCC denied that it had an obligation not to "unreasonably hinder, obstruct or interfere with EME's performance under the Trade Contract." (Pl.'s Ex. 402, Admission No. 1.) In other words, HCC's position at trial was that it had the right to do as it saw fit, without any limitations and with no repercussions.[9] As discussed above, this position is inconsistent with explicit contractual provisions of the Trade Contract that required HCC to schedule and coordinate the work of EME on the Project. Based on the clear provisions of the Trade Contract and General Conditions, the Court concludes that HCC was obligated to schedule and coordinate the work on the Project. That duty included a duty to create and maintain an overall project schedule that would enable all trade contractors, including EME, to plan and coordinate their own work on the Project.

### B. Breach and Damages

■ As described above, in extensive findings of facts, EME has established by a preponderance of the evidence that HCC materially breached the Trade Contract with EME. HCC failed to coordinate and schedule the work on the Project and failed to maintain an overall project schedule upon which EME and other trade contractors could rely in coordinating their own work on the Project. HCC was directly responsible for the inefficient mess that occurred on the Project as trade contractors stumbled over each other trying to each accomplish their responsibilities under their contracts with HCC. The failure to maintain the overall project sched-

ule or otherwise coordinate the work on the Project left the trade contractors in an impossible situation, without adequate guidance to direct and lead the 2,500 workers employed daily on the Project. That EME sustained damages is absolutely clear. The conditions under which it was forced to fulfill its obligations under the Trade Contract were such that it is entirely clear and was foreseeable that damages would occur. Therefore, EME has made its case against HCC for breach of contract—there is a valid contract, HCC materially breached that contract, and the breach resulted in damages to EME.

### IV. HCC's Defenses

As set forth above, the Court has concluded that the evidence at trial supports EME's claim that HCC breached its contractual obligation to schedule and coordinate the work on the Project. In this section, the Court will address the other defenses that HCC has raised, either in response to EME's breach of contract claim or as affirmative defenses, not otherwise dealt with above. First, HCC argues that under Section 9.4 of the Trade Contract, it was permitted to take any action it wished to modify the project schedule, shielding it from any liability for EME's claims. Second, HCC argues that EME failed to comply with the provisions of the Trade Contract governing the submission of claims and therefore should be barred from any recovery in this proceeding. Third, HCC argues that various provisions in the Trade Contract limit or excuse HCC's liability. Finally, HCC argues that it cannot be held liable to EME for additional damages pursuant to EME's settle-

---

9. The testimony of HCC's representatives at trial clearly does not demonstrate unequivocal support of HCC's hardline position. The testimony indicates that some members of the HCC team believed that HCC was required to be reasonable in its actions and that the over-

all failure to coordinate the trade contractors would be justifiable cause for a trade contractor claim against HCC. (See Trial Tr. 6844:3–13 (Testimony of Mike Sincavage): Trial Tr. 4235:5–7 (Testimony of Pete Milner) discussed in section I.B. above.)

ment agreement with Orange County. The Court will address each of HCC's arguments in turn.

### A. The Right to Modify the Project Schedule under the Trade Contract

 HCC has argued that under Section 9.4 of the Trade Contract it had "the right ... to modify the Project Schedule," essentially at whim. (J. Ex. 239, Trade Contract Agreement, § 9.4.) HCC argues that Section 9.4 relieves it of all liability in this case because it was within its rights to make the changes it did to the project schedule. Section 9.4 reads in full as follows:

> Priority of Work: HCC shall have the right at any and all times to modify the Project Schedule, to suspend delay, or accelerate, in whole or in part, the commencement or execution of Trade Contractor's Work or any portion thereof or to vary the sequence thereof, to *reasonably* decide the time, order and priority of the various portions of Trade Contractor's Work, and all other matters relating to the Project. As the Project Progresses, HCC also shall have the right to modify the time, order and priority of the various portions of Trade Contractor's Work, and all other matters relating to the scheduling and coordination of Trade Contractor's Work, *in order to respond to job conditions* and/or *achieve timely completion* of the entire Project. Trade Contractor shall not be entitled to any additional compensation for decisions or changes made by HCC pursuant to this Section 9.4 except as provided in Section 9.7.

(*Id.* at § 9.4 (emphasis added).) HCC's Section 9.4 argument fails for several reasons. First, even if HCC had acted within its rights under Section 9.4, that would not relieve HCC of liability, but merely limit its liability by the terms of Section 9.7. The question of whether EME was required to follow the various claims provi-

sions in the Trade Contract, and if so, whether they substantially complied with those provisions, are discussed below. Second, both under Florida law and under the specific language of Section 9.4, HCC had an obligation to act "reasonably" and not hinder or obstruct EME's performance in making its modifications to the project schedule, which it failed to do. Finally, this argument fails as a matter of fact because HCC did not simply modify the overall project schedule, but completely abandoned it and failed to provide *any* overall project schedule to EME and the other trade contractors that could be used to schedule the work on the Project, and these actions are not protected by the language of Section 9.4.

#### 1. HCC Was Required to Act Reasonably in Any Modification of the Project Schedule

 The express terms of Second 9.4 include the limitation that HCC may only "*reasonably* decide the time, order and priority of [EME]'s work, and all other matters relating to the scheduling and coordination of [EME]'s Work with other work on the Project." (J. Ex. 239, Trade Contract Agreement, § 9.4 (emphasis added).) Additionally, under Florida law every contract carries with it implied covenants, including an implied covenant of good faith and fair dealing. Where a contract's terms "afford a party substantial discretion to promote that party's self-interest, the duty to act in good faith nevertheless limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party." *Cox v. CSX Intermodal, Inc.*, 732 So.2d 1092, 1097–98 (Fla. 1st DCA 1999). The implied covenant cannot vary the express terms of a contract, *id.* at 1098, and must be applied to a specific contractual duty or obligation, *Meruelo v. Mark Andrew of the Palm Beaches, Ltd.*, 12 So.3d

247 (Fla. 4th DCA 2009). Florida courts also have noted that "contract provisions aimed at relieving a party from the consequences of his own fault are not viewed with favor...." *Triple R Paving, Inc. v. Broward County*, 774 So.2d 50, 56 (Fla. 4th DCA 2001) (striking a no-damages-for-delay clause in light of bad faith).

 Florida law also recognizes, in the construction context, "an implied obligation not to hinder or obstruct performance [and] an implied obligation not to knowingly delay unreasonably the performance of duties under the contract...." *Ajax Paving Indus., Inc. v. Charlotte County*, 752 So.2d 143, 144–145 (Fla. 2d DCA 2000); *see also United States ex rel. R.W. Vaught Co. v. F.D. Rich Co., Inc.*, 439 F.2d 895, 900 (8th Cir.1971); *Triple R*, 774 So.2d at 54–55 (noting that no damage for delay clauses are vitiated by delays resulting from the other party's fraud, concealment, or active interference with performance under the contract). While there is a paucity of cases on this topic in Florida, other states have refined the application of the implied obligation not to hinder or obstruct performance. Under Illinois common law principles, "[t]he right to direct the general progress of the work implies an obligation on the part of the contractee to keep the work in such a state of forwardness as to enable the contractor to perform within the required time, and responsibility for delay rests solely with the contractee." *Amp–Rite Elec. Co., Inc. v. Wheaton Sanitary Dist.*, 220 Ill.App.3d 130, 162 Ill. Dec. 659, 580 N.E.2d 622, 637 (1991). Likewise, under Arkansas law, directing a contractor to proceed in accordance with a schedule known to be unworkable constitutes active interference with the contractor's work. *See U.S. Steel Corp. v. Mo. Pac. R.R. Co.*, 668 F.2d 435, 439 (8th Cir. 1982).

HCC has denied that it had any obligation to act reasonably in its scheduling of the work on the Project. (Pl.'s Ex. 402, Admission No. 1.) However, it is the Court's conclusion that pursuant to the language of Section 9.4 and the implied covenants under Florida law, HCC was obligated to exercise its discretion in scheduling the Project reasonably and in good faith, and not in a way that would hinder or obstruct EME's performance of its work on the Project. The facts clearly demonstrated that HCC's actions were neither reasonable nor in good faith. It is further clear that HCC hindered or obstructed EME's work by its complete failure to coordinate the work on the Project. HCC knew of the problems with the project schedule before it accepted EME's bid for electrical work, but did not apprise EME of the issues. The disorder on the Project affected EME's work almost from the very beginning. Under the Trade Contract and General Conditions, HCC had responsibility for the overall scheduling and coordination of the Project but utterly failed to do so. Whatever discretion HCC had under Section 9.4 was clearly exceeded. Accordingly, the limitations of Section 9.4 cannot shield HCC from liability for its breach of its contractual obligations to schedule and coordinate the work on the Project.

### 2. HCC Did Not Simply Modify, but Abandoned the Project Schedule

It is completely reasonable that a construction manager should have total and complete control over a project schedule, along with the ability to change the schedules of trade contractors so as to effectively manage the project. However, what occurred in this case was not simply a modification of the project schedule. HCC completely failed to schedule and coordinate the Project. Scheduling and coordination devolved into a day-by-day endeav-

or, with instructions being given on the ground as to where the teams could work. Had HCC merely modified the project schedule, then damages would have been limited by Section 9.4. However, HCC did not simply modify the project schedule—HCC abandoned it. Thus, it is this Court's conclusion that HCC did not merely exercise its discretion under the contract, but actually breached its contractual duty to schedule and coordinate the work on the Project, including the work of EME.

### B. The Failure to Follow the Claims Process Required by the Trade Contract

HCC asserts that it is not obligated to pay damages to EME for breach of contract because the Trade Contract disclaims liability by HCC for the damages sought and because EME failed to submit its claims timely and follow the claims procedures established by the Trade Contract. These arguments fail for several reasons. First, the Court finds that to the extent required by the terms of the Trade Contract, EME complied with the claims procedures. Second, the Court finds that HCC actively abandoned the claims procedures in the Trade Contract by instituting the proposed change order procedures, which EME complied with entirely. This proceeding is generally about resolving the dispute over Change Order no. 17, which provided an additional $1.5 million payment to EME for damages due to scheduling and coordination failures, and specifically stated that the final amount due under the change order would be determined at a later date. Finally, to the extent EME was required to follow specific procedures after the date it filed its bankruptcy petition, it is excused from performance by virtue of § 362 of the Bankruptcy Code.

#### 1. EME Substantially Complied with the Trade Contract Claims Procedures

The Trade Contract contains several provisions that address different aspects of the process for asserting and prosecuting claims by EME. To the extent that EME was required to follow these provisions, the evidence shows that EME complied. Each specific set of procedures in the Trade Contract regarding different sorts of claims will be addressed in turn.

##### a. Dispute Resolution under Section 34

▮ The most general of these provisions and the only provision to specifically address claims for breach of contract is Section 34.2 of the Trade Contract entitled "Dispute Resolution," which provides, in relevant part:

> If the Trade Contractor has a dispute with HCC regarding the application or interpretation of any provision of this Trade Contract or the breach thereof, the Trade Contractor shall, in accordance with the requirements of Section 21 hereof, submit its claim, in writing, to HCC attaching all supporting documentation. Should additional documentation or information be requested by HCC, the Trade Contractor shall provide such additional documentation and/or information promptly.

(J. Ex. 239, Trade Contact Agreement, § 34.2.) Once EME has submitted a claim, Section 34.2 imposes the following obligation on HCC: "Within thirty (30) days after receiving the Trade Contractor's written claim and all requested documentation and information, HCC shall respond with its position and proposed resolution of the dispute." (Id.) If EME rejects HCC's proposed resolution, Sections 34.2 and 34.3 allow EME to pursue its claims in a court of law. (Id. at §§ 34.2–34.3)

The requirements for submission of a claim under Section 21, which are to be applied to any claims submitted under Section 34.2, are as follows:

Claim Preparation: With respect to any claim submitted by Trade Contractor under this Section 21, Trade Contractor shall prepare the claim in writing and in a format acceptable to HCC. At a minimum, the claim shall include detailed information concerning the alleged claim-causing event, Trade Contractor's damages which allegedly resulted from the event, how the event allegedly caused such damages, and steps allegedly taken by Trade Contractor to mitigate the extent of its alleged damages. The claim shall separately list each type of damage allegedly incurred (but in no event shall it include damages barred or waived by this Trade Contract) and give the most accurate estimate possible of the amount for each type of alleged damage. Upon request by HCC, Trade Contractor will provide any other information concerning the claim. By submitting a claim, Trade Contractor grants HCC the right to examine or audit all of Trade Contractor's, as well as its sub-subcontractors and suppliers, accounting records, job records, payroll records and other records and documents which may have any bearing on the claim.

(J. Ex. 239, Trade Contract Agreement, § 21.5.) HCC did not specify as to the claim "format acceptable to HCC;" accordingly, EME was only required to comply with the requirements of Section 21 to submit a claim pursuant to Section 34.2. The claim must be in writing, with supporting documentation attached, and provide detailed information regarding 1) the claim-causing event; 2) the resulting damages to EME, including each type of damage incurred and the most accurate estimate possible for each type of damage; 3) how the event caused the damages; and 4) the steps allegedly taken to mitigate damages. Following the submission of a claim under Section 34.2, HCC may request additional documentation or information, which EME is required to provide "promptly." (Id. at § 34.2.) Nowhere is there a specific deadline for filing a claim under Section 34.

HCC has argued that EME did not submit any claim meeting the requirements of Section 21.5 prior to July 16, 2003. EME has argued that all the elements of a claim were met in the letter EME sent to HCC on October 31, 2001. The Court agrees with EME's conclusion that the letter of October 31, 2001, which attached the Chitester Report, including a schedule analysis, sufficiently met the requirements of Section 21.5. (See Pl.'s Ex. 47.) The letter was in writing and attached supporting documentation-the Chitester Report. The report detailed the problems with the overall project schedule and the present and projected damages that would be incurred by EME as a result. The October letter could not have detailed all damages resulting from the event, because it would take two years for those damages to unfold. As the delay-causing "event" was not so much a specific event as an overall failure to coordinate and schedule the Project, damages could not be calculated in final terms until EME's work on the Project was completed.

EME clearly attempted to mitigate damages as the work on the Project continued, and the constant stream of communications regarding EME's delay claim has been well documented. Moreover, Change Order no. 17, prepared by HCC, indicates the parties' agreement that a certain amount of damages had occurred (as evidenced by the initial payment of $1.5 million dollars to EME) but that a final determination of the amount of damages would be put off until a later date. Thus, it

appears that EME complied with the terms of Section 34.2, and as the parties could not reach a mutually agreeable solution, EME then chose to pursue its claims in this Court, as it was clearly entitled to do under Section 34.3.

b. *Trade Contractor Claims Procedures under Section 21*

■ Section 21 of the Trade Contract, entitled "Trade Contractor Claims," divides claims into two categories. The first category consists of so-called "pass-through" claims, which HCC can present as a claim for damages to Orange County. The second category consists of claims that HCC cannot pass on to Orange County. HCC argues that EME failed to follow the procedures required under each provision. The Court will address EME's compliance with the terms of each provision in turn.

Section 21.2 governs the procedures for presenting pass-through claims that HCC may be able to pass on to Orange County and reads as follows:

> If Trade Contractor asserts a claim for damages under circumstances that entitle HCC to make a claim for damages against the Owner under the Contract Documents, Trade Contractor shall file with HCC a written claim that meets the requirements of Section 21.5 and is in the form required by the Contract Documents for claims by HCC against the Owner no later than five (5) days prior to the time when HCC is required to file any such claim with the Owner. If no specific deadline for claims is contained in the Contract Documents, the Trade Contractor shall submit such claim within fourteen (14) days of the commencement of the event allegedly giving rise to the claim.

(J. Ex. 239, Trade Contract Agreement, § 21.2.) The CM Agreement does not establish a specific deadline by which HCC is required to file a claim with the Owner. The CM Agreement required HCC to give notice to the Owner within 10 days of the date HCC "has knowledge or should have knowledge of the event giving rise to such claim." (J. Ex. 239, CM Agreement, Art. 16.4.) HCC must then submit a written claim within 15 days of the notice. (*Id.*) It is not apparent to this Court how these provisions could amount to a "specific deadline." Black's Law Dictionary defines "specific" as follows: "Of, relating to, or designating a particular or defined thing; explicit." *Black's Law Dictionary* 1406 (7th ed.1999). Fifteen days following the date of notice, which must be given within 10 days of receiving actual notice, is not a "specific" deadline. EME has presented no other document purporting to give a specific deadline; accordingly, the deadline under Section 21.2 is 14 days from the date of the event giving rise to the claim. This interpretation also makes logical sense. Suppose a claim-causing event occurs on day one and both HCC and EME learn of its occurrence that day. HCC is required to give notice of the event to Orange County within ten days. EME is required to give a claim to HCC within 14 days. Depending on the date on which HCC submits its notice, HCC has between 15 days and 25 days from the date of the claim-causing event to give Orange County its written claim.

The Court has already held that the letter of October 31, 2001, enclosing the Chitester Report, met the requirements of Section 21.5. The issue is now whether that claim was timely sent to HCC. The Chitester Report is dated October 26, 2001. (Pl.'s Ex. 47.) HCC has argued that as early as August and September 2001, EME purports to have begun to encounter delays, obstructions, and other problems associated with HCC's failure to schedule and coordinate the work of the trade contractors on the Project. Therefore, HCC

argues, even a claim submitted in October 2001 would be untimely. However, in this situation, there is no typical delay-causing event—the cause of the delay was systemic. The cause of EME's damages was HCC's continued failure throughout the course of the Project to schedule and coordinate the work. The evidence indicates that the Project was hopelessly off schedule and uncoordinated *before* EME signed the Trade Contract. HCC cannot credibly argue that EME was required to submit a claim prior to the date it signed the Trade Contract.

Even if EME had been concerned as early as August and September that the overall project schedule would cause substantial damages in the form of increased costs in order to complete the Project, only when the Chitester Report was received did EME have confirmation that the overall project schedule would cause EME to incur damages. EME alerted HCC of the damages it had and would continue to incur by letter, enclosing the report, five days after the date of that report. Accordingly, the Court concludes that EME substantially complied with the procedures for submitting a claim under Section 21.2, whether the deadline is 5 days or 14 days or any other deadline. Thus, to the extent required, EME complied with Section 21.2's requirements for submitting a claim to HCC where HCC may be entitled to pass the claim on to Orange County by transmitting the letter of October 31, 2001, alerting HCC of EME's impact claim based on the failures in Project scheduling and coordination.

Turning to the second claims process, Section 21.3 addresses claims made by EME for which HCC cannot seek recovery from Orange County:

> Claims for Which HCC Cannot Seek Recovery from the Owner: If Trade Contractor asserts a claim for alleged damages which is prohibited by this Trade Contract, or asserts such claim under circumstances that do not entitle HCC to make a claim for such damages against the Owner under the Contract Documents, upon written notice from HCC, Trade Contractor shall withdraw the Claim. If Trade Contractor's claim meets the conditions of Section 10.2, Trade Contractor shall proceed in accordance with the provisions of Section 10.2

(J. Ex. 239, Trade Contract Agreement, § 21.3.) This provision indicates that where EME has no valid claim, it should be withdrawn upon notice of HCC, and where it has a valid claim under Section 10.2, it should proceed under that provision. It does not address what requirements apply to claims that do not fall under Section 10.2 but are nevertheless valid. Logically, those claims would fall under the catchall provision, Section 34, discussed above.

### c. *Trade Contractor Claims Procedures under Section 10*

 Section 10 of the Trade Contract governs claims arising as a result of delays, disruptions, and interference. The limitation of liability provisions in Section 10 will be discussed below. The only procedural requirement for the submission of a claim under Section 10.2, which governs delays caused solely by HCC, is that EME may only receive additional compensation under Section 9.7(a), if "a written claim for delay is submitted to HCC within five (5) calendar days from the time of the commencement of such delay, disruption or interference." (J. Ex. 239, Trade Contract Agreement, § 10.2(b).) As discussed above, EME substantially complied with this requirement when it submitted its letter of October 31, 2001, enclosing the Chitester Report, within 5 days of the receipt of that report.

### 2. HCC Waived Compliance with the Claims Procedures by Instituting the PCO Process

This Project was a massive, multi-year construction project involving thousands of disputes both large and small. The testimony makes clear that many of the individuals working on the Project were frustrated and looking for ways to work together, but were often constrained by the Trade Contract terms. Perhaps HCC Senior Construction Manager Pete Milner phrased it best when he spoke of a "bright line" contract clause, noting that "[i]n practice, we would cross that line." (Trial Tr. 4325:20–4326:4.) Under the Trade Contract, change orders are mentioned in several places as the tool by which Orange County and the Architect may negotiate with trade contractors, through HCC, to perform additional work on the Project. However, during the course of construction, a different type of proposed change order process was established. HCC began to issue proposed change orders to trade contractors to attempt to settle claims and disputes between them and HCC. The Court concludes that by adopting this process as the sole means by which HCC negotiated claims by trade contractors, HCC waived and abandoned the claims procedures described in the Trade Contract.

The Florida Supreme Court has defined "waiver" as "the voluntary and intentional relinquishment of a known right or conduct which implies the voluntary and intentional relinquishment of a known right." *Raymond James Fin. Servs., Inc. v. Saldukas,* 896 So.2d 707, 711 (Fla.2005). The Trade Contract clearly has established various procedures for the assertion of trade contractor claims. HCC waived adherence to these procedures by the trade contractors through its conduct, when it replaced those procedures with the proposed change order process. The Trade Contract contains a requirement that it can only be amended "by a written document signed on behalf of HCC and Trade Contractor by authorized persons designated in Section 27." (J. Ex. 239, Trade Contract Agreement, § 35.5.) However, under Florida law, "[t]he parties to a contract may modify the written agreement by subsequent oral agreement or course of dealing with one another despite the requirement of a writing in order to modify." *Linear Corp. v. Standard Hardware Co.,* 423 So.2d 966, (Fla. 1st DCA 1982). A "subsequent course of dealing between the parties" may establish a waiver of a requirement that modifications must be made in writing. *Doral Country Club, Inc. v. Curcie Bros., Inc.,* 174 So.2d 749, 751 (Fla. 3d DCA 1965). The evidence clearly established that throughout the course of construction, HCC used an informal change order process to address all trade contractor claims on the Project, completely abandoning the contractual claims procedures. As a course of dealing, HCC and EME made and negotiated claims solely through this process, and not through the procedures listed in the Trade Contract. By adopting the proposed change order process as the sole means to resolve disputes, HCC waived and abandoned the claims procedures outlined in the Trade Contract, and claims that EME submitted pursuant to the proposed change order process need not also comply with the procedures outlined in the Trade Contract.

Finally, HCC's issuance of Change Order no. 17 operates as a waiver of any failure to comply with the specific claims requirements in the Trade Contract as regards EME's claims in this proceeding. HCC Senior Construction Manager Pete Milner conceded in testimony that HCC was using Change Order no. 17 as a mechanism to pay EME for delay damages

and excess overtime, which are covered by Section 10.2 of the Trade Contract. (*See* Trial Tr. 4422:3–4423:6.) Sections 10.2(b) and 9.7(a) of the Trade Contract only entitled EME to those payments if EME had submitted a written claim within five calendar days from the time of commencement of the relevant delay, disruption, or interference. Thus, the Court draws the inference either that EME had submitted a timely and proper claim that was approved by HCC, or that HCC waived the claims requirements. This alone establishes that any claim EME was required to submit under Section 10.2 regarding the overall impact claim was timely submitted under the terms of the Contract and applicable law or that the requirements were effectively waived by HCC.

### 3. EME Was Excused from Compliance With Any Procedures Post–Petition

█ The Trade Contract was an executory contract on the date of filing. It is a matter of record that in EME's bankruptcy case no order was ever entered to approve any assumption of the Trade Contract, as required for an effective assumption under the Bankruptcy Code. Because the Trade Contract had not been assumed, the automatic stay under § 362 of the Bankruptcy Code excused EME from any duties it may have had to submit further or additional claims to HCC after the petition date of May 29, 2003. *See Allied Fire & Safety Equip. Co., Inc. v. Dick Enters., Inc.,* 972 F.Supp. 922, 928 (E.D.Pa.1997) (holding that there was no requirement to comply with notice provisions of an unassumed executory contract during the pendency of the bankruptcy). Accordingly, at the end of construction, EME was no longer bound by the claims procedures in the Trade Contract simply by the operation of § 362.

### C. The Exculpatory Clauses in the Trade Contract

Section 10 of the Trade Contract, entitled "Delays and Extensions of Time," includes various provisions that purport to limit the damages EME can recover in the event EME's work is hindered by any "delay, disruption or interference" (often referred to collectively as "delays"). (J. Ex. 239, Trade Contract Agreement, § 10.) Section 10 divides delays into two categories—the first category includes delays caused by Orange County, the Architect, any other cause "beyond HCC's direct control," strikes, riots, and acts of god. The second category includes only delays experienced "solely as a result of acts or omissions of HCC." For several reasons, these provisions cannot defeat or limit EME's breach of contract claim.

### 1. Section 10.1 Cannot Defeat EME's Breach of Contract Claim

█ Section 10.1 of the Trade Contract purports to limit HCC's liability where delays are caused by others outside of HCC's control. This provision purports to excuse HCC from any liability where a delay is caused by Orange County or the Architect; "provided, however" that HCC shall "cooperate" in the passing through of such claims. HCC specifically limits EME's recovery to the amount HCC recovers on EME's behalf. The final sentence specifically states that "[p]ayment by [Orange County] or [the Architect] shall be an express condition precedent to HCC's duty of payment to Trade Contractor." (J. Ex. 239, Trade Contract Agreement, § 10.1.) The provision reads in full as follows:

> **Delays Caused by Others:** HCC shall not be liable to Trade Contractor for any delay, disruption or interference to Trade Contractor's Work *caused by the act, omission, neglect or default of the*

*Owner or the Designer* or their respective contractors, subcontractors, employees, servants, agents or consultants, or by reason of fire or other casualty, or on account of riots or of strikes, or other combined action of the workmen or others, *or on account of any acts of God, or any other cause beyond HCC's direct control; provided, however, HCC will cooperate with Trade Contractor in submitting against the Owner or Designer, any just claim arising therefrom which is permitted by the Contract Documents and applicable law.* Trade Contractor shall reimburse HCC for all reasonable expenses incurred by HCC in submitting any such claims on behalf of Trade Contractor. Trade Contractor shall not claim any time extension, cost reimbursement, compensation or damages for any delay, disruption or interference to the Work except to the extent that HCC is entitled to corresponding time extension, cost reimbursement, compensation or damages from the Owner or Designer under the Contract Documents and applicable law. *Trade Contractor's recovery shall he limited to the amount, if any, which HCC, on behalf of Trade Contractor, actually receives from the Owner or the Designer on account of such claim. Payment by the Owner or Designer shall be by an express condition precedent to HCC's duty of payment to Trade Contractor.*

(*Id.* (emphasis added).) HCC has argued that to the extent EME's claims were caused by Orange County or the Architect, EME may not recover from HCC unless HCC is able to recover from the Architect or Orange County. HCC has also argued that the May 2002 storm was an act of god, and that EME cannot recover damages caused by that storm from HCC. These arguments fail for two reasons. First, as a matter of Florida law, the provision fails to provide HCC limitation from liability. Second, the facts have established that

EME's damages were principally caused by HCC's breach of contract in failing to schedule and coordinate the work on the Project, not by the actions of the Architect or Orange County, nor by the May 2002 storm.

Generally, Florida courts disfavor clauses that shift the risk of the owner's failure to pay from the general contractor to the subcontractor. *See, e.g., Peacock Constr. Co. v. Modern Air Conditioning, Inc.,* 353 So.2d 840, 842–43 (Fla.1977). Clauses that purport to shift the risk of non-payment to a subcontractor can generally be interpreted either as "setting a condition precedent" to the general contractor's duty to pay the subcontractor "or as fixing a reasonable time for payment." *Id.* at 842. The Florida Supreme Court has held that "in order to make such a shift, the contract must unambiguously express that intention. And the burden of clear expression is on the general contractor." *Id.* at 842–43; *see also G.E.L Recycling, Inc. v. Atlantic Envtl., Inc.,* 821 So.2d 431, 433 (Fla. 5th DCA 2002); *Bentley Constr. Dev. & Eng'g, Inc. v. All Phase Elec. & Maint., Inc.,* 562 So.2d 800, 802 (Fla. 2d DCA 1990); *Snead Constr. Corp. v. Langerman,* 369 So.2d 591, 593 (Fla. 1st DCA 1978). In Florida, the interpretation of such contract provisions is a question of law and not of fact. *DEC Elec, Inc. v. Raphael Constr. Corp.,* 558 So.2d 427, 428–29 (Fla. 1990). The Florida Supreme Court has made clear that when the risk-shifting provision "is ambiguous, it is interpreted as fixing a reasonable time for the general contractor to pay." *Id.* at 429.

In this case, the limitation of liability is made conditional on HCC's agreement that it "will cooperate with Trade Contractor in submitting against the Owner or Architect any just claim." (J. Ex. 239, Trade Contract Agreement, § 10.1.) The record clearly indicates that HCC did not

cooperate with EME in submitting its claims relating to scheduling and coordination to the Owner or Architect. Accordingly, HCC may not benefit from the limitation of liability provisions, either as a matter of law or because HCC failed to meet a necessary condition. Reading the provisions of Section 10.1 together, they do not unambiguously express the intention to shift the burden of non-payment to EME where HCC fails to cooperate in the submission of a claim to either Orange County or the Architect. As such, the provision must, as a matter of law, be interpreted as "fixing a reasonable time for the general contractor to pay." *DEC Elec., Inc.*, 558 So.2d at 429. Even if this were not the case, HCC, by failing to cooperate with EME, cannot, under the terms of Section 10.1 and as a matter of Florida law, benefit from its provisions regarding the limitation of liability. *See Cohen v. Mohawk, Inc.*, 137 So.2d 222, 224 (Fla.1962); *Clement v. Pensacola Builders Supply Co.*, 138 Fla. 629, 189 So. 852, 853 (1939); *Ballas v. Lake Weir Light & Water Co.*, 100 Fla. 913, 130 So. 421, 427 (1930); *Campbell v. Pace*, 369 So.2d 413, 414 (Fla. 3d DCA 1979).

 In this proceeding, the Court has found that HCC breached its duties of scheduling and coordination of the Project, causing damages to EME. While a small portion of EME's damages may also be attributed in part to the actions of Orange County or the Architect, this does not relieve HCC of liability for the damages that flow from its own breach of the Trade Contract. Further, to the extent any damages may be attributed to Orange County or to the Architect, because HCC breached its contractual obligation to present EME's claims to Orange County or the Architect, HCC must also be held liable for any damages that EME would otherwise have been able to recover. *Atlantic States Construction, Inc. v. Hand, Arendall, Bedsole, Greaves and Johnston,* 892

F.2d 1530, 1537–39 (11th Cir.1990). The Court has already found that to the extent any of EME's damages were caused by the May 2002 storm, HCC must still be liable for those damages. Finally, to the extent EME's damages were caused by other trade contractors, those are damages for which HCC should be directly and solely liable, because they are the direct result of HCC's failure to schedule and coordinate the work of the trade contractors in breach of its contractual obligations. Accordingly, and for these reasons, Section 10.1 does not bar EME's breach of contract claim.

2. Sections 10.2 and 9.7 Cannot Defeat EME's Breach of Contract Claim

 Contract terms that limit a subcontractor's remedies in the event its performance is delayed are commonly referred to as "no damage for delay" clauses, which, under Florida law, are not enforceable under certain circumstances. Section 10.2 provides that if EME's work is delayed, disrupted or interfered with by HCC, then EME's remedies will be limited to either a time extension or compensation under Section 9.7(a). However, even if this Court were to interpret Section 10.2 as an exculpatory clause, as HCC argues it should be, it would be unenforceable under Florida law.

Section 10.2 of the Trade Contract relates only to delays, disruptions, or interference with a trade contractor's work caused "solely as a result of acts or omissions of HCC." (J. Ex. 239, Trade Contract Agreement, § 10.2.) Under this provision, where such a delay occurs,

[A]t HCC's sole discretion, HCC shall provide Trade Contractor either:

(a) an extension of time for completion of the Work equal to the actual impact of the delay, disruption or interference

on the critical path of Trade Contractor's Work, or

(b) additional compensation as provided in Section 9.7(a), but only if a written claim for delay is submitted to HCC within five (5) calendar days from the time of the commencement of such delay, disruption or interference.

(*Id.*) Section 10.2 further states that failing to submit a written claim within 5 days results in "an irrevocable waiver" of the claim, and that the extension or compensation "shall be the sole and exclusive remedy ... against HCC." (*Id.*) Section 10.2 concludes as follows:

Trade Contractor *expressly waives* the right to bring against HCC any claim for damage for delay, acceleration, interference, extra work resulting from such delay, extended overhead, wage escalation, overtime wage provisions, lost opportunity, or lost profit or financial impact on Trade Contractor's other projects. *HCC's exercise of its rights pursuant to Section 9.4 shall not constitute a delay, disruption or interference with Trade Contractor's Work* under this Section 10.2.

(*Id.*) As discussed above, HCC's actions in this case were not within the parameters of Section 9.4. The express waiver and limitation of damages to one of two alternatives to be determined at HCC's sole discretion amount to either a no damage for delay provision or a defined damage for delay provision. However, the same exceptions from enforcement apply to both types of provisions under Florida law and apply in this case.

 Although a " 'no damages' clause is *not* void as against public policy," under Florida law there are several situations in which it cannot be enforced. *Southern Gulf Utils., Inc. v. Boca Ciega Sanitary Distr.*, 238 So.2d 458, 459 (Fla. 2d DCA 1970) (emphasis added); *see also Triple R Paving, Inc. v. Broward County*,

774 So.2d 50, 54 (Fla. 4th DCA 2000). A no damage for delay clause is not enforceable where the damages result from "fraud, concealment, or active interference with performance under a contract." *Newberry Square Dev. Corp. v. S. Landmark, Inc.*, 578 So.2d 750, 752 (Fla. 1st DCA 1991). Moreover, such a clause will not be enforced in the face of "a 'knowing delay' which is sufficiently egregious" or the "willful concealment of foreseeable circumstances which impact timely performance." *Id.; see also Triple R*, 774 So.2d at 54–56; *Southern Gulf*, 238 So.2d at 459. These exceptions arise out of the "implied promise and obligation not to hinder or impede performance." *Newberry Square*, 578 So.2d at 752; *see also Seminole Sheet Metal Co. v. SCI, Inc.*, 828 F.2d 671, 675 (11th Cir.1987); *Triple R*, 774 So.2d at 56 (citing the " 'universally accepted proposition that contract provisions aimed at relieving a party from the consequences of his own fault are not viewed with favor by the courts' "). As stated by the Second District,

Neither party can rely unreasonably on the no-damages clause. The contractor cannot sit idly, comforted by the thought that he will either get his rights-of-way on time and earn a profit on the contract or, if delayed, obtain damages merely on account of the delay. On the other hand, the public authority cannot allow its employees to remain idle on the comfortable assumption that the no-damages clause is to be taken literally.

*Southern Gulf*, 238 So.2d at 459.

 Where there is "a 'knowing delay' which is sufficiently egregious," a no damage clause may be defeated. *Newberry Square*, 578 So.2d at 752. While a knowing delay "can result from either a knowing or an ignorant failure," to recover in the face of negligence, the actions must "transcend[ ] mere lethargy or bureaucrat-

ic bungling." *Southern Gulf* 238 So.2d at 459. Where the party "does not willfully or knowingly delay job progress, it is protected by a 'no damage for delay clause.'" *Triple R,* 774 So.2d at 55. Likewise, bad faith sufficient to invalidate a no damages clause exists where there is "interference with or failure to cooperate in the other party's performance." *Id.* There need not be actual malice to establish "bad faith." *Id.* It is sufficient to show that the breaching party failed to cooperate despite a duty to do so. *Id.*

HCC has argued that the law applying to no damage for delay clauses does not apply here because the provision in question is a "defined" damage for delay clause. This argument fails. The exceptions to enforcing a no damage for delay clause arise out of the common law duty to not interfere with another party's performance of its contract, and accordingly, these principles would apply equally to a defined damage for delay clause. Florida courts have implied that the same exceptions to enforcement might apply. *See Metropolitan Dade County v. Frank J. Rooney, Inc.,* 627 So.2d 1248, 1252–53 (Fla. 3d DCA 1993). Courts outside of Florida have likewise held a defined damage for delay provision to the same standard of enforceability as a no damage for delay provision. *See Grant Constr. Co. v. Burns,* 92 Idaho 408, 443 P.2d 1005, 1011–12 (1968) (holding that if the breach of a contractual duty was a risk that the contractor "did not contractually agree to assume, or which was not within the contemplation of the parties," damages should not be limited to the defined amount).

In this case, EME has established that HCC's actions amounted to more than mere "bureaucratic bungling." HCC failed to adequately schedule and coordinate EME's and all other trade contractors' work on the Project. At the time EME signed the Trade Contract, the over-

all project schedule was already hopelessly marred, yet HCC failed to apprise EME of the problems the Project was facing. Parts of the work EME was contracting to do were not incorporated into the overall project schedule that was issued immediately after EME signed the Trade Contract. To the extent HCC did not know of the problems with the electrical elements of the designs, there is no excuse, because HCC should have known, for it was obligated to complete a thorough pre-construction review. HCC's failure to properly schedule the Project resulted in severe trade stacking and an extremely haphazard work flow. HCC's failure to coordinate inspections on the Project also resulted in inefficiencies. These failures amount to HCC's active interference with EME's performance of its duties under the Trade Contract, or, more precisely, its failure to act where there was a duty to do so. Moreover, if the Court were to interpret Section 10.2 as a defined damage for delay clause, it still could not limit HCC's liability based on the circumstances of this case. By breaching its contractual duty to schedule and coordinate the work on the Project, HCC interfered with EME's performance of its work on the Project. As such, this is not the type of damage for delay that falls within the confines of Section 10.2. Accordingly, the Court concludes that HCC's liability for breach of contract is not limited by Section 10.2 of the Trade Contract.

The Court notes parenthetically that even if HCC were able to limit its damages to those provided under Section 9.7 (which would be the only alternative available as it did not give EME an extension of time sufficient to return EME to the critical path), then EME would likely be able to recover most if not all of the damages it is seeking under its breach of contract claim.

## D. *Equitable Defenses and Waiver*

HCC has raised several additional defenses based on equitable considerations, including waiver. The Court will address these contentions below.

### 1. The Settlement Between EME and Orange County

■ HCC argues that it has been prejudiced by the settlement between EME and Orange County, which HCC contends would preclude it from seeking reimbursement from Orange County for amounts it may have to pay EME. This argument is not supported by any language within the settlement agreement itself, which includes clear language preserving Orange County's separate rights and obligations towards HCC under the CM Agreement. Paragraph 7 reads as follows:

EFFECT OF SETTLEMENT AGREEMENT ON HCC/EME CONTRACT AND ON HCC/COUNTY CONTRACT: The parties acknowledge that nothing in the agreement modifies EME's and HCC's rights, duties, and obligations, one to the other, under the HCC/EME agreement or otherwise. The parties further acknowledge that nothing in this agreement modifies the County's and HCC's rights, duties, or obligations, one to the other, under the County/HCC agreement or otherwise.

(Doc. No. 290, Ex. A, para.7.) Paragraph 9 further states, "nothing in this Agreement shall act as a waiver of any of EME's rights against HCC, or its right to maintain and prosecute its pending action against HCC for damages and for other relief." (*Id.* at para. 9.) Even more specifically, Paragraph 11 states "this Release is limited to a practical resolution between EME and the COUNTY of the litigation and serves no other purposes." (*Id.* at para. 11.) These provisions clearly indicate that the agreement between EME and Orange County does not impact either EME's claims against HCC or HCC's claims or defenses against Orange County. The Court would also point out to HCC that by failing to submit any pass-through claim to Orange County at the time the claim was presented by EME, HCC has orchestrated the situation it now finds itself in.

### 2. Partial Waivers in Pay Applications

■ HCC has argued that EME waived its right to further compensation by signing a partial waiver with each monthly pay application. As part of each pay application, EME submitted a partial waiver (Trial Tr. 1072:14–1073:25), each of which included in substantially similar form, the following language:

*Notwithstanding anything set forth in the Release to the contrary,* the Release only covers work performed by Electric Machinery Enterprises, Inc. ("EME") through the end of the pay application period set forth therein, and the Release expressly excludes and does not release amounts held as retention. The Release also specifically excludes and *does not cover work performed by EME pursuant to change directives for which no written change order has been fully executed and/or for which EME has not been paid. Finally, the Release specifically excludes and does not cover claims previously submitted by EME and which have not been resolved as of the date of the Release.*

(Def.'s Ex. 450 (emphasis added).) It is clear by this provision that the partial pay waivers did not result in EME's waiver of the on-going dispute between the parties that is the subject of this proceeding. Accordingly, this argument is rejected.

The Court parenthetically notes that EME's Complaint includes additional counts for breach of contract in which it also seeks damages under various provisions of the Trade Contract, for both liqui-

dated and unliquidated amounts. While not addressing the specifics of these counts, the Court will merely note that the claims appear to have merit. However, these damages have been subsumed into the Court's ruling on the breach of contract count and the calculation of overall damages. HCC has raised other affirmative defenses that do not relate to the breach of contract claim based on the failure to schedule the Project, but rather relate to these specific categories of subclaims. As damages based on the overall breach of contract claim is sufficient to compensate EME, the Court will not address EME's claims on the other counts of the Complaint nor HCC's defenses to those claims.

## V. Using the Modified Cost Approach for Damages for Breach of Contract

In the Court's Findings of Fact relating to damages, above, the different methodologies analyzed by the parties' experts are discussed. The Court concluded that under the facts of this case, use of the modified total cost approach was appropriate and supported by the evidence. The Court will consider briefly whether using the modified total cost method in this case is a permissible exercise of the Court's discretion in awarding damages under Florida law.

■ Use of either the total cost approach or the modified total cost approach requires establishing several specific elements. *ADF Int'l, Inc. v. Baker Mellon Stuart Constr., Inc.*, No. 98–1310, 2000 WL 34251821, *7 (M.D.Fla. Dec. 28, 2000), *reversed in part, vacated in part and remanded on other grounds*, 31 Fed.Appx. 939 (11th Cir.2002) (unpublished disposition). The total cost approach is appropriate only "when the nature of the excess costs is such that there is no other practicable means of measuring damages, the original bid was realistic, the actual costs

were reasonable, and the plaintiff is not responsible for any of the additional expense." *Dep't of Tranp. v. Hawkins Bridge Co.*, 457 So.2d 525, 528 (Fla. 1st DCA 1984); *see also McDevitt & Street Co. v. Dep't of Gen. Serv.*, 377 So.2d 191, 192 (Fla. 1st DCA 1979).

Application of the modified total cost approach starts with a calculation of the total costs incurred by the contractor to complete its work. However, courts have recognized that simply using the total cost as the method for calculating damages is not appropriate as it "blandly *assumes*— that every penney [sic] of the plaintiff's costs are *prima facie* reasonable, that the bid was accurately and reasonably completed, and that the plaintiff is not responsible for any increases in cost." *Youngdale & Sons Constr. Co. v. United States*, 27 Fed.Cl. 516, 541 (1993) (emphasis in original).

■ Consistent with this approach, the Middle District of Florida has applied the *modified* total cost approach by following the total cost approach and "subtracting those costs that are directly attributable to the contractor's own responsibility and all payments previously made by the owner." *ADF Int'l, Inc.*, 2000 WL 34251821, *6; *see also* 6 *Bruner & O'Connor on Construction Law* § 19:95 (2009) (the *modified* total cost approach entails subtracting from the total cost "any losses incurred on segregated work activities for which the contractor, not the owner, was responsible"). The modified total cost approach is a compromise between the total cost and segregated damages approaches. *See* 6 *Bruner & O'Connor on Construction Law* § 19:95. As with the total cost approach, in order to use the modified total cost approach, the trade contractor must "prove that costs incurred in performing the original work and the extra work had become so co-mingled and 'inextricably in-

tertwined' that use of the segregated damage measure is impracticable." *Id.*

Accordingly, the Court will consider the four prerequisites to applying the modified total cost approach to determine whether its application is appropriate in this proceeding. The four prerequisites are 1) that the nature of the excess costs is such that there is no other practicable means of measuring damages, 2) that the original bid was realistic, 3) that the actual costs were reasonable, and 4) that the plaintiff is not responsible for any of the additional expenses, or has otherwise reasonably accounted for that portion of the total costs for which it is responsible. *See Hawkins Bridge Co.*, 457 So.2d at 528; *ADF Int'l, Inc.*, 2000 WL 34251821, *8.

First, based on careful consideration of the evidence presented and the testimony of the expert witnesses, the Court concluded that in this case, there was no other practicable means on measuring damages. The impacts felt by EME as a result of HCC's breach of contract were so pervasive that it is not possible to unravel them and account for the specific costs associated with each. Accordingly, a total cost approach was the only means possible. Second, based on the testimony of the experts and the fact that EME's bid was in fact lower than HCC's estimation, the Court has also found that the original bid was realistic. Third, based on the testimony of the experts and the Court's review of the evidence, the Court has found that the costs incurred by EME were reasonable. EME's expert witness testified credibly that the costs were reasonable based on his many years of experience in bidding and pricing construction projects. Finally, to the extent EME is responsible for any of the damages it incurred, or to the extent that any cost was not reasonable, the total cost has been appropriately modified, as described in the Findings of Facts. Accordingly, the Court

concludes that, under Florida law, the application of the modified total cost approach is appropriate under the facts of this case.

The Court would note that the calculation of damages is not an exact science. *Specialty Assembling & Packing Co. v. United States*, 174 Ct.Cl. 153, 355 F.2d 554, 572–73 (Cl.Ct.1966). Courts may enter judgment despite an "inability to determine the precise amount of the damages attributable to the [defendant's] breach of contract." *Id.* at 572; *see also Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1302 (Fed.Cir.2002) (noting that "[i]t is well settled that the evidentiary basis for a court's ruling on damages need only be sufficient to enable a court or jury to make a fair and reasonable approximation"). In this case, the evidence presented, including expert testimony, was extensive and permits the Court to make a fair and reasonable approximation of EME's damages flowing from HCC's breach of contract. Accordingly, for these reasons, the Court will award EME the amount of $6,376,000 in damages exclusive of interest and attorneys' fees.

## VI. Set–Off and Motion for Sanctions for Violation of the Automatic Stay

EME filed a Motion for Sanctions for HCC's Willful Violation of the Automatic Stay (Bankr.Doc. No. 337) on January 20, 2004, which was consolidated with this proceeding for purposes of trial. In the Motion for Sanctions, EME argues that HCC's refusal to turn over liquidated amounts remaining due under the Trade Contract amounts to the exercise of control over property of the estate in violation of the automatic stay. EME argues that the back-charges were not valid claims against EME and that even if they were, HCC had no right to set-off or recoupment

that might justify refusing to turn over the liquidated amounts owed. In its response to the motion (Bankr.Doc. No. 362), HCC argues that HCC is not effecting an offset, but rather is entitled to recoupment, and that the pending disputes were such that there were no undisputed monies owed to EME at the time of the demand.

While the Court agrees that the assertion of backcharges was hardly a facially valid claim, as described above in the Court's Findings of Facts, the dispute between these parties as to damages and the amounts owed under the Trade Contract was a significant dispute. HCC's refusal to turn over the funds, given this impending litigation, was reasonable, and the Court will not further consider whether to award sanctions for any violation of the automatic stay that might have occurred.

## VII. Attorneys' Fees and Costs

Pursuant to Section 34.4 of the Trade Contract, the prevailing party is entitled to attorney's fees. The provision reads as follows:

> Should any dispute between HCC and the Trade Contractor proceed to court, that forum shall award to the prevailing party all of its attorney's fees, disbursements or costs as defined in Section 33.6 incurred in connection with the prosecution or defense of the dispute.

(J. Ex. 239, Trade Contract Agreement, § 34.4.) Section 33.6 provides a non-exclusive laundry list of items to be included in any computation of reasonable attorneys' fees, disbursements, or costs. (*Id.* at § 33.6.) Although Section 33.6 only refers to fees incurred by HCC, the language of Section 34.4 indicates that prevailing party fees are to be awarded to the prevailing party, be it HCC or EME. Indeed, even if the benefit were limited to HCC, under Florida law, all contract provisions allowing for an award of attorneys' fees to one party are reciprocal as a matter of law. Fla. Stat. § 57.105(7) (2008).

As EME is the prevailing party on all material issues in this action, it is entitled to an award of attorneys' fees, disbursements, and costs pursuant to Sections 34.4 and 33.6 of the Trade Contract. The amount of attorneys' fees and interest awarded to EME shall be determined in subsequent proceedings, and the Court will reserve jurisdiction to determine the amount of such award and enter judgment.

## CONCLUSION

While HCC may be credited for building the Project well and substantially within the timeframe set out by the County, it did so only at the expense of numerous trade contractors who, because of HCC's enormous management failures in the scheduling and coordination of the Project, had to expend time well beyond what was originally contemplated when they bid on the work. The reasons for these failures appear to result from management problems within the joint venture.

In this regard, if the facts of this case were instead the facts of a business school hypothetical on failed management structures, it might aptly be titled: "Too Many Cooks Spoil the Broth." [10] While both of the primary joint venture partners brought numerous experienced construction managers to the Project, in the final

---

10. Balthazar Gerbier, *A Brief Discourse Concerning the Three Chief Principles of Magnificent Building* 24–25 (Charles Davis, trans. 1662). *available at* http://archiv.ub.uniheidelberg.de/arfdok/volltexte/2008/448/pdf/ Davis_Fontes7.pdf ("It hath been observed among the French [a nation as much addicted to changes as any] that when the charge of an undertaking hath been committed to many, it caused but confusion, and therefore its a saying among them. *Trap de Cuisineirs gattent le pottage,* Too many Cooks spoils the Broth.").

analysis the combined group simply did not perform competently. In fact, as discussed in Section II.D. above, the evidence of these management failures and incompatibility of approaches comes primarily from the testimony of the senior executives of HCC. In this respect, the testimony was explicit in documenting the "inherent difference in management philosophies between Hunt and Clark," that "[e]ach team has a different set of rules," and that " '[t]eam work' is nonexistent...." (Pl.'s Ex. 430; Pl.'s Ex. 123, 4; Pl.'s Ex. 427, 1–2.) These candid assessments comport with the Court's own conclusions concerning the failure of HCC to properly manage the Project.

HCC also does not credibly dispute that EME was damaged as a result of this lack of scheduling and coordination. In fact, it has already paid EME $1.5 million as a partial payment toward the damages caused by these delays. Rather, HCC's primary defenses to liability are various contract clauses, which HCC argues relieve it from any responsibility for damages caused by HCC's breach of the Trade Contract.

In this respect, the facts in this case fit into a pattern whereby a contractor and subcontractor become parties to an onerous one-sided contract. The contractor clearly breaches the contract, but attempts to rely on all of the one-sided provisions excusing its failure to perform. HCC's efforts to do so in this case are unavailing—principally because HCC has failed to prove that these provisions exculpate it from any liability under the terms of the Trade Contract. Moreover, while the Trade Contract gave HCC substantial discretion to promote its own self-interest, HCC's duty to act in good faith nevertheless limited its ability to act capriciously to contravene the reasonable contractual expectations of EME. In such situations, the court must serve as a fair and impartial arbiter of such contracts that were written solely for the benefit of one party.

Accordingly, based on the findings of fact and conclusions of law set forth above, the Court will enter a final judgment against HCC and the joint venture partners, finding them liable to EME, jointly and severally, for damages in the amount of $6,376,000.00, plus, to be determined, attorneys' fees and costs, plus, if warranted, pre-judgment interest. This opinion will be non-final pending calculation of all amounts due and entry of a separate final judgment incorporating these findings and conclusions.

The Court will by separate order schedule a status conference in this matter to consider scheduling of hearings on attorneys' fees and interest before entering a final judgment on these findings of fact and conclusions of law.